**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION**

BIANCA FLETCHER                                                                    PLAINTIFF

VS.
                                  CASE NO. 4:20-CV-521 LPR

NITV FEDERAL SERVICES, LLC;
GENE SHOOK; and JOHN DOES 1-2                                      DEFENDANTS

<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

# EXHIBIT 1

Deposition of Bianca Fletcher with attached exhibits

# In The Matter Of:

*Bianca Fletcher vs.*
*NITV Federal Services, LLC; et al.*

---

*Bianca Fletcher*
*October 13, 2020*

---

*Kelly Hill, CCR*

Original File FLETCHER.txt
Min-U-Script® with Word Index

12

1   A.   ADC.

2   Q.   Is that somewhere near Pine Bluff?

3   A.   Yes.  It's a unit in Pine Bluff.

4   Q.   I've been to a few of them, but not many.

5   And which unit were you in?

6   A.   Tucker Max.

7   Q.   I have been to that one.  Did you ever serve

8   anywhere other than Tucker?

9   A.   No.

10   Q.   How long -- do you and Mr. Pickett reside

11   together?

12   A.   Four years and two months.

13   Q.   Okay.  And the house where you live with Mr.

14   Pickett, do you own it, does he own it, are you

15   renting it?

16   A.   We're buying it.

17   Q.   Together?

18   A.   Yes.

19   Q.   How old are you?

20   A.   29.

21   Q.   What is your date of birth?

22   A.   12/3/90.

23   Q.   And have you ever been involved in any other

24   lawsuits either as a plaintiff or a defendant?

25   A.   No.

70

1    Q.   During the interview you take an exam?   Is

2    this a written exam?

3    A.   No.   It's really not an exam.   It's the major

4    asking you different questions.

5    Q.   Okay.   And the reason why I'm asking, is some

6    of the stuff that we got from the Department of

7    Corrections, we ended up cutting a subpoena for

8    their file materials, and I've given that to your

9    attorney when we got it.   There's a reference to

10   a sergeant exam and Ms. Kelly giving you answers

11   to that exam?

12   A.   Uh-huh.

13   Q.   Did that happen?

14   A.   Yes.

15   Q.   Tell me about that circumstance.

16   A.   Those questions -- those questions go all

17   across ADC.   Those questions, most captains and

18   lieutenants prep their corporals to be the

19   sergeant that they want them to be.   Captain

20   Kelly wanted to help me, so she gave me some of

21   the questions that she felt were necessary to

22   study and for me to get better at.   So, yeah, she

23   gave me those questions, and that was it.

24   Q.   Okay.   So the people like your boss -- was

25   Captain Kelly your boss?

79

1  answers, how did she give you those; was that via

2  text, verbal, written notes; how did she give you

3  those questions?

4  A.  She texted it to me.

5  Q.  Do you still have her number?

6  A.  Yes, I have her number.

7  Q.  Do you know what that number is?

8  A.  I don't know it by heart.

9  Q.  Can you look in your phone and see if you can

10  find it for me?

11  A.  870-830-4738.

12  Q.  Okay.  And is that number still good since

13  the last time you talked to her --

14  A.  Yes.

15  Q.  -- six months ago, or however long it was?

16  A.  Yes.

17  Q.  Thank you.  Cora -- I'm drawing a blank on

18  her last name.

19  A.  Harris.

20  Q.  Harris.  Did she go to any of these outside

21  events?

22  A.  No.  She wasn't on our shift.  They just

23  pulled her in.

24  Q.  So that wasn't --

25  A.  She was on a different shift.  Two shifts are

1   had to take off my bra and show them there was

2   nothing in it, because that's the only thing that

3   was going on.

4   Q.  So it stopped right there?

5   A.  Yeah.  But I took off my top and everything.

6   Q.  Right.  So let's just take it from the top

7   from the day of.  I think it's like April 30,

8   something like that?

9   A.  Yes.  April 30th.

10  Q.  And whatever -- well, maybe that's the right

11  day, may not be the right day.

12  A.  Okay.

13  Q.  What happened?  You're going in?

14  A.  I'm going in, and I get on the scanner, and

15  Corporal Farmer was the officer up there at the

16  moment.  She scanned me through, and she asked me

17  if I would step off and go back through the

18  scanner, I did.  After she did that, she told me

19  to have a seat, and she called one of the

20  captains.  I believe he was -- I think she called

21  my captain, Captain Davis.  He was busy.  Captain

22  Kelly was going -- she was working off, meaning

23  she was getting ready to get off, and I was

24  coming in and her shift was getting off.  She was

25  not busy.  She came since she was still on the

82

1    clock.  She came up to the front.  Ms. Farmer

2    showed her what she saw on the scanner, so

3    Captain Kelly called Warden Culclager.  Culclager

4    asked her to escort me to the conference room.

5    When Captain Kelly came up there she brought

6    Releford with her.

7                    MADAM COURT REPORTER:  I'm sorry?

8                    THE WITNESS:  Jasmine Releford.

9                    MR. ROBERTSON:  R-e-l-e-f-o-r-d.

10   A.  And they both escorted me back into the main

11   building where the conference room is.  And when

12   we got to the door, Captain Kelly told Releford

13   to walk with me in the conference room so I won't

14   be left alone while she used the restroom.

15   Q.  So she goes immediately to the restroom?

16   A.  Uh-huh.

17   Q.  You go into the conference room.  How long

18   was Captain Kelly gone?

19   A.  I do not remember.

20   Q.  Did she come back into the conference room

21   and rejoin you?

22   A.  Yes.

23   Q.  What happened next?

24   A.  Culclager comes in.  Well, I don't -- I don't

25   know if she came in before Culclager or after,

83

1   but Culclager came in and said whatever I had on

2   me to hand it over, and I told her that I didn't

3   have anything on me, that I am willing to have a

4   strip search.  That's when she got Cora Harris

5   and Captain Kelly to administer a strip search.

6   Q.  Where did that take place?

7   A.  That took place in the administration

8   bathroom right across from the conference room.

9   Q.  And how did that happen?  What happens in a

10  strip search?

11  A.  I was told to go in a stall, but I didn't

12  want to go in the stall, because I didn't want

13  anybody to say I threw anything in the toilet.

14  So I did my strip search in the middle of the

15  ladies room.  That's when they -- yeah, they

16  strip searched me and made me squat and cough and

17  all that like an inmate.

18  Q.  So that's something -- have you administered

19  those types of searches before?

20  A.  No.

21  Q.  Have you participated in searches like that

22  before?

23  A.  No.

24  Q.  Did you know how it was going to occur?

25  A.  No.

86

1  A.  Yes.  I buy chicken strips there before I go

2  to work.

3  Q.  There's been some of the documentation from

4  the prison where they've identified the credit

5  card as contraband.

6  A.  Well, yeah, they might consider it as

7  contraband, but as far as getting fired for it or

8  being sent out for a credit card has never been

9  an issue, and Warden Culclager admitted that.

10  Q.  Where did you have the credit card?

11  A.  In my pocket, my back pocket.

12  Q.  Which side?

13  A.  Don't remember.

14  Q.  And obviously you've seen and I've seen, your

15  lawyers have showed to me at least screen caps of

16  the video that shows you and Captain Kelly and

17  Releford walking to the conference room?

18  A.  Yes.

19  Q.  Did you pass her the credit card while you

20  were making that transition?

21  A.  No.

22  Q.  The credit card came out only in the

23  bathroom?

24  A.  Only in the bathroom.

25  Q.  Did you have anything else in your pockets?

1  A.  No.

2  Q.  There's a reference in some of the material

3  from Warden Culclager where she references your

4  pants being unbuttoned, and that you told her a

5  zipper was broke or a button was broke?

6  A.  My zipper was broken.

7  Q.  Your zipper was broke?

8  A.  No, my button was broke, and ADC -- it's our

9  crappy pants that the buttons break very, very

10  easily.

11  Q.  So you did have buttons broken on your pants?

12  A.  Yes, all of my buttons were broken on my

13  pants.

14  Q.  All right.  So what was the scanner showing?

15  A.  It was showing a spot near my private area,

16  my --

17  Q.  You're indicating on your body kind of down

18  toward where the appendix would be?

19  A.  Close to my vagina, that's where the spot

20  showed, or somewhere on my hip or somewhere in

21  that area.

22  Q.  Does it show whether it's on the front or the

23  back?

24  A.  It does -- I don't remember.

25  Q.  Okay.  And is this just like an illuminated

1  spot, a bright spot on the scan?

2  A.  I think it's a dark spot.

3  Q.  Dark spot on the scan.  All right.  And that

4  showed twice?

5  A.  It showed twice when she -- the first time

6  when she took me through it, and it showed it

7  those times, but when I come back it didn't show

8  it.

9  Q.  Okay.  So after the strip search, what

10 happened?

11 A.  After the strip search, I was told to go back

12 out front to get another screening, and nothing

13 showed up.

14 Q.  What happened next?

15 A.  I was told to come back in.

16 Q.  Did anything else happen that day?

17 A.  Yes.

18 Q.  Okay.

19 A.  I got drug tested.  My vehicle was searched,

20 and I was sent back to Warden Culclager's office

21 where she told me that I will be relieved from

22 work until further notice.

23 Q.  So you did not work your shift that day?

24 A.  No, I did not.

25 Q.  What happened next in the time line?

88

1  spot, a bright spot on the scan?

2  A.  I think it's a dark spot.

3  Q.  Dark spot on the scan.  All right.  And that

4  showed twice?

5  A.  It showed twice when she -- the first time

6  when she took me through it, and it showed it

7  those times, but when I come back it didn't show

8  it.

9  Q.  Okay.  So after the strip search, what

10  happened?

11  A.  After the strip search, I was told to go back

12  out front to get another screening, and nothing

13  showed up.

14  Q.  What happened next?

15  A.  I was told to come back in.

16  Q.  Did anything else happen that day?

17  A.  Yes.

18  Q.  Okay.

19  A.  I got drug tested.  My vehicle was searched,

20  and I was sent back to Warden Culclager's office

21  where she told me that I will be relieved from

22  work until further notice.

23  Q.  So you did not work your shift that day?

24  A.  No, I did not.

25  Q.  What happened next in the time line?

89

1    A.   I was sent home.

2    Q.   All right.  There's a report -- and I'll pull

3    it out in a minute -- that's dated -- there's two

4    reports from Donna Best?

5    A.   Uh-huh.

6    Q.   Where she conducted interviews and did this

7    computer voice stress analysis, and one is May

8    2nd, one is May 3rd, 2019.  There are also

9    corresponding tests for Captain Kelly on the same

10   day?

11   A.   Uh-huh.

12   Q.   She had two each as well?

13   A.   Yes.

14   Q.   Is May 2nd the next time you had interaction

15   with the prison over these events?

16   A.   Yes.

17   Q.   Okay.  How did you get notice to come in?

18   A.   I don't remember who called me.  Somebody

19   called me.  Somebody from ADC called me.  I don't

20   remember who it was.

21   Q.   Fair enough.  Did you drive back to the

22   prison or meet them somewhere else?

23   A.   Who, Donna Best?

24   Q.   Yes, ma'am.

25   A.   I drove to -- I don't know what it's called.

90

1  It's ADC's, I guess it's their -- it's one of

2  their buildings.  I think it's off Princeton

3  Pike.  It's here in Pine Bluff.

4  Q.  Is that --

5  A.  Well, it's there in Pine Bluff.

6           MR. ROBERTSON:  Is that where we're

7  going Thursday?

8           MR. GILLHAM:  I can't remember.

9           MADAM COURT REPORTER:  I think so.

10 Q.  So you go to Princeton Pike?

11 A.  Uh-huh.

12 Q.  You go in the building.  What happens next?

13 A.  I went into -- they came and got me, and they

14 took me in the room and explained to me about the

15 CVSA, and I took the CVSA.

16 Q.  All right.  And there's a format where the

17 questions will be prepared and they give you an

18 opportunity to add input.  Did you do that with

19 the questions?

20 A.  Did I add input?

21 Q.  Yes, ma'am.

22 A.  No, I didn't add input.  She asked me -- we

23 went over the questions before, before I got on

24 the machine.

25 Q.  Were you interviewed before the questions

1   were administered?

2   A.  Yes, by Ms. Best.

3   Q.  All right.  And then she does the CVSA exam.

4   How long were you there total?

5   A.  I do not remember.

6   Q.  What's your best guess?

7   A.  I'll say about an hour after the test she

8   walked out.  I stayed in there a few minutes, and

9   then she came back and told me to have a nice

10  day.

11  Q.  All right.  Was the test administered to you

12  twice, if you remember?

13  A.  Not in the same day.

14  Q.  You think she just asked you those questions

15  connected to the microphone just the one time?

16  A.  I believe so.  That's what she told me.

17  Q.  All right.  And after those questions were

18  asked what happened?

19  A.  She stepped out.

20  Q.  And were you by yourself in the room?

21  A.  Yeah, I was just sitting there.

22  Q.  Was anybody in the room other than you and

23  Ms. Best when the questions were asked?

24  A.  No.

25  Q.  Do you remember ballpark how long she was

92

1   gone?  Obviously less than an hour?

2   A.  She stepped out just for a few minutes to go

3   in -- I guess let someone know that she was done,

4   and I guess that she was about to let me go,

5   because I believe that Kelly was coming in after

6   me.

7   Q.  Okay.  So she comes back in, did she say

8   anything to you other than you are free to leave?

9   A.  That's all she said.

10  Q.  And you left?

11  A.  Yes.

12  Q.  And did you have any interaction with anybody

13  else at ADC that day?

14  A.  I sat in another lady's office, but I don't

15  remember us talking about anything.  I believe I

16  was there to just let Captain Kelly go in and for

17  me to go out.  I don't think they wanted us to --

18  Q.  Didn't want to cross paths?

19  A.  Yes.

20  Q.  Well, did you have any other interaction with

21  Captain Kelly between April 30 and May 2nd?

22  A.  No.

23  Q.  Did you have any interaction with Captain

24  Kelly between April 30th and May 3rd?

25  A.  No.  No.

1   Q.  No calls or text messages?

2   A.  I do not remember, but did I talk to her, no,

3   I did not talk to her.  But did she call me or

4   did I call her, I do not remember, but we didn't

5   speak.

6   Q.  How did you get notice to come back the next

7   day?

8   A.  I believe it was Warden Ball who gave me a

9   call.

10  Q.  And what did Warden Ball say to you?

11  A.  To report back to where Ms. Best interviewed

12  me at, and that's what he told me.  I believe he

13  told me to not have contact with Kelly, or he

14  asked me.  He said something about Kelly.  He

15  told me not to have contact with her.

16  Q.  Had you?

17  A.  No.  When he told me not to I didn't.

18  Q.  Okay.  You go back.  What happens?

19  A.  I get back on the CVSA machine.

20  Q.  Just you and Donna Best again?

21  A.  Yes.

22  Q.  Did she again cover the questions that were

23  going to be asked?

24  A.  Yes.

25  Q.  And then she asked you the questions?

1  A.  Yes.

2  Q.  Did she ask you the questions on the CVSA

3  machine just one time or multiple times?

4  A.  Just the time where she prepped me where she

5  asked me the questions before she hooked me up,

6  and then she asked them again.

7  Q.  Okay.  And was that the same format both

8  times?

9  A.  Yes.  Yes.

10  Q.  And you did a better job explaining it than I

11  did asking it.  Thank you.  So after she asked

12  the questions, how long did that -- well, let me

13  back up.  How long did that process take for her

14  to ask you the questions for those two rounds,

15  one off and one on the record?

16  A.  I'll say we sat in there around about 30

17  minutes.

18  Q.  After she asked the questions what happened?

19  A.  I believe I was free to go.

20  Q.  All right.  Did you see anybody else that day

21  other than Ms. Best?  Or let me start with a new

22  question.  Did you speak with anybody else other

23  than Ms. Best?

24  A.  Well, I talked to a guy and a lady, but I

25  don't remember if it was before or after, but it

100

1    have some I'm going to show you in a minute to

2    try and pin down dates on time line?

3    A.   Did she give me paper.  I believe she gave --

4    yeah, she gave me a termination paper and I gave

5    her my badge.

6    Q.   Did you have to turn anything else back in?

7    A.   No.

8    Q.   So the OC pepper spray, firearms, any

9    self-defensive things, those aren't stuff you

10   leave with, they stay at the facility?

11   A.   Yes, they stay at the facility unless you're

12   a sergeant or something.

13   Q.   But you didn't take any --

14   A.   I didn't have any.

15   Q.   All right.  So after that conversation and

16   whatever paperwork she may have given you, what

17   happens next?

18   A.   I was terminated.  I looked for a lawyer.

19   Q.   And you found Mr. Gillham?

20   A.   Mr. Gillham.

21   Q.   All right.  And then he initiated the appeal

22   process?

23   A.   Yes.

24   Q.   And the SEAGAP people -- I'm going to

25   shortcut.  The SEAGAP people said record doesn't

101

1  support it, and then it was appealed from that,

2  and the termination was upheld; is that correct?

3  A.  Correct.

4  Q.  I don't want to rush through it, but I'm

5  dragging.

6  A.  That's fine.

7  Q.  All right.  If you feel like we need to go

8  back and cover that, you're certainly welcome to.

9  Okay.  Let's do this; let's track through some of

10 these and get our time line pinned down.  I'm

11 going to show you what we'll mark as Exhibit No.

12 1 to your deposition, which is a -- you can see

13 it says Internal Affairs Division CVSA Report,

14 there's case number, it has your name, Corporal

15 Bianca Fletcher, and it has a date May 2nd, 2019,

16 correct?

17                    (Deposition Exhibit No. 1 was

18 marked.)

19 A.  Yes.

20 Q.  Okay.  You can see at the bottom that this

21 has what's called a bates label, so in a big, ole

22 stack of documents we got from the Arkansas

23 Department of Correction, there's a number that's

24 been put on it, ADC 0015 is where this report

25 starts.

129

1   A.  Okay.

2   Q.  As you sit here today, do you know what you

3   want from my clients?

4   A.  No.  I'll have to talk to my lawyer.

5   Q.  Okay.  In your discovery responses there's

6   numerous references -- or at least references to

7   the Adani scanner being wrong on multiple

8   occasions?

9   A.  Yes.

10  Q.  And is it your understanding that the ADC

11  relied on that scanner as support for their

12  proposition that you had contraband on you?

13  A.  Yes.

14  Q.  So in your opinion, the scanner was wrong?

15  A.  Yes.

16  Q.  Is it your opinion that the scanner is

17  frequently wrong?

18  A.  Yes.

19  Q.  Did you sue the Adani scanner manufacturer?

20  A.  No.

21  Q.  Why not?

22  A.  Don't know.

23  Q.  Are you dependent on anybody for financial

24  support, other than perhaps Cagney?

25  A.  Cagney.  My mom helps here and there.

136

1    this was prepared for the purpose of the SEAGAP

2    hearing?

3    A.   No.  When we did this, he just wanted to know

4    the process of going in the entrance building,

5    what it looked like, what did you have to go

6    through to get to the entrance building.

7    Q.   Would that be the ADC attorney or your

8    attorney?

9    A.   My attorney.

10   Q.   So that was obviously used as an exhibit

11   during your SEAGAP deal.  Okay.  Do you have any

12   other diaries or notes of anything that

13   transpired?

14   A.   No.

15   Q.   Okay.  Where do you bank; where was your bank

16   card, what bank?

17   A.   Bank of America.

18   Q.   Is that out of Pine Bluff?

19   A.   Yes.  Bank of America is pretty much

20   everywhere.

21   Q.   Yeah.  Is the debit card you used to buy gas

22   that night still on that account?

23   A.   Yes.  It's the same account.  I've always had

24   the same account.

25   Q.   Okay.  Do you have anything -- as you sit

1  here today, do you know of any standard that

2  Mr. Gene Shook breached, something he should have

3  done but didn't or did do but did it wrong?

4              MR. GILLHAM:  Objection form.

5  Q.  If you know?

6              MR. GILLHAM:  You can go ahead and

7  answer.

8  A.  I don't know.

9  Q.  Okay.  Same thing for NITV Federal Services?

10  A.  Don't know.

11  Q.  You don't know of anything they did wrong?

12  A.  Well, yeah.  My -- I had two different tests,

13  and they came back different.

14  Q.  Okay.  Do you know what they did wrong,

15  though, with respect to the equipment they've

16  supplied?

17  A.  I don't know --

18              MR. GILLHAM:  Objection form.

19  A.  I don't know what they did wrong.

20  Q.  And I take it you would rely on others to

21  identify anything that NITV Federal Services did

22  wrong?

23  A.  Will you say that again?

24  Q.  Yeah.  If you can't say that they did

25  anything wrong, you would have to rely on others

139

1  Q.  To your knowledge, has Mr. Gene Shook uttered

2  any false statements to you or about you?

3  A.  Not to my knowledge.

4  Q.  One of your allegations in your complaint was

5  that there was fraud conducted on the State by

6  NITV Federal Services.  Do you personally have

7  any knowledge of the proof that would support

8  that claim?

9  A.  No.

10  Q.  Okay.  Do you personally have any knowledge

11  that NITV Federal Services uttered any false

12  statements about you?

13  A.  No.

14            MR. GILLHAM:  Objection to form.

15  Q.  Do you personally have knowledge of anything

16  that Mr. Shook did that was negligent, you

17  personally?

18            MR. GILLHAM:  Objection to form.  Go

19  ahead.

20  A.  No.

21  Q.  Do you personally have any knowledge of

22  anything that NITV Federal Services did that was

23  negligent?

24            MR. GILLHAM:  Objection form.  Go

25  ahead.

1   A.   No.

2   Q.   Okay.  Have I been courteous to you today?

3   A.   Yes.

4   Q.   Thank you.

5            MR. ROBERTSON:  I'll pass the

6   witness.

7                  EXAMINATION

8   BY MR. GILLHAM:

9   Q.   So the Adani scanner, do you know of

10  situations where it has given false readings on

11  other people?

12  A.   Yes.

13  Q.   And the Adani scanner, did it pick up the

14  credit card that was in your hip pocket -- or the

15  bank card that was in your hip pocket?

16  A.   No, it did not.

17  Q.   So if it didn't pick that up, but it's

18  supposed to have picked up something else that

19  were on your body, does it seem like the Adani

20  scanner was reading inappropriately that day?

21  A.   No, it was not.

22  Q.   Did you carry any contraband that day?

23  A.   No.  Other than the credit card that I had, I

24  did not have contraband.

25  Q.   Did you pass any contraband to the captain?



**Arkansas Department of Correction**

Maximum Security Unit
2501 State Farm Road
Tucker, Arkansas 72168-9503
Phone: (501) 842-3800
Fax: (501) 842-1977

May 20, 2019

Bianca Fletcher

RE: TERMINATION

I met with you on Thursday, May 16, 2019 in my office in the presence of Felecia Williams, Unit Human Resources Manager for you violating the following AD 12-33 policies:

**Section 1: Employees are expected to conduct themselves in a professional manner. Subsection N: conduct unbecoming a public employee. Subsection P: Violation of published policy. *Severity of discipline depends upon severity of policy violation and effects upon the Department of Correction.**

**Section 6: Employees are expected to perform at a level commensurate with the job specifications, performance standards, and other duties assigned. Subsection A: Unsatisfactory work performance.**

**Section 18: Employees must give clear, complete and accurate information in completing applications, work records, investigations and claims for reimbursement. Subsection B: Falsification of written/verbal statements/information. *Note: Intentional omission of significant information done with the intent to falsify or deceive will be considered falsification.**

On April 30, 2019, you reported to work at approximately 5:50 pm at the Maximum Security Unit. Cpl. Verna Farmer-Barnes was working the Adani body scanner and observed an unidentifiable object in or near your vaginal area. Captain Nicola Kelly and Capt. LeMarcus Davis was called to the Entrance Building to review the scan. However, Capt. Kelly responded and observed that there was an object located in/near your vaginal area. You were rescanned and the object was still there. I was notified by Capt. Kelly of the anomaly and advised that you had been re scanned and the object still appeared to be located in/near the vaginal area. I advised Capt. Kelly to escort you to the Conference room and wait for my arrival at the unit.

Upon my arrival, I reviewed the images on the Adani Scanner and observed an unidentifiable object located in/near the vaginal area. I advised you what I had viewed on the Adani Body scanner and gave you the opportunity to give me what you had or I would be call the State Police and you could hand them what was seen on the scanner. You stated that you did not have anything and that you were ready to be stripped searched. Sgt. Cora Harris and Capt. Nicola Kelly escorted you to the bathroom and conducted a strip search with no contraband found. You were taken back out to the Entrance Building and rescanned, with no object found.

*An Equal Opportunity Employer*



ADC 0452

The object that was observed on the two previous scans were no longer present. You were drug tested with negative results and your car was searched with no contraband found. You wrote a statement denying you tried to introduce contraband, drugs, money, or a cell phone. You stated that you were stripped searched and nothing was found.

During the investigation, it was discovered by review of video footage, that Capt. Kelly escorted you to the Conference room along with Cpl. Jasmine Releford. It was also discovered that Capt. Kelly allowed Cpl. Releford to sit in the conference room with you while she went to the restroom. Capt. Kelly then returned back to the Conference room and held security on you, along with Cpl. Releford.

On May 2, 2019, you were interviewed by Internal Affairs and denied you brought in contraband other than accidently having your bankcard on you. You were asked relevant questions and found not Deceptive on question 6, which cleared you from passing contraband to Cpl. Releford. However, Internal Affairs could not clear you on the rest of the relevant questions 4, 10, 12, and 14.

Additional surveillance footage was reviewed at the unit, and it appeared that you passed something to Capt. Kelly as you walked from the Entrance Building to the Conference room. On May 3, 2019, you were interviewed again by Internal Affairs and denied passing anything to Capt. Kelly while she was escorting you to the Conference room.

You also denied that you communicated with Capt. Kelly since you were contacted by Deputy Warden Ball. You stated Deputy Warden Ball called you on the afternoon of May 2, 2019 and advised you to report to Internal Affairs on May 3, 2019, at 9:00 am.

You were administered a CVSA to determine the truthfulness of your statement. Upon the completion of the CVSA, the results indicated that you showed deception to questions 4 and 6.

You denied passing anything to Capt. Kelly when you were being escorted to the Conference room. You denied you contacted Capt. Kelly after you were contacted by Deputy Warden Ball. You were asked if you ever called Capt. Kelly over a cell phone and you stated no. You were asked if you ever texted Cpt. Kelly and you stated yes. You stated you and Capt. Kelly had each other's phone numbers. However, Capt. Kelly denied that you all had each other's phone number or that you all ever communicated with each other outside of work.

During our meeting you stated that you did not do nothing. I stated to you I reviewed the CVSA report that was administered on you on May 2, 2019. On question #4: On April 30th, did you have contraband on your person? You stated NO. No deception indicated (showed some stress to this question, but no enough to call deceptive) Question #6: did you pass contraband to Officer Releford? You stated NO. No deception indicated. Officer Releford was asked this question also and she passed. Question #10: Did you pass contraband to Capt. Kelly? You stated NO. No deception indicated (showed some stress to this question, but no enough to call deceptive). Question #12: Did you hide contraband at the Unit? You stated NO. No deception indicated (Per CVSA Expert Gene Shook, had significant problems with this question but not enough to call deceptive). Question #14: have you brought illegal contraband into the unit? You stated NO. No deception indicated (Per CVSA Expert Gene Shook, had significant problems with this question but not enough to call deceptive).

The CVSA administered on May 2, 2019, was based on video footage of you all entering the Main Building going into the Conference room. You all entered the Conference room and Capt.

Kelly goes to the restroom.  Another CVSA was administered on May 3, 2019, based on additional video footage of you all coming down the walkway leading from the Entrance Building going into the Main Building and it reflects that you passed something to Capt. Nicola Kelly  You were asked the following questions.  Question #4:  Have you communicated with Capt. Kelly since you talked to Warden Ball yesterday?  You stated NO.  Deception was indicated. Question #6:  Did you pass anything to Capt. Kelly while you were walking on the sidewalk to the main building?  You stated NO.  Deception was indicated.

You were asked if you ever called Capt. Kelly on a cell phone and you stated no.  But you stated you had texted her.  During our meeting you stated that you had texted her on March 24th of 2018.  You stated you texted pictures of your baby and that you still have it in your phone.  I asked you if Capt. Kelly had your phone number.  You stated probably not.  She never texted back.  I asked you how you got Capt. Kelly phone number.  You stated through Markisha Johnson, who used to work at the Max. Unit.  I asked you was that the only time you and Capt. Kelly communicated outside of work.  You stated Capt. Kelly came to your baby shower.  You stated that she stayed about an hour.  You stated that one time you went to her house because you all had a potluck on the shift and you went over to help cut up vegetables.  I asked you if Capt. Kelly knew you were coming.  You stated "yes" that she knew you and Johnson were coming.  I asked you did she ever show you questions for a Sergeant interview.  You stated she showed you one answer on her phone.  I asked you where you were when she showed you the answer.  You stated at her truck.  You stated she just showed it to you on her phone.

I asked you did you want to add anything else of significance that I should know.  You stated the only thing that you could think of is that you came on your cycle the next day and you were stripped searched and nothing was found.  I asked did you pass Capt. Kelly anything while you were down the sidewalk.  You stated no ma'am, nothing at all.  I asked you were you all close while you all were coming down the sidewalk.  You stated you all were walking side by side, you, she and Cpl. Releford were walking side by side.

Ms. Fletcher, taking in consideration what you stated and all the documentation that I have that includes the CVSA report, Video footage, and the Adani scanned images, I find you guilty of violating the above AD 12:33 policies and hereby terminate your employment with the Arkansas Department of Correction.

You have the right to appeal this decision.  You have five working days from the receipt of this letter to do so.  You can contact Tammy Baker at 870-267-6451, Central Administration Grievance Office for the proper paperwork.

If you are entitled to a final paycheck, you must return all your state issued property to the Uniform Room at the Training Academy at 1500 NE 1st Street England, AR 72046 at (501) 842-8580.

Sincerely,

*a. Culclager*

Aundrea Culclager, Warden
AC: fw

cc:     Central Human Resource
        Unit Personnel File
        CC: 7018 0360 0000 6975 2978

ADC 0454



Department of Transformation and Shared Services
Governor Asa Hutchinson
Secretary Amy Fecher
Director Kay Barnhill

January 10, 2020

> RECEIVED
> JAN 1 3 2020
> GRIEVANCE OFFICE

Secretary Wendy Kelley
Department of Human Services
PO Box 1437, Slot S-201
Little Rock, AR 72201

Re: Bianca Fletcher, SEGAP case #2019-S34

Bianca Fletcher was terminated by the Arkansas Department of Corrections, Division of Correction (Division) for violating the following AD 12-33 Employee Conduct Standards: 1) 1n Conduct unbecoming a public employee; 2) 1p Violation of written policies; 3) 18b Falsification of written/verbal statements/information; and 4) 6a Unsatisfactory work performance. Ms. Fletcher's policy violations stem from her bringing contraband into the Maximum Security Unit and giving it to her security escort, Captain Kelly. Ms. Fletcher appealed her termination to the State Employee Grievance Appeal Panel (SEGAP) where SEGAP unanimously found that the record did not support that Ms. Fletcher deliberately tried to falsify information or deceive the Division and that the Division did not follow its progressive disciplinary policy. The Division requested a review of SEGAP's decision. After reviewing the Administrative Record and evidence submitted by both parties, I do not accept the recommendation of SEGAP and uphold the termination of Ms. Fletcher.

**Background**

Ms. Fletcher worked as a Corporal at the Maximum Security Unit. After walking through the Unit's security body scanner, the guard on duty noticed an unidentifiable object in or near Ms. Fletcher's vaginal area. Ms. Fletcher denied having anything on her. She was rescanned, and the unidentifiable object was still seen. Ms. Fletcher volunteered to be strip searched and she was escorted by two security guards to another building. No contraband was found during the search. Ms. Fletcher walked through the body scanner a third time and this time no object was found. Ms. Fletcher again denied bringing contraband into the building other than accidentally leaving her bank card in her back pocket. Her drug test was negative, and no contraband was found in her car.

The Division reviewed the video footage of Ms. Fletcher being escorted to another building to be searched. The Division determined it appeared to show that Ms. Fletcher passed something to Captain Kelly while walking. The other security escort denied seeing Ms. Fletcher pass anything to Captain Kelly. Ms. Fletcher was administered two computerized voice stress analysis (CVSA) tests. Gene Shook, a contract instructor for the CVSA company, provided a cold call opinion on the results of both tests. In his opinion, the first test showed no deception was indicated but that Ms. Fletcher did show some stress on the questions. The second test result showed deception on two questions. Ms. Fletcher was asked a similar question on both CVSAs with conflicting results.

Office of Personnel Management
1509 West 7th Street, Suite 201 • Little Rock, AR 72201 • 501.682.1823



EXHIBIT
8

ADC 0052



**Department of Transformation and Shared Services**
Governor Asa Hutchinson
Secretary Amy Fecher
Director Kay Barnhill

The Division relied on the CVSA report, video footage, and scanned body images and determined that Ms. Fletcher violated policy because she denied having contraband despite having a bank card in her pocket. The Division also believed she was lying about passing contraband to Captain Kelly. Ms. Fletcher was terminated and filed a grievance requesting to be reinstated with backpay. At the Division hearing, Ms. Fletcher testified that she never had contraband and that she had gotten gas before reporting to work that morning which is why she had the bank card in her pocket. The Division Internal Review Committee found that Ms. Fletcher was trying to introduce contraband into the Unit and that she passed it off to Captain Kelly.

**Analysis**

The Division's argument on appeal is that SEGAP failed to defer to the Division determination regarding the weight given to Mr. Shook's opinion of the CVSA; that the Division IRC reviewed the video and was in the best position to determine that contraband was passed off; and that the Division Internal Review Committee and the Warden determined the witness testimony was credible.

Division policy provides that progressive discipline is to be administered for violations of 1n, 1p and 6a. 18b Falsification of written/verbal statements/information requires immediate termination. The record does not definitively support that Ms. Fletcher had contraband or that she lied about passing contraband to Captain Kelly. That being said, Ms. Fletcher admitted she had a bank card in her pocket and since a bank card is considered contraband, Ms. Fletcher violated policy 18b with her verbal statements. The only disciplinary action available to the Division was termination.

**Recommendation**

Based on the administrative record and appeal, it is my determination that the Division followed its policy in terminating Ms. Fletcher as it relates to her having contraband in the form of a bank card despite denying she had contraband. I uphold Ms. Fletcher's termination.

Sincerely,

Amy Fecher

Cc:   Bianca Fletcher
      Lucien Gillham
      Thomas Burns, ADC Attorney
      Tammy Baker, Grievance Officer