**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

BIANCA FLETCHER                                                    PLAINTIFF

VS.
                        CASE NO. 4:20-CV-521 LPR

NITV FEDERAL SERVICES, LLC;
GENE SHOOK; and JOHN DOES 1-2                          DEFENDANTS

<u>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**</u>

# EXHIBIT 2

Deposition of Warden Aundrea Culclager with
attached exhibits

# In The Matter Of:

*Bianca Fletcher vs.*
*NITV Federal Services, LLC; et al.*

---

*Aundrea Culclager*
*October 15, 2020*

---

*Kelly Hill, CCR*

1  Q.  Superintendent.  All right.  Tell me what's

2  the hierarchy?  I don't --

3  A.  As far as the Department of Corrections as a

4  whole --

5  Q.  Well, just typically for your line of work.

6  You know, I know there's probably all kinds of

7  branches in the ADC, but for your line of work so

8  we know that Ms. Fletcher started I think as some

9  type of officer, then was a corporal, then would

10  have been sergeant, and then up the chain.  So

11  using that kind of as a reference point, take me

12  through the hierarchy and how you rank.

13  A.  Corporal, then sergeant, then lieutenant,

14  then captain, then major, then deputy warden,

15  then warden and then superintendent.

16  Q.  And when were you promoted to superintendent?

17  A.  September of 2020.

18  Q.  So recently.  All right.  How long did you

19  serve in the capacity as a warden approximately?

20  A.  Three years.

21  Q.  How long did you serve as a deputy warden

22  approximately?

23  A.  About 10.  10 years.

24  Q.  How long have you been with the ADC?

25  A.  32.

1  did you actually work in the prison building as

2  the warden?

3  A.  Yes.

4  Q.  So would you have to go through the scanner

5  system every day just like everybody else?

6  A.  Yes.

7  Q.  So let's talk about that process.  When you

8  pull into the parking lot, there's like a gate or

9  an entry building, I think is what it's called;

10 is that correct?

11 A.  Yes.

12 Q.  When I went through, I don't remember a

13 scanner.  I remember a typical magnetron thing

14 like you would go through at the courthouse.  Is

15 the scanner something different than that?

16 A.  Repeat that.

17 Q.  Let me just start over.  Take me through what

18 happens when you walk through that entrance

19 building to gain access to the prison back in

20 April of 2019.  Tell me -- describe for me that

21 process.

22 A.  You walk through the door.  You have to clear

23 the Adani scanner, and any items that you have

24 you have to -- they have to go through the

25 scanner as well.  Step onto the Adani scanner,

16

1  Q.  So the Adani scanner, what does that look

2  like?  So my frame of reference is the airport,

3  and I don't know if that helps.

4  A.  The Adani scanner, it's got like a platform

5  that you step onto, and the platform pulls you

6  through the actual scanning part.  Once you go

7  through the actual scanning part, it alerts to

8  anything that might be on your person.  It shows

9  an image of your body, and it can detect if you

10  have anything up under your clothes, it shows an

11  image.

12  Q.  Okay.  And I want to cover the Adani -- well,

13  we can go ahead and talk about it now.  As you

14  know, Ms. Fletcher claimed that she went through

15  the Adani scanner twice before you get there, and

16  there were concerns that it showed something down

17  near her vaginal area in her clothing.  She

18  claimed that that was a false read.  Does the

19  Adani scanner make false readings, and if so, in

20  what circumstances?

21  A.  Yes, it has been known to make false

22  readings.  Anytime anyone comes through and there

23  is an image and you can't determine what it is,

24  we consider that to be an anomaly.  That means

25  that we have to know exactly what it is.  So if

22

1   documents.

2                   MR. ROBERTSON:  I want to -- let's

3   just do new numbers per depo, if that's okay,

4   unless you --

5                   MR. GILLHAM:  I don't -- it's your

6   deposition.

7                   MR. ROBERTSON:  Well, I didn't know

8   if you wanted one set.

9                   MR. GILLHAM:  You can do it however

10  you want.

11  Q.  I want to cover some of the documents that

12  Mr. Burns provided to us via subpoena

13  technically -- well, can y'all share one?

14  A.  Yes.

15  Q.  I'm going to show you first what's marked as

16  Exhibit No. 1 to your deposition, and I'll

17  represent to you that this has been produced in

18  two separate occurrences.  If you see there's a

19  handwritten 161, that's because it was a part of

20  the SEAGAP hearing apparently.  And then you have

21  the ADC 234 number.  That was one of several

22  hundred pages that were produced by Mr. Burns

23  when we issued a subpoena.  In particular, do you

24  recognize this document?

25                   (Deposition Exhibit No. 1 was

23

1   marked.)

2   A.  Yes.

3   Q.  And is this the document that sets forth the

4   company's -- or excuse me -- the ADC's policies

5   and procedures for searches looking for

6   contraband?

7   A.  Yes.

8   Q.  All right.  And is this a document that

9   guides what you do and don't do in any given day

10  in searching for contraband, at least as of April

11  of 2019?

12  A.  Yes.

13  Q.  Why do you -- give me some examples of

14  contraband.

15  A.  Contraband can be a cell phone.  It can be

16  food.  It could be drugs.  It could be

17  unauthorized shoes -- well, contraband, it could

18  be like a lighter.  It could be just anything

19  that based on policy or either ADC staff are not

20  allowed to bring in.

21  Q.  Okay.  Let's talk about the bank card.  Is a

22  bank card contraband?

23  A.  Yes.

24  Q.  Why?

25  A.  It's not authorized to come inside the

1    ago with Ms. Fletcher that she was carrying food.

2    I did not see food -- after the fact, I looked at

3    pictures, I didn't see it, and I looked through

4    the record again, and I've seen no reference to

5    her having food on her.  It wasn't mentioned

6    anywhere that I saw in the SEAGAP hearing

7    testimony.  Do you remember her having food when

8    she went through and was in the conference room,

9    for example?

10   A.  No, I don't recall.

11   Q.  And you were in the conference room with her,

12   correct?

13   A.  Yes.

14   Q.  Okay.  The -- that was Exhibit No. 1 to your

15   deposition.  I want to cover some basic

16   documents.  I want to show you what we'll mark as

17   Exhibit No. 2 to your deposition, and I'll

18   represent to you this is an End-User License

19   Agreement from my company which would have gone

20   to -- or my client's company which would have

21   gone to the ADC setting forth the ground rules,

22   if you will, for how their device is used.

23                    (Deposition Exhibit No. 2 was

24   marked.)

25   Q.  If you go to Page 2 of that document, and

26

1   then there's VIII, and I'm going to read it to

2   you, and you tell me if I read it accurately.

3   And I want to read it to you and you tell me.  It

4   says Caveat, NFS sell the Computer Voice Stress

5   Analyzer as an investigative tool.  The results

6   of any testing should not be used as a final

7   determinant, nor should the results of any test

8   be included in a probable cause affidavit.  The

9   results of a CVSA examination should not be used

10  to obtain an arrest or search warrant.  Did I

11  read that accurately?

12  A.  Yes.

13  Q.  Have you ever seen that document before,

14  Exhibit No. 2?

15  A.  No.

16  Q.  All right.  Let's talk about something you

17  would have seen and we'll mark as Exhibit No. 3,

18  an Administrative Directive from the Arkansas

19  Department of Correction that talks about use of

20  the CVSA device, and do you recognize this

21  document, Exhibit 3?

22              (Deposition Exhibit No. 3 was

23  marked.)

24  A.  Yes.

25  Q.  All right.  Turn to Page ADC 46 at the

26

1  then there's VIII, and I'm going to read it to

2  you, and you tell me if I read it accurately.

3  And I want to read it to you and you tell me.  It

4  says Caveat, NFS sell the Computer Voice Stress

5  Analyzer as an investigative tool.  The results

6  of any testing should not be used as a final

7  determinant, nor should the results of any test

8  be included in a probable cause affidavit.  The

9  results of a CVSA examination should not be used

10  to obtain an arrest or search warrant.  Did I

11  read that accurately?

12  A.  Yes.

13  Q.  Have you ever seen that document before,

14  Exhibit No. 2?

15  A.  No.

16  Q.  All right.  Let's talk about something you

17  would have seen and we'll mark as Exhibit No. 3,

18  an Administrative Directive from the Arkansas

19  Department of Correction that talks about use of

20  the CVSA device, and do you recognize this

21  document, Exhibit 3?

22              (Deposition Exhibit No. 3 was

23  marked.)

24  A.  Yes.

25  Q.  All right.  Turn to Page ADC 46 at the

27

1    bottom, and you can see from the heading at the

2    top, it's discussing internal investigations and

3    CVSA exams, correct?

4    A.  Yes.

5    Q.  And then the item that's listed as No. 4 on

6    this report -- or this policy says, and I'll read

7    it, and you again tell me if I've read it

8    accurately.  The requesting authority will not

9    sustain a complaint against an employee solely on

10   the basis of a Computerized Voice Stress Analysis

11   result.  There must at least be one additional

12   item of corroborating evidence in a written

13   report completed by the investigating officer in

14   order for the requesting authority to sustain a

15   complaint.  Did I read that accurately?

16   A.  Yes.

17   Q.  All right.  Is that consistent with the

18   language I read to you from the End-User License

19   Agreement, meaning the CVSA is not to be used by

20   itself to make a decision?

21   A.  Yes.

22   Q.  Okay.  Take it through just the narrative, if

23   you will, of what you remember how you got notice

24   of what was going on that day.

25   A.  I got a phone call at home by Captain Kelly

35

1                    (Deposition Exhibit Nos. 5 and 6

2    were marked.)

3    A.  Yes.

4    Q.  All right.  And I'll show you Exhibit 6 which

5    is the May 3rd, 2019 report on Captain Kelly.

6    Have you seen that document before?

7    A.  Yes.

8    Q.  Okay.  And these documents are -- well, first

9    off, they're prepared by a person named Donna

10   Best.  Do you know who Donna Best is?

11   A.  Yes.

12   Q.  And who is she?

13   A.  Ms. Best handles all of the employee

14   grievance hearings.

15   Q.  Did -- do you know if she -- well, Ms. Best

16   works for Mr. Naylor or with Mr. Naylor?

17   A.  No.  Ms. Best works -- I think her immediate

18   supervisor would be -- she works for Ms. Cryer

19   now.

20   Q.  Okay.  If you know.

21                  MR. BURNS:  She's getting that

22   confused.  You're thinking of Tammy Baker.

23                  THE WITNESS:  Oh, okay.

24   Q.  Yeah.  No big deal.

25   A.  Yeah.

1    Q.   But Donna Best --

2    A.   Yeah, she does work for Raymond Naylor.

3    Q.   All right.  Exhibits 5 and 6 to your

4    deposition and Exhibits 1 and 2 on the deposition

5    of Ms. Fletcher appear to represent an

6    investigation that was conducted by Ms. Best with

7    her using the CVSA exam?

8    A.   Yes.

9    Q.   Okay.  And did you rely on information

10   contained in these reports when you were making

11   your termination decisions for Captain Kelly and

12   Corporal Fletcher?

13   A.   Yes.

14   Q.   All right.  I want to ask you just a few

15   things.  The May 2nd report, they have some

16   similarities.  For example, on Captain Kelly,

17   they report finding a bank card, but if you turn

18   to Page 2 of 4 on the narrative which is under

19   ADC 279.  And I'm on Exhibit 5.  And in that last

20   paragraph on that page, it's reported that Ms.

21   Fletcher told Captain Kelly that she stopped and

22   got something to eat and stuffed the bank card in

23   her pocket, correct?

24   A.   Yes.

25   Q.   Okay.  Do you remember Ms. Fletcher telling

1   you that she used the card to buy gas, not food?

2   A.  Yes.

3   Q.  Okay.  With respect to Exhibit 5 to your

4   deposition, this is Captain Kelly's report again,

5   Question 4 on the CVSA she was asked if Bianca

6   Fletcher passed contraband to her, and deception

7   was indicated.  And then Question 6, did she hide

8   contraband in the unit, and deception was

9   indicated again, correct?

10  A.  Yes.

11  Q.  All right.  And I believe there was a very

12  similar question asked of Ms. Fletcher in her May

13  3, 2019 in which she was asked if contraband was

14  passed to Captain Kelly, she denied that, but

15  deception was indicated on that as well, correct?

16  A.  Yes.

17  Q.  So both Kelly and Fletcher failed the

18  question when asked if Fletcher passed contraband

19  to Kelly, correct?

20              MR. GILLHAM:  Object to form.

21  A.  Yes.

22  Q.  Okay.  Did you have a chance to review the

23  surveillance video of Releford, Fletcher and

24  Kelly walking from the entrance building down the

25  sidewalk toward the conference room?

1  A.  Yes.

2  Q.  And did you make certain observations about

3  that surveillance video?

4  A.  Yes.

5  Q.  What were those observations?

6  A.  That Corporal Fletcher, as her and Captain

7  Kelly -- which Releford was on the outside,

8  Fletcher was on the inside and Kelly was on the

9  outside -- that Fletcher goes toward Kelly, and

10  it appears where something is passed and Kelly

11  puts it in her pocket, and then they kind of

12  drift apart again as they are walking up the

13  walkway.

14  Q.  So they get close together?

15  A.  Yes.

16  Q.  If I remember right, they get close together,

17  they may have bumped.  They separate, they come

18  back close together, and then there's movement,

19  that in your view, would be consistent with a

20  hand-off of some sort?

21  A.  Yes.

22              MR. GILLHAM:  I'm going to object to

23  the form.

24  Q.  And they split back apart?

25              MR. GILLHAM:  Let the record reflect

39

```
 1   that her answer kind of came over Mr. Robertson's
 2   speech so I didn't have a chance --
 3              MR. ROBERTSON:  That's fine.
 4   Q.  Let me restart my question.  Let's start over
 5   with it.  All right.  When you were watching the
 6   video, did you see where Ms. Fletcher who is in
 7   the middle, and Ms. Kelly, who I think if you're
 8   looking at the video would be on the right side,
 9   correct, Releford, Fletcher, Kelly?
10   A.  Yes.
11   Q.  Okay.  Did you see where they bumped?
12              MR. GILLHAM:  Objection form.
13   Q.  Or came in close contact?
14              MR. GILLHAM:  Same objection.
15   A.  Yes.  They came in close -- you could see
16   where they got close enough.  One hand went
17   behind the other one's back, and then it appeared
18   something went in the pocket.
19   Q.  And by in the pocket, you mean Captain Kelly
20   putting something in her back pocket?
21   A.  Back pocket.
22   Q.  And you made a gesture with your hand as if
23   reaching behind your back to put something in
24   your pocket?
25   A.  Yes.
```

1   Q.  And you were mimicking what you saw on the

2   video, or what you think you saw?

3   A.  What I saw.

4   Q.  Okay.  When Captain Kelly and Releford and

5   Fletcher arrived at the conference room, it's my

6   understanding that Releford and Fletcher stayed

7   in the room and Captain Kelly went to the

8   restroom; is that true?

9   A.  No.

10  Q.  It's not true?

11  A.  No.

12  Q.  What happened?

13  A.  Once they came into the main building,

14  Fletcher and Releford went inside the conference

15  room and Captain Kelly went to the bathroom.

16  Q.  Okay.  Did that trigger a red flag in your

17  mind?

18  A.  Yes.

19  Q.  Why is that?

20  A.  Captain Kelly was instructed to escort her to

21  the conference room since she is the captain and

22  she is the chief commander of the shift.

23  Q.  Okay.  And having seen the surveillance

24  video, did you later develop a concern that she

25  may have disposed of contraband when she went

41

1    into the restroom?

2    A.  After seeing the video, yes.

3    Q.  Okay.  I want to point your attention to the

4    report, Exhibit 6 to your deposition.  This will

5    be at the second page of the May 3rd report on

6    Captain Kelly, which is bates labeled ADC 283 at

7    the bottom right.  In the pretest interview,

8    looks likes it's about the third sentence down,

9    and I'll read it, and you tell me if I read it

10   accurately.  Captain Kelly stated she did not

11   pass me any contraband or nothing.  If she did,

12   it was a piece of paper, but I don't even

13   remember her doing that.  Did I read that

14   statement correctly?

15   A.  Yes.

16   Q.  Did she make a statement like that to you?

17   A.  Yes.

18   Q.  What did she say to you, and referring of

19   course to Captain Kelly?

20   A.  Exactly what's stated here.

21   Q.  Now, this is reportedly made to Ms. Best.

22   Were you present when this statement was uttered,

23   or did that happen at a different time?

24   A.  No, I wasn't present, but any meetings that I

25   have they're recorded, and Ms. Best is -- she got

42

1  my recordings of the actual meeting.

2  Q.  Okay.  So were you in a meeting with Ms.

3  Kelly when she made that statement to you, that

4  if she passed anything, it might have just been

5  paper?

6  A.  Yes.

7  Q.  And does that still give you concern, that

8  even if it's just paper, that it may have been

9  contraband?

10  A.  Yes.

11  Q.  Ms. Fletcher actually described a

12  circumstance where people -- their letters don't

13  even go to the inmates anymore because they can

14  be soaked in drugs.  What other concern would you

15  have of paper being passed inside the prison?

16  A.  As you stated, inmates do soak paper.  Now we

17  don't even allow paper products to come in due to

18  that fact.  So when I asked her the question, she

19  stated that, no, she did not pass her anything,

20  but then stated, if she did, it was paper.  So I

21  asked her, how can it be no, she didn't, but now

22  if she did, so I had a question about that.

23  Q.  Okay.  And in your mind's eye, did you begin

24  to think that she was lying to you?

25  A.  Yes.

46

1   A.   She made it seem like she didn't know she was

2   coming, and I asked Ms. Fletcher did Captain

3   Kelly know you were coming, and she says, yes,

4   she knew I was coming.

5   Q.   Okay.  Did you view your interviews of Ms.

6   Fletcher and Ms. Kelly as inconsistent with

7   respect to their description of their

8   relationship with one another?

9   A.   Yes.

10  Q.   Did that cause you to conclude that one of

11  them was being untruthful, or perhaps both of

12  them?

13  A.   Yes.

14  Q.   And you didn't need the CVSA exam to tell you

15  whether or not they were being truthful or

16  untruthful to make that conclusion, did you?

17  A.   No.

18          MR. GILLHAM:  Objection to form.

19  Q.   Now, Ms. Kelly, according to this report,

20  stated that they did not have the type of

21  relationship where they had each other's phone

22  numbers.  I'll represent to you that two days ago

23  Ms. Fletcher had Ms. Kelly's phone number in her

24  phone and even read it to me on the record.  That

25  would be inconsistent with any statement from Ms.

47

1    Fletcher that she did not have the phone number,

2    correct?

3              MR. GILLHAM:  Objection form.

4    A.  Yes.

5    Q.  Okay.  I'm going to show you what we'll mark

6    as Exhibit No. 7, and it's really just for my

7    information.  This is a handwritten diagram that

8    was used in the SEAGAP hearing.  Have you seen

9    that document before?

10             (Deposition Exhibit No. 7 was

11   marked.)

12   A.  Yes.

13   Q.  Is any of the handwriting on that document

14   yours?

15   A.  No.

16   Q.  There is -- and I'm holding it up.  So we

17   have -- if you hold the -- in the landscape view

18   of the page, you have the entry building on your

19   right, correct?

20   A.  Yes.

21   Q.  And then it has CR on the far left, which I

22   assume would be conference room, correct?

23   A.  Yes.

24   Q.  There's a -- I guess that's a sidewalk, and

25   then there's an arrow pointing to the middle of

1   A.  Yes.

2   Q.  That video itself --

3                MR. GILLHAM:  I'll probably use it

4   when I cross her.

5   Q.  The video itself is not continuous motion,

6   correct, it takes a picture every second or two;

7   is that true?

8   A.  Yes.

9   Q.  I guess we call it old-school surveillance

10   video.  All right.  I'll tell you what I'll do, I

11   want to go ahead and just make a -- these aren't

12   very good.  I'm trying to find the best set of

13   photographs to use.

14                MR. GILLHAM:  Are they of the Adani?

15                MR. ROBERTSON:  It's a packet that

16   came in the ADC file.  They're all black and

17   whites, and they're not -- they've been copied

18   over so many times, I don't know which one is the

19   best one, but we'll just go with this one.

20   Q.  All right.  We'll mark as Exhibit No. 9 a

21   complete copy of the packet of photos that were

22   given to me by the ADC via subpoena.  And I'll

23   show those to you, and if you will, just thumb

24   through those real quick for me.

25                (Deposition Exhibit No. 9 was

1    marked.)

2    Q.   Okay.  The first two photographs on Exhibit

3    No. 9 are the same two we were just talking about

4    which are also Exhibit 9 to Fletcher's

5    deposition, correct?

6    A.   Yes.

7    Q.   The remainder appear to be scans.  Are all

8    those from the Adani scanner?

9    A.   Yes.

10   Q.   All right.  You can see that, again, these

11   are bates labeled documents that are numbered as

12   ADC -- well, the scans start at like 177 and go

13   on back.  If you would, look through there and

14   pick out the best photo, two or three, that helps

15   me understand what it is that you would have been

16   seeing on the scanner.

17   A.   182 and 183, 184 are your best ones.

18   Q.   Okay.  I'll tell you what I'll do -- I don't

19   know if blue or red will be better.  I'm going to

20   slide you a pen.  And if you will, on the best

21   ones, 182, 183, 184, I think you said, mark or

22   circle the object that you're talking about.

23   Okay.  Now go to 185, can you see it on that one

24   as well?

25   A.   Yes, you can see it, but not as clear,

1   marked.)

2   Q.   Okay.   The first two photographs on Exhibit

3   No. 9 are the same two we were just talking about

4   which are also Exhibit 9 to Fletcher's

5   deposition, correct?

6   A.   Yes.

7   Q.   The remainder appear to be scans.   Are all

8   those from the Adani scanner?

9   A.   Yes.

10  Q.   All right.   You can see that, again, these

11  are bates labeled documents that are numbered as

12  ADC -- well, the scans start at like 177 and go

13  on back.   If you would, look through there and

14  pick out the best photo, two or three, that helps

15  me understand what it is that you would have been

16  seeing on the scanner.

17  A.   182 and 183, 184 are your best ones.

18  Q.   Okay.   I'll tell you what I'll do -- I don't

19  know if blue or red will be better.   I'm going to

20  slide you a pen.   And if you will, on the best

21  ones, 182, 183, 184, I think you said, mark or

22  circle the object that you're talking about.

23  Okay.   Now go to 185, can you see it on that one

24  as well?

25  A.   Yes, you can see it, but not as clear,

54

1    because of the other little piece down at the

2    bottom here.

3    Q.  All right.  Let's go back to the first one

4    then which was 182?

5    A.  Yes.

6    Q.  And just for my information, I saw you circle

7    it, hold it up and show it to me one more time,

8    just so I -- okay.  There is a defined white

9    patch there, correct?

10   A.  Yes.

11   Q.  All right.  The sticker on the bottom of that

12   says Officer Fletcher 4/30/19, and it says

13   before.  Do you know which of the two scans this

14   showed up from where the objects were still

15   showing up?  Is there a way to tell?

16   A.  Yes.  The two -- the ones that say before,

17   that would be the ones when she originally first

18   went through the scanner.

19   Q.  Okay.  And what about these photographs again

20   makes you believe that this was not a false read?

21   A.  Based on the size, based on the position.

22   When I say the position, where it's located and

23   the definite shape.

24   Q.  Okay.  So this would have been in your view

25   in her pubic area?  Here's what I'm getting at;

55

1    everybody has used the word vagina, but this

2    appears to be above the vagina?

3    A.  Uh-huh.

4    Q.  And I'm trying to find out if you can tell me

5    anatomically where you believe that object is

6    located?

7    A.  It could be either inserted in or it could be

8    on the outside, either or.

9    Q.  Really.  Okay.  And that's based on what

10   you've seen in prior cases?

11   A.  Yes.

12   Q.  All right.  Let me get Fletcher's 9 from you,

13   and we'll keep that in the stack over here.  You

14   actually made the initial decision to terminate

15   Ms. Kelly and Ms. Fletcher, correct?

16   A.  Yes.

17   Q.  Was there anybody else in your view that

18   warranted disciplinary action for what happened

19   on April 30, 2019?

20   A.  No.

21   Q.  Do you have any history with the CVSA exam

22   personally?

23   A.  Rephrase that.

24   Q.  Have you ever taken one, been administered

25   one?

57

1   your mind that you considered or relied upon in

2   making the termination decisions for those two

3   individuals?

4              MR. GILLHAM:  Object to the form.

5   A.  No.  Based on what's in the report.

6   Q.  All right.  When Captain Kelly volunteered

7   that she had given answers to the sergeant's exam

8   to Ms. Fletcher, is that something that she could

9   have been disciplined for?

10  A.  Yes.

11  Q.  Is that something that's common or expected

12  with respect to people who are taking the

13  sergeant's exams?

14  A.  No.

15  Q.  Okay.  They are not supposed to be given

16  those answers in advance?

17  A.  No.

18  Q.  Are they not even supposed to be given the

19  questions in advance?

20  A.  When you say questions, each interviewer or

21  promotion panel have a different set of

22  questions, so you do have staff that may actually

23  jot down some of the questions, but when you talk

24  about a captain giving it to a corporal, then no.

25  Q.  That should not have happened?

1    A.   No.

2    Q.   Did that demonstrate an element of bias to

3    you that Ms. Kelly is biased in favor of Ms.

4    Fletcher?

5    A.   Yes.

6    Q.   And is that a problem for someone who is in

7    leadership like Ms. Kelly?

8    A.   It could be.

9    Q.   All right.  We have a situation where you're

10   investigating potential contraband being brought

11   into a prison, correct?

12   A.   Yes.

13   Q.   You have interviewed the person who had two

14   positive scans showing at least a potential that

15   something is there, correct?

16   A.   Yes.

17   Q.   You have surveillance video that makes it

18   sure look like something was handed off, correct?

19   A.   Yes.

20   Q.   You have Captain Kelly immediately going to

21   the restroom, which was an opportunity for her to

22   discard what it made it look like on the video

23   that she had been handed, correct?

24              MR. GILLHAM:  Object to form.

25   A.   Yes.

59

1    Q.  You interviewed Ms. Fletcher and Ms. Kelly,

2    and they provided inconsistent statements to you

3    concerning their knowledge of one another,

4    correct?

5                    MR. GILLHAM:  Objection form.

6    A.  Yes.

7    Q.  Do you form the belief that one or both of

8    them were lying to you at the time, correct?

9                    MR. GILLHAM:  Objection form.

10   A.  Yes.

11   Q.  You did not need the CVSA exam to tell you

12   that they were lying to you, did you?

13                   MR. GILLHAM:  Object to form.

14   A.  No.

15   Q.  Given the circumstances of this termination

16   and the fact that you had inconsistent

17   statements, surveillance video, Adani scanner

18   showing the presence of an object, and especially

19   with the fact that one or both had lied to you,

20   was there any way that you could allow them to

21   remain employed with Arkansas Department of

22   Corrections?

23                   MR. GILLHAM:  Objection form.

24   A.  No.

25   Q.  And you didn't need the CVSA exam to tell you

60

1  that, did you?

2              MR. GILLHAM:  Objection form.

3  A.  No.

4  Q.  Based on what you know today, would you have

5  terminated both of those individuals even if the

6  CVSA exam had not been performed?

7              MR. GILLHAM:  Object to form.

8  A.  Yes.

9              MR. ROBERTSON:  I pass the witness.

10              MR. GILLHAM:  Jim, can we stipulate

11  to -- you know, they gave a transcript of the

12  hearing to us, and my cross-examination is going

13  to be shorter if we can stipulate that that's an

14  accurate transcript, but if you can't, then I'm

15  going to have to go on.

16              MR. ROBERTSON:  I'm assuming it's

17  accurate.  I mean, was it a court reporter that

18  did it?

19              MR. BURNS:  The SEAGAP panel?

20              MR. GILLHAM:  It was recorded.  You

21  did not have a court reporter?

22              MR. BURNS:  Right, it's recorded.

23  We don't have a court reporter there, but the

24  SEAGAP administrator is the one who --

25              MR. ROBERTSON:  Well, let's do this;

# END-USER LICENSE AGREEMENT FOR CVSA SOFTWARE

**IMPORTANT READ CAREFULLY: This End-User License Agreement (EULA) is a legal agreement between you (either an individual or a single entity) and the NITV Federal Services, LLC (NFS) which installed the Computer Voice Stress Analyzer® (SOFTWARE PRODUCT or SOFTWARE) on a Dell Latitude or Dell ATG or Dell XFR or other Computer (COMPUTER). The SOFTWARE PRODUCT includes computer software, the associated media, any printed materials, and any online or electronic documentation. Once the EULA is signed by any member of said entity or the CVSA® is used by anyone employed by said entity, it is understood and agreed to be bound by the terms of this EULA.**

## SOFTWARE PRODUCT LICENSE

The SOFTWARE PRODUCT is protected by copyright laws and international copyright treaties, as well as other intellectual property laws and treaties. **The CVSA SOFTWARE PRODUCT is licensed, not sold.**

I.  **GRANT OF LICENSE.** This EULA grants you the following rights:
   ➢ **Software.** You may use this copy of the SOFTWARE PRODUCT (CVSA Program) only on the COMPUTER described below in this Agreement.

II. **DESCRIPTION OF OTHER RIGHTS AND LIMITATIONS.**
   ➢ **Limitation on Reverse Engineering, De-compilation and Disassembly.** You may not reverse engineer, de-compile, or disassemble the SOFTWARE PRODUCT, except and only to the extent that such activity is expressly permitted by applicable law notwithstanding this limitation.
   ➢ **Separation of Components.** The SOFTWARE PRODUCT (CVSA) is licensed as a single product. Its component parts may not be separated for use on any other computer.
   ➢ **Single COMPUTER.** The SOFTWARE PRODUCT is licensed with the COMPUTER described below as a single integrated product. This license specifically excludes any use, review, evaluation, research & development (R&D), scientific testing or analysis of the CVSA SOFTWARE PRODUCT by the user or any third parties not specifically authorized by NFS.
   ➢ **Rental.** You may not rent, lease, assign, sub-lease, loan, sell, or otherwise transfer any rights to the SOFTWARE PRODUCT or COMPUTER under this agreement.
   ➢ **Termination.** Without prejudice to any other rights, NFS may terminate this EULA if you fail to comply with the terms and conditions of this EULA. In such event, you must return the computer in question in order to allow NFS to destroy all copies of the SOFTWARE PRODUCT and all of its component parts. The computer will then be returned minus the CVSA program.

III. **UPGRADES.** If you receive a CVSA SOFTWARE PRODUCT upgrade, you may use that upgrade only in accordance with this EULA and added only to the computer described below.

IV. **COPYRIGHT.** All title and copyrights in and to the CVSA SOFTWARE PRODUCT (including but not limited to any images, photographs, animations, videos, audio, music, algorithms, text and "applets") incorporated into the SOFTWARE PRODUCT, are owned by NFS or its suppliers. You may not copy the printed materials accompanying



EXHIBIT
2

NITV 000001

# END-USER LICENSE AGREEMENT FOR CVSA SOFTWARE

the CVSA SOFTWARE PRODUCT. All rights not specifically granted under this EULA are reserved by NFS.

V. **PRODUCT SUPPORT.** Product support for the SOFTWARE PRODUCT is provided by NFS. For product support, or if you have any questions concerning this EULA, please refer to the information provided in the CVSA User's Manual.

VI. **U.S. GOVERNMENT RESTRICTED RIGHTS.** The SOFTWARE PRODUCT and documentation are provided with RESTRICTED RIGHTS. Use, duplication, or disclosure by the Government is subject to restrictions as set forth in subparagraph (c)(1)(ii) of the rights in Technical Data and Computer Software clause at DFARS 252.227-7031 or subparagraphs (c)(1) and (2) of the Commercial Computer Software Restricted Rights at 48 CFR 52.227-19, as applicable. Manufacturer is NFS, 11400 Fortune Circle, West Palm Beach, FL 33414.

VII. **CONFIDENTIAL INFORMATION.** During the term of this Agreement, Licensee and its Employees, agents, and duly authorized users shall be exposed to certain information concerning the business, products, proposed new products, customers and related information concerning NFS or the CVSA which is not known to the public ("Confidential Information"). Licensee agrees not to disclose or otherwise make such Confidential Information available to third parties or to make any use of such Confidential Information without prior written consent of NFS, which consent may be withheld in NFS's sole and arbitrary discretion. Licensee shall be liable for any and all damages, costs, and attorney's fees incurred by reason of a breach of this provision, or any other provision of this Agreement, whether directly by Licensee or any user Licensee employs or otherwise directly or indirectly, has enabled access to the Confidential Information. Licensee shall be responsible for all damages including but not limited to, incidental and consequential damages. This license agreement in no way supersedes any state or local statute.

VIII. **CAVEAT.** NFS sells the Computer Voice Stress Analyzer as an *investigative tool*. The results of any testing should not be used as a final determinant, nor should the results of any test be included in a *probable cause* affidavit. The results of a CVSA examination should not be used to obtain an arrest or search warrant.

IX. **EXPORT CONTROL WARNING: The CVSA is classified as a Restricted Crime Control Technology by the US Department of Commerce and subject to Export Licensing by the US Government. The CVSA should not be removed from the US without an Export Determination by the US Government. Violations are subject to severe fines and possible CRIMINAL PROSECUTION.**

X. **NFS has advised purchaser of the option to secure extended 4-year Dell warranty at an additional cost.**
   - ❑ Purchaser agrees to buy 4 year *on site* warranty at the Dell price of $300.00.
   - ❑ Purchaser declines purchase to buy 4-year warranty.

XI. **SUMMARY:**

NITV 000002

# END-USER LICENSE AGREEMENT FOR CVSA SOFTWARE

➢ The Print Utility, as required, may be copied and installed on any other computer for the purposes of reading VSA files or printing.
➢ The NFS agrees to reload the CVSA program on a Licensee's CVSA in the event of a hardware failure.

**The warranty on the COMPUTER and SOFTWARE PRODUCT will be in effect when this document is signed and returned to NFS, and when the CVSA® is shipped to purchaser.**

I have read and understand this End-User License Agreement and Limited Warranty for the Computer Voice Stress Analyzer.  Authorized Company or Agency Representative for the purchase of the Computer Voice Stress Analyzer as described below:

_Raymond Taylor_ , Title _Dr. Internal Affairs Admistrator_
Authorized signature

Printed name of authorized signature _Raymond Taylor_

Entity purchasing the CVSA _AR Dept. of Correction_

_6814 Princeton Pike_
(Address)

_Pine Bluff, AR 71602_
(City, State, Zip)

_870-267-6218_
(Phone number)

_Raymond.Taylor@arkansas.gov_
(E-mail address required for transfer of warranty)

Signed this _18th_ day of _July_ , 20_14_

**(BELOW:  FOR OFFICE USE ONLY)**

(1) Dell Latitude Computer (2) Dell ATG (3) Dell XFR (4)

Other Model # _E5440 , E5000_

Number of Computers _1_

Serial #'s _AR23612_
* _J8MP5S2_

Revised 13 August 2013 jk/cg

NITV 000003



PO Box 8707
Pine Bluff, AR 71611-8707
Phone: 870-267-6200
Fax:    870-267-6244
www.adc.arkansas.gov

**Arkansas Department of Correction**

# ADMINISTRATIVE DIRECTIVE

**SUBJECT:**   Internal Investigations and Computerized Voice Stress
Analysis Examinations

**NUMBER:**   17-16                    **SUPERSEDES:**  11-35

**APPLICABILITY:**  All Employees, Contract Employees, Volunteers and Inmates

**REFERENCE:** AR-014 – Internal Affairs and    **PAGE: 1 of 10**
Investigations

**APPROVED:**  Original Signed by Wendy Kelley **EFFECTIVE DATE: 05/26/17**

---

**I.**   **POLICY:**

To ensure that incidents are investigated in a timely, efficient and procedurally
correct manner and computerized voice stress analysis examinations are used only
under limited circumstances when thorough investigation reveals their usefulness
to an inquiry.

**II.**   **EXPLANATION:**

Evidence gathering, labeling and protection of evidence, questioning and taking
statements from witnesses, use of photographs, computerized voice stress analysis
examinations, and report writing must be professionally accomplished to be
useful to the requesting authority.

A.   All incidents as defined in Administrative Regulation 005 should be
investigated by Internal Affairs.  Suspicion of criminal acts (trafficking,
staff sexual misconduct, theft, etc.), serious violation of an inmate's
personal rights, or of rules, regulations or procedures, and complaints or

EXHIBIT
3

ADC 0042

information supplied which may have a serious bearing on facility or institutional operations should also be matters for investigation.

1.    All suspicions of criminal acts or institutional rule violations will be reported to the Warden and the Chief Deputy Director, Deputy Director, Assistant Director or Internal Affairs Administrator who will advise the Director.  In cases where warranted, the Internal Affairs Administrator, after consulting with the Director or Chief Deputy Director, will advise the Prosecuting Attorney and local law enforcement including State Police or Sheriffs of the jurisdiction where the incident occurs.

2.    Requests for departmental staff participation in an investigation must be initially processed through the chain of command before a request for this service is made to the Chief Deputy Director, Deputy Director, Assistant Director or Internal Affairs Administrator by the Warden.

3.    The agency shall impose no standard higher than a preponderance of the evidence in determining whether allegations of sexual abuse or sexual harassment are substantiated.

B.    The guidelines below will provide the salient procedures and techniques used in forming investigations.  Attention to detail and thoroughness in approach are required in any investigation.  If these guidelines are followed, it will provide for a complete, thorough and timely investigation.

C.    Investigatory Procedures and Techniques:

1.    Evidence Gathering:  Evidence uncovered relating to a matter under investigation must be properly handled, protected and labeled.  After an incident occurs, it may be wise to "seal off" an area to protect the integrity of the investigation and the evidence.

a.    Evidence which may reveal information through Crime Lab analysis (fingerprints, substance, etc.) should be handled with extreme care.  In no case should a person's position or simple curiosity be a reason to unnecessarily handle evidence.  Destroying latent fingerprints which might provide ownership/responsibility/involvement can seriously jeopardize the investigator's fact-gathering process.

b.    Evidence which will be sent to a Crime Lab, such as rape kits, should, immediately after discovery, if size or type permits, be placed in a sealed container, labeled and taken

to the Arkansas Crime Lab.  Whether evidence is or is not
sent to a Crime Lab does not change the necessity for its
protection in a sealed container.

c.      Evidence labeling must include:

   (1)     Exact location where found.

   (2)     Date and time found.

   (3)     The name(s) of person(s) discovering the evidence
           (name must be printed and evidence label signed).

   (4)     Location where evidence will be stored (until taken
           to Crime Lab, as needed).

   (5)     Date taken and returned from analysis (as needed).

   (6)     Where evidence is transferred and date.  Receipt for
           evidence transferred away from institution control
           must be obtained including:  complete description
           of evidence, printed and signed name of recipient,
           job title, agency and date transferred.

   (7)     Chain of custody form to include signatures, time
           and date of any persons handling the evidence.

2.    Use of Photographs:  Photographic evidence is useful and can be
      invaluable in subsequent investigation and/or prosecution.  Each
      facility should have a digital camera.  Photographs shall be taken
      immediately at the scene and of the victim as soon as possible - in
      cases of physical assault.  Photographs of property damage or the
      scene of a theft are likewise important.  Photographs should be
      handled with the same care as other evidence and labeled.

3.    Statements:  Statements are a most important part of any
      investigation but it is absolutely imperative that the rights of
      individuals who may be charged with an offense in court are not
      violated.  If a reasonable belief exists that a felony has occurred,
      the information should be forwarded to the Arkansas State Police
      or proper jurisdictional law enforcement officials, at which time
      the law enforcement officials will conduct the interview and advise
      the suspects of their appropriate rights.

It is advisable that a witness be present when possible. All statements will be recorded, and recorded statements will be transcribed when necessary.

4.  Reports: Reports prepared during an investigation are to be totally comprehensive. All employees who participate or observe significant events or situations shall prepare incident reports pursuant to Administrative Regulation 005. Investigation reports shall be prepared to evaluate the relevant facts.

5.  Computerized Voice Stress Analysis Examinations: These investigative tools shall be employed only with prior written or verbal approval of the Director, Chief Deputy Director, Deputy Director, Assistant Director or Internal Affairs Administrator on the basis that there is no reasonable alternative to the determination or resolution of disputed issues of fact.

   a.  An employee who refuses to take a computerized voice stress analysis examination can be disciplined solely for refusing to do so, as outlined in the Administrative Directive on Employee Conduct. If an employee consents to take a computerized voice stress analysis examination, he/she shall sign the Computerized Voice Stress Analysis Authorization and Consent form - Attachment A.

   b.  The Director may order that an employee submit to a computerized voice stress analysis examination for violations of policy that would warrant discharge, suspension or criminal sanctions. The following procedural safeguards will be utilized if this policy is invoked.

      (1)  Where an employee is accused and the investigating officer believes it to be important, the accuser will be tested on the computerized voice stress analysis first and must substantially tell the truth prior to any order given for an employee to take a computerized voice stress analysis test.

         Absent an accusation against a particular employee, where a preliminary investigation reveals that there is credible evidence that the employee was involved or has direct knowledge of the incident, a computerized voice stress analysis test may be ordered.

(2)   The investigating officer must present reasons to the Director as to why a particular employee should complete a computerized voice stress analysis. If the Director agrees, the employee will then be ordered to take the test.

(3)   If after taking the test, the employee objects to the results of the test, that employee may make a written request to the Director to have a second reading of the original computerized voice stress analysis charts made by another independent examiner. A copy of the letter of analysis completed by the second examiner will be given to the employee.

(4)   The requesting authority will not sustain a complaint against an employee solely on the basis of computerized voice stress analysis results. There must be at least one additional item of corroborating evidence in the written report completed by the investigating officer in order for the requesting authority to sustain the complaint. (A witness statement is corroboration.)

c.   An inmate who refuses to take a computerized voice stress analysis examination after appropriate safeguards of his/her constitutional rights may receive disciplinary action for such refusal.

d.   Preliminary Procedural Limitations: Widespread or indiscriminate use of the computerized voice stress analysis is unnecessary and costly but, when required, accurate and reliable computerized voice stress analysis results can be obtained by observing high standards of professionalism in administration and confidentiality with respect to the results. Therefore, the following preliminary procedural safeguards must be observed:

(1)   Thorough preliminary investigation of the incident reveals that there are believable allegations that a serious incident has taken place in which the Administrative Regulations of the agency, the rules or conduct guidelines of the Department, or the law have been violated. A "serious" incident is one which could be grounds for suspension or discharge of an employee or for discipline of an inmate.

(2)   Thorough preliminary investigation of the incident undertaken reveals that there is a credible allegation that the prospective subject of the computerized voice stress analysis examination was involved in or had direct knowledge of the incident.

(3)   The computerized voice stress analysis examiner must be apprised of the relevant findings and results of the preliminary investigation and use such as a basis for the formulation of examination questions.

(4)   An employee or inmate requested or directed to take a computerized voice stress analysis examination must be advised of the constitutional privilege against self-incrimination and not be required to waive it.

e.   Requirements which apply during the computerized voice stress analysis examination and following its administration are:

(1)   The employee or inmate shall be advised that the test is being administered as part of an official investigation, shall be informed of the nature of the incident and his/her alleged involvement in or knowledge of it, and of the right to refuse to answer questions which would tend to incriminate.

(2)   The scope of the examination shall be limited to the incident under investigation, and the questions asked shall relate specifically and directly to the performance of the employee's duties in the course of participating in, witnessing the incident, or having knowledge of the incident, or to the inmate's participation in, witnessing of the incident. A list of all questions asked must be incorporated in the report of the examiner.

(3)   The examination must be conducted by qualified computerized voice stress analysis examiners.

(4)   The Department shall furnish the employee with exactly the same report that it received regarding the results of the examination.

    f.  The Department has a responsibility to have examinations administered with impartiality.  In an accuser-accused relationship, the accuser will be examined first, if he/she will cooperate, to test the validity of the accusations.

       In rare instances, the accused may take the computerized voice stress analysis examination at his/her request and with permission from the Director, Chief Deputy Director, Deputy Director, Assistant Director, or the Internal Affairs Administrator.

  D.  Unit or Departmental Investigations:  After the initial reporting of an incident in accordance with AR 005, an investigation shall be conducted into the matter.  All incident reports, statements, disciplinary and medical reports shall be compiled within seven (7) days of the date of the discovery of the incident.  The Warden or Administrator shall prepare a memorandum in which he/she summarizes this information and makes his/her recommendation for the continuation or termination of the investigation.  This memorandum shall be referred in the electronic Offender Management System (eOMIS) or forwarded by paper copy under certain instances, with copies of all attached reports, within ten (10) days of the date of the discovery of the incident to the Chief Deputy Director, Deputy Director, Assistant Director, and the Internal Affairs Administrator; unless requested prior to the ten (10) day timeframe.

  E.  Internal Affairs Investigations:  The Director, Chief Deputy Director, Deputy Director, or Assistant Director may order an Internal Affairs investigation by the Internal Affairs Division of an incident at any time.  All unit or division investigation material shall be forwarded to the Internal Affairs Administrator.  The investigation shall be directed by the Internal Affairs Division, and the Warden will cooperate with requests and provide assistance required to complete the investigation.  The Internal Affairs Division will have unlimited access to all areas and files relevant to any ongoing investigations.  The Internal Affairs Division will complete its investigation within twenty (20) days of the date the incident was referred and forward its reports and recommendations to the requesting authority.  Any extension of the twenty (20) day limit must be requested, in writing, from the Internal Affairs investigator to the Internal Affairs Administrator for prior approval before the completion of the twenty (20) day deadline.  The requesting authority must be advised by the Internal Affairs Administrator of an extension of the twenty (20) day deadline.

  F.  Confidentiality:  All notes, reports, tape recordings, and any other materials which are part of an investigation are considered confidential.  No one shall have free access to these records other than the investigative personnel, the Warden/Administrator, Chief Deputy Director, Deputy

Director, Assistant Director or the Director, unless specific permission is granted by the Director or the Internal Affairs Administrator.

Dissemination of investigative information under the provision of the Freedom of Information Act shall be handled by the office of the Director.

**III.   ATTACHMENTS:**

Attachment A -- Computerized Voice Stress Analysis Examination

AD 17-16   Internal Investigations-CVSA Exams                    9 of 10

Attachment A

**AUTHORIZATION AND CONSENT FORM FOR COMPUTER VOICE STRESS ANALYIS (CVSA)**

The undersigned CVSA Examiner on _____ (Date) and _____ (Time) obtained

Written or Oral authorization from _____ to conduct a

CVSA on: _____ (ADC Number _____)

_____ (Employee Number _____)

Purpose of Investigation:

**FOR ADC EMPLOYEE:** I understand I have the right to a Second Reading of the CVSA
Examiner's original charts by another licensed independent CVSA examiner should I disagree
with the results. To exercise my right to a Second Reading, I must make a written request to the
Director of the Department of Correction within five (5) business days. I fully understand all
expenses associated with a requested Second Reading will be paid by me. I will receive a copy
of the Analysis of the Second Reading.

_____ I accept and agree to take the CVSA.

_____ I decline and refuse the CVSA.

_____         _____
Name/Title                           Date/Time

The above signature was witnessed by: _____ _____
                                      Name/Title              Date

Authorization Verified by:

_____  _____
Name/Title                    Date

ADC 0050

## Arkansas Department of Correction
## Internal Affairs Division

### ADMINISTRATIVE WARNING

Date:_____   Time: _____

Employee:_____   Rank: _____

Unit:_____   Position: _____ Employee No: _____

This is an official administrative inquiry regarding _____ an incident, _____ misconduct or _____ improper performance of official duties, which is under administrative investigation.  This inquiry pertains to
_____.

The purpose of this interview is to obtain information which will assist in the determination of whether administrative action is warranted. In an administrative investigation you are **required** to truthfully answer all questions directed to you, both orally and when requested in writing.

You are going to be asked a number of specific questions regarding the performance of your official duties. These questions are specifically, directly and narrowly related to the performance of your duty.  You are not being questioned for the purpose of instituting criminal proceedings against you.

During the course of this questioning even if you do disclose information which indicates you may be guilty of criminal conduct in this matter, neither your self-incrimination statements, nor the fruit thereof, will be used against you in any criminal proceeding.

If you refuse to answer questions directed to you, you will be given a direct order by a superior officer and/or IAD investigator to answer the question directed towards you in this matter. If you refuse to answer the questions, you will be advised such refusal constitutes a violation of the Arkansas Department of Correction Employee Conduct Standards and may serve as a basis for more serious disciplinary action up to and including, **discharge**.

During this investigation you are directed to not discuss or make known any information concerning this matter with anyone other than your direct Chain of Command, your attorney/representative or members of the Internal Affairs Division.

If you have any questions regarding this warning, or any questions regarding the procedures to be followed, you may direct those questions to the Administrator of Internal Affairs Division, or his designated representative.

I, _____, hereby acknowledge the receipt of the above warning; that I have been given an opportunity to read it, or have it read to me; and I fully understand my rights as outlined above.

_____        _____
Witnessed by:                                                    Date:

ADC 0051



**Arkansas Department of Correction**

# Internal
# Affairs
# Final Report

| | |
|---|---|
| **IAD Case Number:** | **19-178** |
| **Unit Incident Number:** | **2019-05-003** |
| **Type:** | **Investigation** |
| **Allegation:** | **Introduction of Contraband – Maximum Security Unit** |
| **Requesting Authority:** | **Warden Aundrea Culclager, Maximum Security Unit** |
| **Victim(s):** | **N/A** |
| **Subject(s):** | **Corporal Bianca Fletcher; Corporal Jasmine Releford; Captain Nicola Kelly** |
| **Witness(es):** | **Corporal Verna Farmer-Jones** |
| **File Contains:** | |

| | | | | | |
|---|---|---|---|---|---|
| Interview of Victim | ☐ | Medical Reports | ☐ | Statement of Victim | ☐ |
| Interview of Subject | ☒ | CVSA Reports | ☒ | Statement of Subject | ☒ |
| Interview of Witness | ☐ | Diagrams | ☐ | Statement of Witnesses | ☒ |
| Incident Reports | ☒ | Crime Lab Reports | ☐ | Unit Investigation | ☒ |

Other: ☐ Enemy Alert Notifications

**Investigator's Name & Signature:**
Donna M. Best _Donna M. Best_

Date:   05/06/2019        Page  1  of  11 Pages

Sensitive information may be contained in this file, and any unauthorized release is prohibited.

EXHIBIT

ADC 0259

REFERRAL CHRONOLOGY:

On May 1, 2019, Internal Affairs received a request from Warden Aundrea Culclager of the Maximum Security Unit, requesting Internal Affairs to further investigate this case (Incident #2019-05-003). The case was assigned to this Investigator under Case #19-178 as an Introduction of Contraband investigation on May 1, 2019, and received by this Investigator on May 1, 2019.

**SYNOPSIS OF THE ALLEGATION:** On April 30, 2019, Corporal Bianca Fletcher (D-Shift), reported to work at approximately 5:50 p.m. Officer Verna Farmer-Barnes was working the Adani Scanner and an object appeared in the vaginal area of Corporal Fletcher. Captain LaMarcus Davis and Captain Nicola Kelly were called to the Entrance Building to review the scan and the object was still there in the vaginal area. Corporal Fletcher was rescanned and the object was still there. At this time, Warden Aundrea Culclager was notified and Captain Kelly was told to escort Corporal Fletcher to the Conference Room and wait on the Warden to arrive.

After Warden Culclager arrived, Sergeant Cora Harris was called to help Captain Kelly conduct a strip search of Corporal Fletcher with no contraband found. Warden Culclager was informed and had Corporal Fletcher taken back out to the Adani scanner and rescanned, with no object found. The object that was found on two other scans were not present. Corporal Fletcher was drug tested with negative results and her car was searched, with no contraband found. Corporal Fletcher wrote a statement denying she tried to introduce contraband, drugs, money, or a cell phone. She stated she was strip-searched and nothing was found.

During the investigation, it was discovered by review of video, when Captain Kelly escorted Corporal Fletcher to the Conference Room, she had Officer Jasmine Releford to help escort. It was also discovered that Captain Kelly had Officer Releford sit in the Conference Room with Corporal Fletcher while Captain Kelly went to the restroom. Captain Kelly then went and held security on Corporal Fletcher, along with Officer Releford. When Warden Culclager arrived, Captain Kelly was told to remove Officer Releford from the Conference Room and Sergeant Harris was called to assist Captain Kelly strip search Corporal Fletcher in the Restroom and no contraband was found. It was at this time when another scan was conducted and the object was no longer present.

*Deputy Warden Todd Ball noted that Captain Kelly should have never had Officer Releford sit in the Conference Room holding security on another officer. In his opinion, it was very likely that the object discovered on two scans was passed off at this time. Deputy Warden Ball recommended an Internal Affairs investigation with CVSA on Corporal Fletcher, Officer Releford, and Captain Kelly to determine if Corporal Fletcher was introducing contraband into the unit of any kind and if the contraband was passed off to Officer Releford or if she had knowledge of the contraband, and if Captain Kelly had anything/knowledge to do with the contraband not being found on the third scan.*

2

ADC 0260

EVIDENCE SUPPORTING THE ALLEGATION:

Corporal Bianca Fletcher:

1.  **Personal interview between IAD Investigator Donna Best and Corporal Bianca Fletcher at Central Office on May 2, 2019.**

    On May 2, 2019, Internal Affairs Investigator Donna Best conducted an interview with Corporal Bianca Fletcher at Central Office. Corporal Fletcher stated that when she came to work on April 30, 2019, they told her she could not clear the scanner. Corporal Fletcher stated that she had seen the scanner "mess up many a time before." She could not offer any explanation as to why she could not clear the scanner. Corporal Fletcher stated that she went through the scanner again and she was told that it looked like there was an object on her person. Corporal Fletcher stated that Captain Kelly escorted her to the Conference Room. She stated that Corporal Releford also escorted her to the Conference Room. Corporal Fletcher was asked why Corporal Releford was asked to escort her and she stated she thought Corporal Releford was about ready to clock out, so Captain Kelly told her to come on back.

    Corporal Fletcher was asked what happened when the three of them got to the conference room. She stated that Captain Kelly told her to sit down and to wait for Warden Culclager. She stated that both Captain Kelly and Corporal Releford sat with her in the Conference Room. Corporal Fletcher was asked if Captain Kelly ever left the room, and she stated, "No, I believe we all sat in there waiting for the Warden." Corporal Fletcher was asked what happened when Warden Culclager got to the Conference Room. She stated the Warden asked her if she had anything, and if she did, to hand it over to her or she could hand it over to the State Police. She said she told Warden Culclager she did not have anything, so Warden Culclager told her she was going to get strip-searched. She said she told the Warden that was fine. She said they found a female sergeant, Sergeant Harris, and her and Captain Kelly took her into the restroom. She said they told her to go into the stall, but she did not want to go into the stall, because she did not want to get aside of a toilet or behind a door. She said she stood there, got undressed, took off all her clothing, squatted, coughed, and they found nothing. Corporal Fletcher said they took her back through the scanner and there was nothing that showed in the scanner.

    This investigator informed Corporal Fletcher that the cameras were reviewed and when they (Fletcher, Releford, & Kelly) got to the Conference Room, Captain Kelly left the Conference Room, went across to the restroom, and was in the restroom for approximately three minutes, leaving her alone with Corporal Releford. It was pointed out to Corporal Fletcher that she did not mention that Captain Kelly was not in the Conference Room with her the whole time. She stated she did not recall Captain Kelly leaving.

    Corporal Fletcher denied she had contraband on her person. She denied she had any illegal contraband on her. She stated that she had stopped to get gas on her way to work and she put

3

ADC 0261

her credit card in her pants pocket.  She stated she forgot she had it in her pocket, but said they are not allowed to have a credit card inside the unit.  She denied she passed contraband to Officer Releford.  She denied she passed contraband to Captain Kelly.  She denied she hid contraband at the Unit.  She denied she brought illegal contraband into the Unit.

Corporal Fletcher was given a CVSA to determine the truthfulness of her statement.  CVSA Examiner Donna Best helped Corporal Fletcher formulate the relevant questions.

2. **CVSA Results for Corporal Bianca Fletcher conducted by CVSA Examiner Donna Best on May 2, 2019 at Central Office.  See Case File for complete details.**

On May 2, 2019, CVSA Examiner Donna Best conducted a pre-test interview (see Paragraph 1) with Corporal Bianca Fletcher at Central Office in reference to this case.  Corporal Fletcher was given a CVSA to determine the truthfulness of her statement.  CVSA Examiner Donna Best helped Corporal Fletcher formulate the relevant questions.  This Investigator asked the following relevant questions, along with control and irrelevant questions to Corporal Fletcher.  **Question 4:** On April 30th, did you have contraband on your person?  **Response: No, No Deception Indicated (showed some stress to this question, but not enough to call deceptive).  Question 6:** Did you pass contraband to Officer Releford?  **Response:  No, No Deception Indicated. Question 10:** Did you pass contraband to Captain Kelly?  **Response:  No, No Deception Indicated (showed some stress to this question, but not enough to call deceptive).  Question 12:** Did you hide contraband at the Unit?  **Response:  No, No Deception Indicated (Per CVSA Expert Gene Shook, had significant problems with this question, but not enough to call deceptive).  Question 14:** Have you brought illegal contraband into the unit?  **Response:  No, No Deception Indicated (Per CVSA Expert Gene Shook, had significant problems with this question, but not enough to call deceptive).  POST-TEST INTERVIEW:** Corporal Fletcher denied she brought any contraband into the unit.  Corporal Fletcher was released from her interview pending further investigation.  **CONCLUSION:** Based upon my training and experience, Corporal Fletcher showed No Deception to Question 6 on her CVSA.  I could not clear her on the rest of the questions as she showed significant stress to some of the other questions, but not enough to be called deceptive.

After her interview and CVSA was conducted On May 2, 2019, additional surveillance footage was reviewed at the Unit, which showed Corporal Fletcher being escorted from the Entrance Building to the Main Building.  In this footage, it appeared that Corporal Fletcher passed something to Captain Kelly while they were walking on the sidewalk.  Corporal Fletcher was ordered to appear at Internal Affairs to be re-interviewed and to submit to a CVSA on May 3, 2019.  Internal Affairs Administrator Raymond Naylor showed Corporal Fletcher the surveillance video.  She denied she passed anything to Captain Kelly.  She denied she had communicated with Captain Kelly that morning.

3. **Personal interview between IAD Investigator Donna Best and Corporal Bianca Fletcher at Central Office on May 3, 2019.**

ADC 0262

On May 3, 2019, Internal Affairs Investigator Donna Best conducted an interview with Corporal Bianca Fletcher at Central Office. Corporal Fletcher denied she passed any item to Captain Kelly while she was being escorted from the Entrance Building to the Main Building. Corporal Fletcher stated Deputy Warden Ball called her yesterday afternoon (May 2, 2019) and told her to report to Internal Affairs on May 3, 2019, at 9:00 a.m. She denied she communicated with Captain Kelly since Deputy Warden Ball contacted her.

4. **CVSA Results for Corporal Bianca Fletcher conducted by CVSA Examiner Donna Best on May 3, 2019 at Central Office. See Case File for complete details.**

On May 3, 2019, CVSA Examiner Donna Best conducted a pre-test interview (see Paragraph 1) with Corporal Bianca Fletcher at Central Office in reference to this case. Corporal Fletcher was given a CVSA to determine the truthfulness of her statement. CVSA Examiner Donna Best helped Corporal Fletcher formulate the relevant questions. This Investigator asked the following relevant questions, along with control and irrelevant questions to Corporal Fletcher. **Question 4:** Have you communicated with Captain Kelly since you talked to Warden Ball yesterday? **Response: No, Deception Indicated. Question 6:** Did you pass anything to Captain Kelly while you were walking on the sidewalk to the main building? **Response: No, Deception Indicated. POST-TEST INTERVIEW:** Corporal Fletcher denied she passed anything to Captain Kelly when she was being escorted to the Main Building. She denied she contacted Captain Kelly after Deputy Warden Ball contacted her. Corporal Fletcher was asked if she ever called Captain Kelly over a cell phone and she stated no. Corporal Fletcher was asked if she ever texted Captain Kelly and she stated yes. She said she texted pictures of her baby to Captain Kelly after her baby was born. She stated her and Captain Kelly had each other's phone numbers (Captain Kelly denied they had each other's phone number or that they ever communicated with each other outside of work during her interview). **CONCLUSION:** Based upon my training and experience, Corporal Fletcher showed Deception to Questions 4 and 6 on her CVSA.

**Captain Nicola Kelly:**

1. **Personal interview between IAD Investigator Donna Best and Captain Nicola Kelly at Central Office on May 2, 2019.**

On May 2, 2019, Internal Affairs Investigator Donna Best conducted an interview with Captain Nicola Kelly at Central Office. Captain Kelly stated Major Randle had asked to bring something up front for Re-Entry. She stated she went to the Entrance Building to give it to the Rover to bring to the Major. She stated while she was in the Entrance Building, Corporal Farmer called her over to the scanner because it looked like there was an object on Corporal Fletcher's person. Captain Kelly stated it did look like there was an object, so they made Corporal Fletcher go back through the scanner. She stated, "It still looked like something." Captain Kelly stated they made Corporal Fletcher go back through again and "it still looked like something." She stated at that time, she had Corporal Fletcher take a seat and she called Warden Culclager to get confirmation to strip search Corporal Fletcher.

5

Captain Kelly stated Warden Culclager asked her to escort Corporal Fletcher to the Conference Room, which she did.  She stated Corporal Jasmine Releford was out at the Entrance Building as well.  She stated she was going to bring Corporal Releford in to the "bio" so that the shift could be biometric out.  She said she told Corporal Releford to step into the conference room with Corporal Fletcher because at about that time, she had to use the bathroom, which she did.  She said after she used the bathroom, she went into the Conference Room and sat down until Warden Culclager arrived.  She stated once Warden Culclager came in, Sergeant Harris came in and Warden Culclager asked Sergeant Harris to come into the bathroom with her to conduct a strip search on Corporal Fletcher.

Captain Kelly stated that once they walked into the bathroom, Corporal Fletcher never went into a stall.  She said she told Corporal Fletcher to remove all her clothes and she told her to hand her clothes to Sergeant Harris so that she could search them.  She stated at that time, they found Corporal Fletcher's bank card and she told Corporal Fletcher that she was not supposed to bring that in.  She stated Corporal Fletcher told her, "Yes, mamm, but I stopped and got me something to eat and I stuck it in my pocket and I really forgot about it."  Captain Kelly said she told Corporal Fletcher that she could not take her card in, so Corporal Fletcher gave the card to her.  She stated Corporal Fletcher removed all her clothing, faced her and Sergeant Harris and she squatted and coughed several times.  Captain Kelly said she had Corporal Fletcher turn with her buttocks towards them and had her squat and cough several times.  She stated nothing came out, so she had Corporal Fletcher dress and they went back to the Conference Room and reported to Warden Culclager.  She confirmed Corporal Fletcher went through the scanner again and the scan was clear.

It was pointed out to Captain Kelly that she left Corporal Fletcher alone in the Conference Room with Corporal Releford.  She stated she knew she could not leave Corporal Fletcher alone and she had to use the bathroom.  She stated she did not know she would have to use the bathroom right then.  She stated she takes blood pressure pills and "when I gotta go, I gotta go."  She stated she just wanted someone to stay with Corporal Fletcher so she could not do anything while they were waiting.

Captain Kelly stated she did not walk close to Corporal Fletcher when they walked from the Entrance Building to the Main Building.  Captain Kelly was asked if Corporal Fletcher passed contraband to her on April 30 and she replied no.  She denied she hid any contraband at the unit.

Captain Kelly was given a CVSA to determine the truthfulness of her statement.  CVSA Examiner Donna Best helped Captain Kelly formulate the relevant questions.

2.  **CVSA Results for Captain Nicola Kelly conducted by CVSA Examiner Donna Best on May 2, 2019 at Central Office.  See Case File for complete details.**

ADC 0264

On May 2, 2019, CVSA Examiner Donna Best conducted a pre-test interview (see Paragraph 1) with Captain Kelly at Central Office in reference to this case. Captain Kelly was given a CVSA to determine the truthfulness of her statement. CVSA Examiner Donna Best helped Captain Kelly formulate the relevant questions. This Investigator asked the following relevant questions, along with control and irrelevant questions to Captain Kelly. **Question 4:** On April 30, did Corporal Bianca Fletcher pass contraband to you? **Response: No, Deception Indicated (Per Cold Call by CVSA Expert Examiner Gene Shook). Question 6:** Did you hide contraband at the unit? **Response: No, Deception Indicated (Per Cold Call by CVSA Expert Examiner Gene Shook). POST-TEST INTERVIEW:** Captain Kelly was informed that she was found deceptive on both questions during her CVSA. She was asked if she ever hid contraband at the unit during her official duties. She stated she had put contraband in her box when they confiscated it from an inmate until it could be taken to the Warden's safe (this could explain a deceptive answer to this question). She denied Corporal Fletcher passed her contraband on April 30. Captain Kelly was asked if she ever received contraband from Corporal Fletcher during official duties when they were doing searches, etc. She said she may have received nuisance contraband from Corporal Fletcher.

A third chart was conducted to help clear Captain Kelly. This Investigator asked the following relevant questions, along with control and irrelevant questions to Captain Kelly: **Question 4:** Did Corporal Fletcher give you contraband in the conference room? **Response: No, Deception Indicated (Per Cold Call by CVSA Expert Examiner Gene Shook). Question 6:** Other than the bank car, did you get contraband from Corporal Fletcher on April 30? **Response: No, No Deception Indicated (Captain Kelly could not be cleared on this question, but it was not enough to call deceptive per Cold Call by CVSA Expert Examiner Gene Shook.) POST-TEST INTERVIEW:** Captain Kelly was informed that she was found deceptive on her CVSA. She denied she received any contraband from Corporal Fletcher on April 30. She stated she was the one who called Warden Culclager because the scans were suspicious. **CONCLUSION:** Based upon my training and experience, the subject showed Deception to relevant Question 4 and could not be cleared on Question 6 on her CVSA.

3. **005 from Captain Nicola Kelly: See file for complete statement.**

After her interview and CVSA was conducted On May 2, 2019, additional surveillance footage was reviewed at the Unit, which showed Corporal Fletcher being escorted from the Entrance Building to the Main Building. In this footage, it appeared that Corporal Fletcher passed something to Captain Kelly while they were walking on the sidewalk. Captain Kelly was ordered to appear at Internal Affairs to be re-interviewed and to submit to a CVSA on May 3, 2019. Internal Affairs Administrator Raymond Naylor showed Captain Kelly the surveillance video. She denied Corporal Fletcher passed her anything. She denied she had communicated with Corporal Fletcher since she left my office the day before.

4. **Personal interview between IAD Investigator Donna Best and Captain Nicola Kelly at Central Office on May 3, 2019.**

7

ADC 0265

On May 3, 2019, Internal Affairs Investigator Donna Best conducted an interview with Captain Nicola Kelly at Central Office.  Captain Kelly stated she did not remember Corporal Fletcher passing her anything while she was escorting Corporal Fletcher from the Entrance Building to the Main Building.  Captain Kelly stated, "She did not pass me any contraband or nothing.  If she did, it was a piece of paper, but I don't even remember her doing that."  She stated they walked side-by-side and she (Captain Kelly) had a cup in her hand.  She said Corporal Fletcher did not even have enough time to pass her anything.  She said if there was contraband, it was in her clothes and the three of them (Captain Kelly, Corporal Fletcher, and Corporal Releford) walked from the Front Entrance to the Conference Room.  She said she watched the video and you cannot see Corporal Fletcher hand her anything.  She said she may have pulled up her pants.  Captain Kelly denied she communicated with Corporal Fletcher since she left my office yesterday.  She denied she ever communicated with Corporal Fletcher via cell phone.  She stated they did not have that type of relationship and they did not have each other's phone numbers.  Captain Kelly said she thought Corporal Fletcher had something on her person and that was why she contacted Warden Culclager.  She said she would not jeopardize her job over Corporal Fletcher.

5.  **CVSA Results for Captain Nicola Kelly conducted by CVSA Examiner Donna Best on May 3, 2019 at Central Office.  See Case File for complete details.**

   On May 3, 2019, CVSA Examiner Donna Best conducted a pre-test interview (see Paragraph 1) with Captain Nicola Kelly at Central Office in reference to this case.  Captain Kelly was given a CVSA to determine the truthfulness of her statement.  CVSA Examiner Donna Best helped Captain Kelly formulate the relevant questions.  This Investigator asked the following relevant questions, along with control and irrelevant questions to Captain Kelly.  **Question 4:**  Have you communicated with Corporal Fletcher since you left my office yesterday?  **Response:  No, No Deception Indicated (Showed significant stress to this question.  Not enough to call Deceptive, but too much to clear this question per CVSA Expert Examiner Gene Shook – Cold Call).** **Question 6:**  Did Corporal Fletcher pass you anything while you were walking on the sidewalk to the main building?  **Response:  No, Deception Indicated (Per Cold Call by CVSA Expert Examiner Gene Shook).  POST-TEST INTERVIEW:**  Captain Kelly denied Corporal Fletcher passed her anything when she was being escorted to the Main Building.  She denied she contacted Corporal Fletcher since she left my office yesterday.  Captain Kelly stated she was telling the truth. **CONCLUSION:**  Based upon my training and experience, Captain Kelly could not be cleared on Question 4 and she showed Deception to Question 6 on her CVSA.  CVSA Expert Examiner Gene Shook confirmed this through cold call.

**Sergeant Cora Harris:**

1.  005 from Sergeant Cora Harris:  See file for complete statement.

**EVIDENCE NOT SUPPORTING THE ALLEGATION:**

ADC 0266

**Corporal Bianca Fletcher:**

1. Statement of Witness from Corporal Bianca Fletcher:  See file for complete statement.

**Officer Jasmine Releford:**

1. Personal interview between IAD Investigator Donna Best and Corporal Jasmine Releford at Central Office on May 2, 2019.

   On May 2, 2019, Internal Affairs Investigator Donna Best conducted an interview with Corporal Jasmine Releford at Central Office.  Corporal Releford stated that she was getting ready to go off shift, when Captain Kelly asked her to help escort Corporal Fletcher to the Conference Room. She stated they went to the Conference Room, sat down, and when Warden Culclager came into the room, she asked her to leave the room.  Corporal Releford stated she waited by biometrics until key count cleared.

   Corporal Releford was asked to describe what happened when the three of them arrived at the Conference Room.  She said Corporal Fletcher sat at the conference table opposite Captain Kelly and she (Corporal Releford) sat at the computer table.  She stated that they discussed how Lieutenant Graydon had given his two-week notice.  She stated another conversation was about Corporal Fletcher's truck and that it was "nasty" and how it might have a "beer or some liquor" in it.  Corporal Releford stated that Corporal Fletcher said she did not have any contraband on her and that she said she could be strip-searched.  Corporal Releford said another conversation they had was Corporal Fletcher talked about how she used to smoke before starting at ADC.  She said about that time, Warden Culclager came in.

   Corporal Releford was asked if at any time she was left alone with Corporal Fletcher.  She stated, "Yes Mamm."  She stated as soon as they came in from the Entrance Building and they were walking into the Conference Room, Captain Kelly went to the restroom.  When asked what Captain Kelly said, Corporal Releford said the Captain stated, "I'm going to use the restroom." She stated she never saw anybody pass anything when they were walking through the gates.

   Corporal Releford denied Corporal Fletcher passed contraband to her.  She denied she hid contraband at the unit.

   Corporal Releford was given a CVSA to determine the truthfulness of her statement.  CVSA Examiner Donna Best helped Officer Releford formulate the relevant questions.

2. CVSA Results for Corporal Jasmine Releford conducted by CVSA Examiner Donna Best on May 2, 2019 at Central Office.  See Case File for complete details.

   On May 2, 2019, CVSA Examiner Donna Best conducted a pre-test interview (see Paragraph 1) with Corporal Jasmine Releford at Central Office in reference to this case.  Corporal Releford was given a CVSA to determine the truthfulness of her statement.  CVSA Examiner Donna Best

ADC 0267

helped Corporal Releford formulate the relevant questions. This Investigator asked the following relevant questions, along with control and irrelevant questions to Corporal Releford. **Question 4:** On April 30, did Corporal Bianca Fletcher pass contraband to you? **Response: No, No Deception Indicated. Question 6:** Did you hide contraband at the unit? **Response: No, No Deception Indicated. POST-TEST INTERVIEW:** Corporal Releford had nothing further to add and she was released from her interview. **CONCLUSION:** Based upon my training and experience, the subject showed No Deception to relevant Questions  4 and 6 on her CVSA.

3. **The Unit did not obtain a Statement of Witness from Corporal Jasmine Releford.**

**INVESTIGATOR'S OBSERVATION:** Based on a review of the documentation provided, a unit level investigation was conducted. On April 30, 2019, Corporal Bianca Fletcher appeared to have an object in her vaginal area during her Àdani Scan. Corporal Fletcher was scanned two more times and it still appeared that an object was in her vaginal area. The unit contacted Warden Culclager and she told Captain Nicola Kelly to escort Corporal Fletcher to the Conference Room to wait for the Warden.

Captain Kelly asked Corporal Jasmine Releford to accompany them to the Conference Room. Video footage shows when the three officers arrived at the Conference Room; Captain Kelly immediately left the Conference Room and went to the bathroom. Captain Kelly was in the bathroom for approximately three minutes, leaving Corporal Fletcher alone with Corporal Releford.

After Warden Culclager arrived at the Conference Room, she dismissed Corporal Releford from the room, and asked that Sergeant Cora Harris assist Captain Kelly strip-search Corporal Fletcher. No contraband was found on Corporal Fletcher's person. Corporal Fletcher was sent through the scanner and no object was seen.

During her first interview with Internal Affairs, Corporal Fletcher denied she brought in contraband, other than accidently having her bankcard on her person. The only question that Corporal Fletcher was found Not Deceptive on was relevant question 6, which cleared her from passing contraband to Corporal Releford. Although, I could not call the test Deceptive (per CVSA Expert Gene Shook), I could also not clear Corporal Fletcher on the rest of the relevant questions (see first CVSA Report).

Additional surveillance footage was reviewed at the Unit, and it appeared that Corporal Fletcher might have passed something to Captain Kelly as they walked from the Entrance Building to the Conference Room. Corporal Fletcher again denied she passed anything to Captain Kelly. She also denied she communicated with Captain Kelly since she talked to Warden Ball on May 2, 2019. Corporal Fletcher was found Deceptive on both relevant questions (see second CVSA Report).

Corporal Jasmine Releford denied Corporal Fletcher passed contraband to her on April 30, 2019. She also denied she hid contraband at the Unit. Corporal Fletcher was found Not Deceptive on her CVSA. Corporal Fletcher was also found Not Deceptive on her CVSA when asked if she passed contraband to Corporal Releford. Both CVSA's clear Corporal Releford of any involvement of receiving or hiding contraband on the date in question (See CVSA Reports).

10

ADC 0268

During her first interview with Internal Affairs, Captain Nicola Kelly denied Corporal Fletcher passed contraband to her on April 30, 2019. She denied she hid contraband at the unit. Captain Kelly was found Deceptive on both questions. After talking to Captain Kelly during her post-test interview, I decided to run a third chart to try to clear the Captain. Captain Kelly was found Deceptive on Question 4 and could no clear Question 6 on her third chart (See first CVSA Report). I received a Cold Call from CVSA Expert Examiner Gene Shook for these charts.

Additional surveillance footage was reviewed at the Unit, and it appeared that Corporal Fletcher might have passed something to Captain Kelly as they walked from the Entrance Building to the Conference Room. Captain Kelly denied Corporal Fletcher passed anything to her. She also denied she communicated with Corporal Fletcher since she left my office on May 2, 2019. Captain Kelly could not clear Question 4 and was found Deceptive on Question 6 (see second CVSA Report).

Ultimately, no contraband was found on Corporal Fletcher on April 30, 2019. In the surveillance footage during the walk from the Entrance Building to the Conference Room, it appeared that Corporal Fletcher might have passed something to Captain Kelly; however, the footage is not definitive.

<u>**EXHIBITS INCLUDED IN THIS FINAL REPORT:**</u>

1. Request for investigation documentation regarding Incident #2019-05-003 from Warden Aundrea Culclager of the Maximum Security Unit.
2. Unit Investigative documents.
3. CVSA Reports

<u>**EXHIBITS UNATTACHED:**</u> Recordings of all interviews conducted exist and are retained in the office of Internal Affairs, and may be reviewed upon request.

11

ADC 0269



Cpl. Bianca Fletcher passing an object to Cpt. Nicola Kelly

EXHIBIT

9

tabbies

ADC 0175

/02



05/17/2019  14:12

Cpt. Nicola Kelly placing the object in her back pocket.

*l03*

ADC 0176



Cpl. Bianca Fletcher #116238
April 30, 2019



*10⁴*

Cpl. Bianca Fletcher #116238
April 30, 2019





Cpl. Bianca Fletecher #116238
April 30, 2019



*106*

Cpl. Bianca Fletcher #116238
April 30, 2019
After strip search

 

Cpl. Bianca Fletcher
April 30, 2019
After strip search





Officer Fletcher
4/30/19

Before



officer Fletcher
4/30/19

Before

110



officer Fletcher
4/30/19
Before

/11



Officer Fletcher
4/30/19

Before

ADC 0185



Officer Fletcher
4/30/19

Before

113



**Arkansas Department of Correction**

Director's Office
PO Box 8707
Pine Bluff, AR 71611-8707
Phone: 870-267-6999
Fax:    870-267-6258
www.adc.arkansas.gov

# ADMINISTRATIVE DIRECTIVE

**SUBJECT:**  Unit Entry Procedures for Inmates, Visitors and Staff for the Control of Contraband

**NUMBER:  14-44**                                    **SUPERSEDES:  13-113 and 13-118**

**APPLICABILITY:**   All employees, visitors, and inmates of the Arkansas Department of Correction

**REFERENCE:** AR 401 Searches for and Control of Contraband;        **PAGE 1 of 9**
AD 11-24 Searches of Inmates, Unit Searches & Control of Contraband;
AD 14-03 Inmate Property Control;
Arkansas Code Annotated 12-27-107;
Arkansas Code Annotated 25-17-301, et seq.;
AR 865 Offender Visitation;
AD 14-18 Peace Officer Powers

**APPROVED:  Original Signed by Ray Hobbs**                **EFFECTIVE DATE:  10/22/14**

## I.    POLICY:

It shall be the policy of the Arkansas Department of Correction (ADC) to have procedures in place to detect and deter the introduction, manufacture, possession and/or conveyance of contraband.  Any visitor refusing a search shall be escorted from Department property subject to the provisions below, and may be **indefinitely suspended** from visitation and phone privileges.  Any staff refusing a search shall be escorted from Department property subject to the provisions below, and may be permanently barred from all ADC facilities.  ADC Correctional Peace Officers are authorized to detain for a reasonable length of time any visitor or staff if **reasonable suspicion** exists that the individual is attempting to bring contraband into the facility.  ADC Correctional Peace Officers

EXHIBIT

tabbies

1

ADC 0234

161

are authorized to make an arrest where **probable cause** exists that a criminal offense has been committed.

## II.   EXPLANATION:

The control of contraband within a correctional environment is necessary to provide a safe, secure environment for inmates, employees, and visitors. The detection, interception and confiscation of contraband is essential to provide security and good order in the institution and is required to protect the public, staff and inmates.

## III.   APPLICABILITY

The policy applies to all unit employees, inmates, visitors, and others who enter any Arkansas Department of Correction Unit or Facility.

## IV.   DEFINITIONS

As used in this document, the following definitions apply:

A.   Anomaly:  Something that is peculiar, irregular, or difficult to classify. For purposes of this policy, it refers to an item that does not appear to be part of an individual's body or item of clothing.

B.   Contraband:  Any item or items determined by the Board of Corrections or Arkansas Department of Correction to jeopardize the safety, security, or good order of its institutions, including but not limited to items which are illegal or banned by policies.

C.   Staff:  All Arkansas Department of Correction employees, volunteers, contract medical and mental health employees, Arkansas Correctional School employees and employees of Riverside Vo-Tech.

D.   Inmates:  Persons incarcerated in the Department of Correction.

E.   Visitor:  Any individual who is neither an inmate nor staff, including but not limited to inmate family members or friends, vendors, state officials, law enforcement, members of the media, etc.

F.   Strip Search:  An unclothed body search, which requires the person to remove his or her clothing in conformance with approved procedures and professional practices.  A strip search of a visitor or staff will be performed by staff of the same gender as the person being searched.

162

ADC 0235

G.   Pat Search:  A clothed body search consisting of an individual's garments, and personal effects ready at hand, the body's surface, and area within the individual's immediate control.  The search of staff may be performed by an employee of either gender.  The search of a visitor should be by an employee of the same gender.

H.   Reasonable Suspicion of Possession of Contraband:  Arkansas Department of Correction officials must have a reasonable suspicion that an individual is suspected of possessing contraband.   Such suspicion must be drawn on knowledge of reasonable and articulable facts sufficient to cause a reasonable person knowing the same facts to conclude the same thing.

Factors for determining Reasonable Suspicion may include but are not limited to:

(1) Demeanor of the individual;
(2) Gait and manner of the individual;
(3) Whether the individual is carrying and/or attempting to conceal any article or object;
(4) Manner of dress;
(5) Apparent effort to avoid identification or confrontation by officials;
(6) The time of day or night the individual is observed;
(7) Information obtained from monitored conversation;
(8) Information received from background checks;
(9) Information obtained from reliable informants or third parties; and
(10) Whether the individual is consorting with others whose conduct is "reasonably suspect".

I.   Probable Cause:  A level of reasonable belief based on facts that can be articulated and would warrant a person of reasonable caution to believe that a criminal offense has been committed.

I.   Metal Detector:  An electronic device used for detecting the presence of metallic objects.

K.   Cell Tower:  An electronic device used to detect ferrous metals used in production of electronic items such as cell phones.

L.   Advanced Imaging Technology:  A device used to safely screen an individual for both metallic and non-metallic contraband that may be concealed under clothing.

M.   Handheld tools:  An electronic device used to screen for contraband, including a metal detector, cell phone detector, or other electronic device

ADC 0236

AD 14-44    Unit Entry Procedures for Inmates, Visitors and Staff for the Control of Contraband Page 4 of 9

that can be easily held and manipulated by staff in searching a particular area of an individual, packages, or possessions.

N.   Ion Scanner:  A device used to screen for drug residue on hands or other objects.

## V.   ENTRY PROCEDURES

A. Any individual seeking entry into any Unit or Facility of the Arkansas Department of Correction must successfully navigate all physical and electronic security checkpoints, except members of the Parole Board, Board of Corrections, the Arkansas General Assembly, Governor's Office, law enforcement officers requested to assist the Department, and those individuals allowed by the Warden. These individuals will be met at the Entrance Building by a Deputy Warden or Warden for escort into the Unit or Facility when clearance of the electronic security checkpoints is not required by the Warden.

1.   Physical and electronic checkpoints may include but are not limited to the following:

   a.   Walk-through and/or hand-held metal detectors, cell towers and/or hand-held cell phone detectors, and Advanced Imaging Technology;

   b.   Searches of persons, clothing and other personal items;

   c.   Ion scanning devices;

   d.   Drug interdiction and detection dogs; and

   e.   Any other electronic or advanced technological devices obtained and authorized by the Department.

2.   It is important for individuals to realize personal clothing choices containing metal (for example, snaps, buttons, buckles, underwires or support materials) may cause the electronic detectors to alarm.

3.   No person unless specifically exempted will be allowed entry into any Arkansas Department of Correction facility without being able to clear the security screening utilized by that facility.

4.   Non-compliance by Employees will be subject to disciplinary action and visitors will be indefinitely suspended from the inmate's visitation and phone lists.

*164*

ADC 0237

5. Everyone entering ADC property may have their vehicle searched at any time, including entry and exit of the property.

6. Individuals, as well as packages and other non-vehicular items entering and leaving the facility may be searched by visual and physical searches including electronic methods of inspection, inspections/searches by canine teams including drug dogs, and any of the other electronic or advanced technologies obtained and authorized by the Department for use in searches.

VI.   **ENTRY PROCEDURES FOR UNITS OR FACILITIES WITH X-RAY, METAL DETECTORS, ION SCANNING, ADVANCED IMAGING TECHNOLOGY, AND/OR CELL TOWERS**

1. <u>STEP ONE</u>:  X-ray of personal property:

   a. Upon entry into the Entrance Building an individual shall remove and place all items from pockets and/or person into the designated container. This includes, but is not limited to jackets, coats, shoes, belts, food, jewelry, money, etc.

   b. The container will be placed in the X-ray machine for scanning.

   c. All articles will be scanned utilizing the X-ray machine and searched by the Screening Officer to ensure there are no contraband and/or unauthorized articles entering the facility. Any contraband articles discovered at this step will be confiscated and the individual will not be allowed access to the facility without the approval of the Warden and/or designee.

   d. Although it is essential that all searches are thorough and systematic, it is equally important that no damage, loss or abuse occurs to any personal property. Any such loss or damage that is determined to be through neglect may result in disciplinary action against the negligent employee(s) and officer(s); and they may be liable for the cost of replacement of such items. Any item seized as contraband shall be properly documented.

2. <u>STEP TWO</u>: **Walk-through Metal Detector.** When instructed by the Screening Officer the individual will enter the Walk-through Metal Detector. If cleared by the Screening Officer the individual will proceed to the Pat Search area.  However, if an alarm activates on the Walk-through Metal Detector the individual will step back and remove any other metallic objects. An individual will only be allowed three (3) attempts to successfully clear the Walk-through Metal Detector.  If unsuccessful after the third and final

attempt, the Warden and/or designee will be contacted.  Then the individual will be asked to submit to a Pat Search and a Cell Phone Tower screening.  If the individual fails to clear either screenings, proper documentation will be prepared using a 005.  The individual will then be given an opportunity by the Warden and/or designee to submit to a Strip Search.

3.  **STEP THREE**:  **Advanced Imaging Scanner.**  When instructed by the Screening Officer, the individual will walk into the Image Screening Unit and stand in the designated area.  The individual being scanned will lift their arms above their heads as instructed by the Screening Officer.  The person will stand still until the Screening Officer advises them to leave the Screening Unit.  Any anomalies identified by the Image Screening Unit will result in a search by staff.  Any items discovered on the person being screened will be removed by that individual and handed to the Screening Officer for examination.  If the item is contraband it will be confiscated and the Warden and/or designee will be contacted.  The individual will then be required to be screened again.  If a clear image is presented, the individual will continue to the Pat Search area.  If a clear image is not presented, the individual will be searched again in the area containing the anomaly to confirm whether there is anything present.  The area will be searched first by a pat search, and if the area cannot be determined to be clear of any contraband, the Warden or designee will ask the individual to submit to a Strip Search.

4.  **STEP FOUR**:  **Pat Search.**  All individuals entering the facility will submit to a Pat Search of their persons.  If no contraband is found during the Pat Search the individual will be allowed to proceed to the next entrance screening step.  If contraband is located or detected on the individual by the Searching Officer, the Warden and/or designee must be immediately contacted and the individual will not be allowed to enter the facility without further screening which may include a Strip Search.  The individual may also be detained for a determinable amount of time dependent upon the decision of the Warden and/or designee.

5.  **STEP FIVE**:  **Cell Phone Tower.**  When instructed by the Screening Officer, the individual will move to the Cell Phone Tower's designated box area.  He or she will be required to turn or rotate their body a full 360 degree circle while remaining in the designated box.  The Cell Phone Tower utilizes an alarm system that works in conjunction with a light system in detecting the presence of contraband cell phones.

**"Green Light"** designates the individual is cleared for entry.  He or she will be allowed to retrieve their personal property, log in and enter the building.

**"Yellow Light"** designates caution because some metal is present, but not necessarily a cell phone.  Staff will attempt to locate the metal using a hand-held metal detector.  Once located, the metal will be removed.

*166*

**"Red Light and/or Auditory Alarm"** designates a "POSITIVE" alert for the presence of a cell phone and/or cell phone components. Staff will attempt to locate the metal using a hand-held metal detector; once located, the metal will be removed.

**Note:** Should a yellow light, red light, and/or auditory alarm appear/sound, the individual will step out of the designated box, re-check and remove from their persons any metal items and return to the designated box for another screening. Upon showing of a "Green Light" he or she will be allowed to retrieve their personal property, log in and enter the building. If a "Red Light" or "Yellow Light" is indicated, the Warden and/or designee will be contacted. After the additional screening, the results of failing to clear the Cell Tower will be documented with a 005. The person will be given an opportunity by the Warden and/or designee to submit to a strip search.

6. **STEP SIX: Strip Search.** If the individual agrees, he or she will be escorted to a private area by a person of the same gender, who will perform the search. All strip searches shall be conducted in an area separate and private from inmates and other staff, if possible, and in such a way as to ensure tact, privacy, and a minimum of embarrassment. If contraband is discovered, it will be taken by security staff and the person will be allowed to dress. Established procedures will be followed in dealing with the individual and the contraband. If no contraband is found, the individual will be allowed to dress and proceed. If the individual refuses the strip search, he/she will be denied entry. If an employee, he/she will be subject to disciplinary action. If a visitor, he/she will be denied entry and suspended from the inmate's visitation and phone list. Strip Searches may be requested only when **reasonable suspicion** exists that the visitor is attempting to bring contraband into the facility. Strip searches of visitors will not be conducted indiscriminately and must be authorized by the Warden/Center Supervisor or, in their absence, the Deputy Warden or appropriate Deputy Director, or Director. Visitors under the age of eighteen will not be subjected to a strip search without the consent of the visitor's parent or guardian.

VII.    **SPECIAL INSTRUCTIONS**

**Medical Restrictions:** Bypassing any security point due to medical restriction must be authorized by the Warden and/or designee.

A.    Persons with Internal Medical Devices such as a pacemaker or a defibrillator will notify the Screening Officer immediately upon entry. That individual must provide a recent signed statement from a physician in good standing. The individual will be scanned by the Advanced Imaging Scanner.

*167*

ADC 0240

B.  All forms of electronic scanning, Metal Detector, Cell Tower and Imaging Technology, may be used on pregnant females.  In the event a pregnant individual (staff and/or visitor) presents a recent signed statement in advance of seeking entry into the facility from a physician in good standing that the individual cannot be screened by any of the electronic scanning equipment:  metal detector, cell tower or advanced imaging technology, the individual will be subjected to a thorough pat search.

C.  Any approved individuals with valid medical excuses will be searched by means that have been identified and authorized by the Unit Warden and/or designee, based on their provided medical information.  This may be any combination of the search procedures identified in this policy.  If no contraband is found they will be allowed to enter into the facility and proceed.  If contraband is found, the individual will be detained and the Warden and/or designee will be immediately advised.

D.  A list of all excused employees will be kept in a separate file within the Warden's office.  Their medical statements will be kept in their medical file in the Human Resources Office as provided by policy.

## VIII.   CRIMINAL CHARGES

The introduction of contraband is grounds for arrest. Arkansas Department of Correction Institutional Correctional Peace Officers are authorized to make an arrest, where probable cause exists that a criminal offense has been committed.

## IX.    ENTRY PROCEDURES FOR INMATES

Inmates entering the Sally Port search area are subject to and will submit to any or all of the following searches:

1. Pat Search
2. Strip Search
3. Metal Detector screening
4. Cell Phone Detection Tower screening
5. Advanced Imaging Technology
6. Body Cavity Search, see AD 11-65

**NO INMATE WILL BE ALLOWED TO ENTER THE BUILDING WITHOUT SATISFACTORY COMPLETING EACH STEP.**

*163*

## Frequently Asked Questions For the Adani CONPASS

**Q: Is the Adani CONPASS Scan safe?**

A: Yes. The exposure received is less than the average amount of background radiation that a person receives standing in the sun for about 1 hour.

**Q: How does a CONPASS Scan compare to the radiation that I receive during a commercial flight?**

A: Every 4 minutes during a commercial flight equals 1 CONPASS Scan.

**Q: How long does the CONPASS Scan take?**

A: Less than 8 seconds.

**Q: Will the CONPASS Scan violate any of my privacy concerns?**

A: No. The CONPASS System does not use surface rending imaging technology or software. There are no soft tissue images created by the CONPASS System eliminating privacy concerns.

**Q: Will being scanned on the CONPASS System affect my pacemaker?**

A: No.

**Q: Do I need to remove my shoes, belt, jewelry or any outer apparel during a CONPASS Scan?**

A: No.

**Q: How many CONPASS Scans am I allowed to have in 1 year?**

A: 4,000. More than 10 per day! Federal Regulations regard this imaging technology as an NID (Negligible Individual Dose) procedure.

**Q: How does the CONPASS Scan compare to a chest x-ray?**

A: One chest x-ray is equivalent to 400 CONPASS Scans.

*169*