1

1           IN THE UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF ARKANSAS
2                    CENTRAL DIVISION

3    BIANCA FLETCHER              )
              PLAINTIFF,          )
4                                 )
     VS.                          )NO. 4:20-CV-521 LPR
5                                 )
     NITV FEDERAL SERVICES, LLC;  )
6    GENE SHOOK; AND              )
     JOHN DOES 1-2                )
7              DEFENDANTS.        )

8

9

10

11                  ORAL DEPOSITION OF

12                 AUNDREA CULCLAGER

13                  OCTOBER 15, 2020

14

15

16

17

18

19

20                    KELLY D. HILL

21             CERTIFIED COURT REPORTER

22               STATE OF ARKANSAS

23                  (501) 416-9329

24

25

                    KELLY D. HILL
               CERTIFIED COURT REPORTER
                    (501) 416-9329

2

1        ANSWERS AND DEPOSITION OF AUNDREA CULCLAGER,

2    a witness produced at the request of the

3    Defendants, was taken in the above-styled and

4    numbered cause on the 15th day of October 2020,

5    1:03 p.m., before Kelly Hill, a Certified Court

6    Reporter, taken at Arkansas Department of

7    Corrections, 6814 Princeton Pike, Pine Bluff,

8    Arkansas 71602, in accordance with the Federal

9    Rules of Civil Procedure.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1    APPEARANCES OF COUNSEL:

2
     ON BEHALF OF PLAINTIFF:
3
         MR. LUCIEN R. GILLHAM
4        SUTTER & GILLHAM, PLLC
         P.O. BOX 2012
5        BENTON, ARKANSAS 72018

6
     ON BEHALF OF DEFENDANTS:
7
         MR. JAMES D. ROBERTSON
8        BARBER LAW FIRM
         425 WEST CAPITOL AVENUE, SUITE 3400
9        LITTLE ROCK, ARKANSAS 72201

10
     ALSO PRESENT:  MR. THOMAS BURNS
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    S T I P U L A T I O N S

2

3        The attorneys for all parties present

4    stipulate and agree as follows:

5

6    Objections:

7        Reserve all objections, except as to the form

8    of the questions and the nonresponsiveness of the

9    answers, until the time of trial, which

10   objections are waived if not made at the taking

11   of the deposition.

12

13   Signature:

14       Waived.

15

16

17

18

19

20

21

22

23

24

25

5

1                    I N D E X

2

3   STYLE AND NUMBER . . . . . . . . . . . . . .   1

4   APPEARANCES. . . . . . . . . . . . . . . . .   3

5   STIPULATIONS . . . . . . . . . . . . . . . .   4

6   DEPOSITION EXHIBIT INDEX . . . . . . . . . .   6

7

8   WITNESS:    AUNDREA CULCLAGER

9        Examination by Mr. Robertson . . . . . .   7
         Examination by Mr. Gillham . . . . . . . 61
10       Further by Mr. Robertson . . . . . . . . 88
         Further by Mr. Gillham . . . . . . . . . 90
11       Deposition Concluded . . . . . . . . . . 91

12  COURT REPORTER'S CERTIFICATE . . . . . . . . 92

13

14

15

16

17

18

19

20

21

22

23

24

25

6

1                    DEPOSITION EXHIBIT INDEX

2    No. 1   Administrative Directive          Page   22
              ADC 234-242
3
     No. 2   End-Use License Agreement         Page   25
4             NITV 000001-000003

5    No. 3   Administrative Directive          Page   26
              ADC 0042-0051
6
     No. 4   Sgt. Harris report                Page   31
7
     No. 5   CVSA Report (Captain Kelly)       Page   35
8             ADC 278-281   5/2/19

9    No. 6   CVSA Report (Captain Kelly)       Page   35
              ADC 282-284
10
     No. 7   Handwritten diagram               Page   47
11            ADC 86

12   No. 8   Internal Affairs Final Report     Page   48
              ADC 259-269
13
     No. 9   ADC Packet of photos              Page   52
14            ADC 175-186

15   No. 10  Transcription                     Page   91
              ADC 98-124

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2                AUNDREA CULCLAGER,

3    having been first duly cautioned and sworn to

4    testify the truth, the whole truth and nothing

5    but the truth, testified on her oath as follows:

6                   EXAMINATION

7    BY MR. ROBERTSON:

8    Q.  All right.  Good afternoon, Warden Culclager.

9    Again, my name is Jim Robertson.  I'm with the

10   Barber Law Firm out of Little Rock, and I

11   represent two individuals that have been sued by

12   Ms. Bianca Fletcher, one of your former

13   employees.  My clients are a company called NITV

14   Federal Services, and then one of their

15   contractors, a fellow named Gene Shook.  Do you

16   know anything about those two individuals?

17   A.  No more than Gene Shook.  I know he's the one

18   that, when there's a question about one of the

19   questions, that they called him, and he kind of

20   gives them directions, the one that's conducting

21   the CVSA.

22   Q.  Do you know anything about NITV?

23   A.  No.

24   Q.  All right.  We'll come back to that in a

25   little more detail.  I want to cover a few ground

8

1  rules first.  This is probably a process that's

2  familiar with you given your experience and

3  position within the Arkansas Department of

4  Corrections, but as you can see, we're taking a

5  deposition, and Ms. Hill is taking down

6  everything that we say.  Ultimately it will be

7  printed in a booklet.  All of your answers need

8  to be verbal.  If you gesture in some way, I may

9  ask you whether you mean yes or no.  If you say

10  uh-huh or huh-uh, I will ask whether you mean yes

11  or no, just so the record conveys what you intend

12  it to convey.

13      I'm also not here to make you uncomfortable

14  in any way.  If you need a break, I don't care if

15  it's three minutes from now, just say, hey, Jim I

16  need a break, and we'll take one.  The only thing

17  I ask is that we finish whatever question that's

18  pending so that we can start fresh when we get

19  back on the record.  Is that fair?

20  A.  Yes.

21  Q.  I am human.  I do not always ask perfect

22  questions.  I wish I did.  Invariably there will

23  be something I mess up in every deposition.  If I

24  ask a question that you don't follow or don't

25  understand, please let me know, and I'll be happy

1  to rephrase my question.  Is that fair?

2  A.  Yes.

3  Q.  All right.  Probably the biggest rule we have

4  is to not talk over one another so that Ms. Hill

5  can get everything down.  If I flag you down,

6  please wait on me to finish my question before

7  you begin your answer, and I will do my best to

8  wait on you to finish your answer before I start

9  my next question so that everything comes through

10  clearly.

11      All right.  With that said, what is your full

12  name?

13  A.  Aundrea Faye Culclager.

14  Q.  A-n-d --

15  A.  A-u.

16  Q.  A-u.  Okay.  Faye, F-a-y-e?

17  A.  Yes.

18  Q.  Have you gone by any other last names?

19  A.  Weekly and Fitzgerald and Massey.

20  Q.  Maiden name is?

21  A.  Fitzgerald.

22  Q.  Okay.  All right.  And it has been

23  represented to me that you are a warden in the

24  Arkansas Department of Corrections?

25  A.  Superintendent.

1  Q.  Superintendent.  All right.  Tell me what's

2  the hierarchy?  I don't --

3  A.  As far as the Department of Corrections as a

4  whole --

5  Q.  Well, just typically for your line of work.

6  You know, I know there's probably all kinds of

7  branches in the ADC, but for your line of work so

8  we know that Ms. Fletcher started I think as some

9  type of officer, then was a corporal, then would

10  have been sergeant, and then up the chain.  So

11  using that kind of as a reference point, take me

12  through the hierarchy and how you rank.

13  A.  Corporal, then sergeant, then lieutenant,

14  then captain, then major, then deputy warden,

15  then warden and then superintendent.

16  Q.  And when were you promoted to superintendent?

17  A.  September of 2020.

18  Q.  So recently.  All right.  How long did you

19  serve in the capacity as a warden approximately?

20  A.  Three years.

21  Q.  How long did you serve as a deputy warden

22  approximately?

23  A.  About 10.  10 years.

24  Q.  How long have you been with the ADC?

25  A.  32.

11

1    Q.   Wow.   Have you worked for anybody else in

2    that 32-year period?

3    A.   No.

4    Q.   How far did you go in school?

5    A.   Master's degree.

6    Q.   From where?

7    A.   University of Phoenix.

8    Q.   And where did you get your undergrad?

9    A.   University of Arkansas Little Rock.

10   Q.   And what is that degree in?

11   A.   Criminal justice.

12   Q.   When did you get your undergrad degree from

13   UALR in criminal justice?

14   A.   2009.

15   Q.   Is that something you did later in life?

16   Obviously not right out of high school.

17   A.   Yes.

18   Q.   All right.   Have you reviewed anything to

19   prepare for your deposition today?

20   A.   Yes.

21   Q.   What have you reviewed?

22   A.   The actual SEAGAP hearing.

23   Q.   The transcript?

24   A.   Yes.

25   Q.   I didn't bring all of that.   I brought --

12

1    I've got a couple of pieces of it, but I have

2    also a series of reports that were prepared by

3    Ms. Best with Internal Affairs.  Did you happen

4    to review any of those documents?

5    A.   Yes.

6    Q.   Do you remember anything else you reviewed?

7    A.   No.

8    Q.   Did you have a chance to look at the

9    surveillance videos again?  I know you would

10   have --

11   A.   No.

12   Q.    -- looked at them back when the SEAGAP

13   hearing occurred.  Would that have been 2019 I

14   guess?

15   A.   No.

16   Q.   You haven't looked at anything else.  All

17   right.  When do you first remember meeting Bianca

18   Fletcher?

19   A.   Around 2017 I believe.

20   Q.   When she was under your supervision?

21   A.   When I was at the Max as the deputy warden.

22   Q.   Okay.  And I believe her records show -- and

23   please correct me if I'm wrong -- that she would

24   have started in the 2016 time frame, and that

25   worked at Tucker Max.  Is that consistent with

1   your recollection?

2   A.   As with dates, I'm not sure on that.

3   Q.   Does the range sound reasonably close?

4   A.   Sounds reasonable, yes.

5   Q.   How long did you work at Tucker Max?

6   A.   Approximately three years.

7   Q.   In what capacity did you serve there?

8   A.   Deputy warden and warden.

9   Q.   What time frame are we talking about?

10  A.   2015 up until 2018 deputy warden.

11  Q.   All right.

12  A.   '17 or '18 deputy warden.

13  Q.   All right.   So when these events that

14  transpired, I have them actually as occurring in

15  April 30, 2019 was when Ms. Fletcher went through

16  the scanner.   What was your job on that day?

17  A.   I was the warden.

18  Q.   You were the warden?

19  A.   Yes.

20  Q.   Okay.   At Tucker Max?

21  A.   Yes.

22  Q.   Now, I've been to that place like once or

23  twice, and I don't remember the layout, but I

24  remember there's multiple buildings there, or

25  maybe I'm getting them and Cummins confused.   But

14

1    did you actually work in the prison building as

2    the warden?

3    A.   Yes.

4    Q.   So would you have to go through the scanner

5    system every day just like everybody else?

6    A.   Yes.

7    Q.   So let's talk about that process.  When you

8    pull into the parking lot, there's like a gate or

9    an entry building, I think is what it's called;

10   is that correct?

11   A.   Yes.

12   Q.   When I went through, I don't remember a

13   scanner.  I remember a typical magnetron thing

14   like you would go through at the courthouse.  Is

15   the scanner something different than that?

16   A.   Repeat that.

17   Q.   Let me just start over.  Take me through what

18   happens when you walk through that entrance

19   building to gain access to the prison back in

20   April of 2019.  Tell me -- describe for me that

21   process.

22   A.   You walk through the door.  You have to clear

23   the Adani scanner, and any items that you have

24   you have to -- they have to go through the

25   scanner as well.  Step onto the Adani scanner,

15

1   they scan you, you step down.  There's a cell

2   phone tower that you have to clear.  They do a

3   pad search.  And if all that clears, then you are

4   free to put your clothing back on.  When I say

5   clothing, that means your belt and shoes, things

6   of that nature, then you're cleared to go on in

7   the facility.

8   Q.  Okay.  And you walk -- you exit the entrance

9   building on the other side.  There's some sort of

10  gated mechanism there that then gets you access

11  to a long sidewalk that takes you to the next

12  main building; is that correct?

13  A.  Yes.

14  Q.  Now, the cell phone tower, you say you have

15  to clear that.  What does that mean?

16  A.  The cell phone tower picks up if you have a

17  cell phone on you, so you have to stand in front

18  of the cell phone tower and make a complete turn,

19  360 degree turn.  And if it alerts, which means

20  if a red light lights up or it shows that the

21  cell phone tower goes off, then they have to make

22  sure that you don't have anything, and they might

23  make you go back through the actual Adani

24  scanner.  It just all depends on if it lights up

25  or not.

16

1   Q.   So the Adani scanner, what does that look

2   like?  So my frame of reference is the airport,

3   and I don't know if that helps.

4   A.   The Adani scanner, it's got like a platform

5   that you step onto, and the platform pulls you

6   through the actual scanning part.  Once you go

7   through the actual scanning part, it alerts to

8   anything that might be on your person.  It shows

9   an image of your body, and it can detect if you

10  have anything up under your clothes, it shows an

11  image.

12  Q.   Okay.  And I want to cover the Adani -- well,

13  we can go ahead and talk about it now.  As you

14  know, Ms. Fletcher claimed that she went through

15  the Adani scanner twice before you get there, and

16  there were concerns that it showed something down

17  near her vaginal area in her clothing.  She

18  claimed that that was a false read.  Does the

19  Adani scanner make false readings, and if so, in

20  what circumstances?

21  A.   Yes, it has been known to make false

22  readings.  Anytime anyone comes through and there

23  is an image and you can't determine what it is,

24  we consider that to be an anomaly.  That means

25  that we have to know exactly what it is.  So if

17

1   there is an image, we have them go through a

2   second time.  If they can't clear the second

3   time, then we ask them do they consent to a strip

4   search.  Then if they consent to a strip search,

5   then we strip search them, and then we have them

6   go back through the Adani scanner.

7   Q.   And that's pretty much what happened with Ms.

8   Fletcher as I understand it?

9   A.   Yes.

10  Q.   All right.  The purpose of the second trip

11  through the Adani scanner, does that typically

12  resolve whether or not there's something there or

13  not something there on the Adani scanner?

14  A.   No, it doesn't.

15  Q.   Okay.  How do you -- tell me with what

16  frequency do you have problems with the Adani

17  scanner.  And that's a bad question.  I can tell

18  from your look.  Let me start over with my

19  question and give you something more specific.

20      How frequently do you have issues where

21  there's something that shows an anomaly, and then

22  you do your further check and there's no anomaly

23  there, via strip search or pat-down or what have

24  you?

25  A.   Not very often.

18

1  Q.   So that's not an every person coming through

2  issue?

3  A.   No.

4  Q.   Is it even more than once a day in your

5  experience?

6  A.   No.

7  Q.   Okay.  Is it more than once a week in your

8  experience?

9  A.   No.

10  Q.   Okay.  So it's not very frequent at all that

11  you have an anomaly that's unverified?

12          MR. GILLHAM:  Objection to form.

13  Q.   In your experience?

14          MR. GILLHAM:  Objection to form.  Go

15  ahead.

16  Q.   Do you want me to start over with that

17  question?

18  A.   Yes.

19  Q.   All right.  I'm not sure I can ask it again.

20  Let me try.  So in your experience, to have an

21  anomaly on the Adani scanner that's not

22  subsequently verified is an infrequent

23  experience; is that true?

24          MR. GILLHAM:  Objection to form.

25  And when I do that, you can go ahead and answer.

1   It's just a lawyer thing I've got to do.  I'm not

2   trying to interfere with him or suggest an

3   answer.  You just ignore me.

4   A.  Okay.  Now, ask me that question one more

5   time.

6   Q.  Sure.

7           MR. GILLHAM:  I'll just have that

8   objection, and I won't state it again.

9           MR. ROBERTSON:  Agreed.  You don't

10   have to repeat your objection on this question.

11   Q.  All right.  So we're going to start over with

12   the question.  In your experience, based on your

13   years at the Arkansas Department of Correction,

14   when you have a scenario where the Adani scanner

15   shows an anomaly that is not subsequently

16   verified, i.e. nothing is found, is that an

17   infrequent occurrence?

18   A.  Yes.

19   Q.  All right.  How many people go through a

20   scanner in a given day at Tucker Max?  And an

21   estimate is fine.

22   A.  It all depends on how many people come inside

23   the facility.  It fluctuates based on the fact

24   you might have a lawyer to come in or you might

25   have a vendor to come in, so it kind of

20

1   fluctuates day to day.

2   Q.  Let's talk about just employees.  Every

3   employee has to go through that same process?

4   A.  Yes.

5   Q.  How many of those would have been there

6   approximately April of 2019?

7   A.  On a daily basis, based on two shifts, which

8   is the night shift and the day shift that would

9   actually have to come in and clear it, as well as

10  any of your program people that works in the

11  office, I would say about maybe 50.

12  Q.  50.  Okay.  So minimum 50 people per day go

13  through the Adani scanner?

14  A.  50 people per day, but anytime a person goes

15  outside the facility and come back in, they have

16  to go through it again.

17  Q.  Okay.  So it could be as much -- typically

18  more than 50 then?

19  A.  Yes.

20  Q.  All right.  And on a given day, like for

21  example, with Ms. Fletcher where you were

22  actually called because there were two trips

23  through the Adani scanner that showed a positive

24  finding or an anomaly, and then a strip search

25  that was consented to and ordered, it is my

1    impression that it is not very frequently that

2    the warden has to come down there and supervise

3    that process; is that true?

4    A.   No.

5    Q.   It's not true?

6    A.   No.  Usually if I'm on the compound, I get

7    the call, regardless of whether I'm on duty or

8    not, to let me know that we have someone that

9    couldn't clear the scanner.  At that point I go

10   down and I look at it myself.

11   Q.   How frequently does that typically happen?

12   A.   Within what time frame?

13   Q.   April of '19.

14   A.   April of '19, probably twice.  Two times.

15   Q.   In the whole month?

16   A.   That I looked at it.

17   Q.   All right.  So would one of those two have

18   been Ms. Fletcher?

19   A.   Yes.

20   Q.   Do you remember -- I don't need names.  But

21   do you remember the circumstances of the other

22   one?

23   A.   No, sir.

24   Q.   Okay.  So let's track through some of our

25   documents.  I'm going to -- we have a series of

1   documents.

2          MR. ROBERTSON:  I want to -- let's

3   just do new numbers per depo, if that's okay,

4   unless you --

5          MR. GILLHAM:  I don't -- it's your

6   deposition.

7          MR. ROBERTSON:  Well, I didn't know

8   if you wanted one set.

9          MR. GILLHAM:  You can do it however

10  you want.

11  Q.  I want to cover some of the documents that

12  Mr. Burns provided to us via subpoena

13  technically -- well, can y'all share one?

14  A.  Yes.

15  Q.  I'm going to show you first what's marked as

16  Exhibit No. 1 to your deposition, and I'll

17  represent to you that this has been produced in

18  two separate occurrences.  If you see there's a

19  handwritten 161, that's because it was a part of

20  the SEAGAP hearing apparently.  And then you have

21  the ADC 234 number.  That was one of several

22  hundred pages that were produced by Mr. Burns

23  when we issued a subpoena.  In particular, do you

24  recognize this document?

25          (Deposition Exhibit No. 1 was

23

1    marked.)

2    A.   Yes.

3    Q.   And is this the document that sets forth the

4    company's -- or excuse me -- the ADC's policies

5    and procedures for searches looking for

6    contraband?

7    A.   Yes.

8    Q.   All right.   And is this a document that

9    guides what you do and don't do in any given day

10   in searching for contraband, at least as of April

11   of 2019?

12   A.   Yes.

13   Q.   Why do you -- give me some examples of

14   contraband.

15   A.   Contraband can be a cell phone.   It can be

16   food.   It could be drugs.   It could be

17   unauthorized shoes -- well, contraband, it could

18   be like a lighter.   It could be just anything

19   that based on policy or either ADC staff are not

20   allowed to bring in.

21   Q.   Okay.   Let's talk about the bank card.   Is a

22   bank card contraband?

23   A.   Yes.

24   Q.   Why?

25   A.   It's not authorized to come inside the

24

1    facility.

2    Q.   And I take it it's something that you don't

3    want prisoners having access to?

4    A.   Correct.

5    Q.   And I'm a layperson, so tell me why you would

6    not want a prisoner to have access to a bank

7    card.

8    A.   Just based on some of the crimes.  You have

9    inmates in there that are in there for fraud and

10   other things of that nature, so staff don't need

11   a bank card.

12   Q.   Right.  And that's for their own protection

13   as much as anybody else's?

14   A.   Correct.

15   Q.   You mentioned food.  Would there be any

16   reason for a staff worker such as Ms. Fletcher to

17   carry food through the security scanner into the

18   main building?

19   A.   Yes, because the food items have to be

20   checked.

21   Q.   Okay.  So they can bring food in, it just has

22   to be checked?

23   A.   Yes.  And it has to meet the guidelines as

24   far as what you can bring in.

25   Q.   There was testimony that came out two days

25

1   ago with Ms. Fletcher that she was carrying food.

2   I did not see food -- after the fact, I looked at

3   pictures, I didn't see it, and I looked through

4   the record again, and I've seen no reference to

5   her having food on her.  It wasn't mentioned

6   anywhere that I saw in the SEAGAP hearing

7   testimony.  Do you remember her having food when

8   she went through and was in the conference room,

9   for example?

10  A.  No, I don't recall.

11  Q.  And you were in the conference room with her,

12  correct?

13  A.  Yes.

14  Q.  Okay.  The -- that was Exhibit No. 1 to your

15  deposition.  I want to cover some basic

16  documents.  I want to show you what we'll mark as

17  Exhibit No. 2 to your deposition, and I'll

18  represent to you this is an End-User License

19  Agreement from my company which would have gone

20  to -- or my client's company which would have

21  gone to the ADC setting forth the ground rules,

22  if you will, for how their device is used.

23                  (Deposition Exhibit No. 2 was

24  marked.)

25  Q.  If you go to Page 2 of that document, and

26

1   then there's VIII, and I'm going to read it to

2   you, and you tell me if I read it accurately.

3   And I want to read it to you and you tell me.  It

4   says Caveat, NFS sell the Computer Voice Stress

5   Analyzer as an investigative tool.  The results

6   of any testing should not be used as a final

7   determinant, nor should the results of any test

8   be included in a probable cause affidavit.  The

9   results of a CVSA examination should not be used

10  to obtain an arrest or search warrant.  Did I

11  read that accurately?

12  A.   Yes.

13  Q.   Have you ever seen that document before,

14  Exhibit No. 2?

15  A.   No.

16  Q.   All right.  Let's talk about something you

17  would have seen and we'll mark as Exhibit No. 3,

18  an Administrative Directive from the Arkansas

19  Department of Correction that talks about use of

20  the CVSA device, and do you recognize this

21  document, Exhibit 3?

22                   (Deposition Exhibit No. 3 was

23  marked.)

24  A.   Yes.

25  Q.   All right.  Turn to Page ADC 46 at the

27

1   bottom, and you can see from the heading at the

2   top, it's discussing internal investigations and

3   CVSA exams, correct?

4   A.  Yes.

5   Q.  And then the item that's listed as No. 4 on

6   this report -- or this policy says, and I'll read

7   it, and you again tell me if I've read it

8   accurately.  The requesting authority will not

9   sustain a complaint against an employee solely on

10  the basis of a Computerized Voice Stress Analysis

11  result.  There must at least be one additional

12  item of corroborating evidence in a written

13  report completed by the investigating officer in

14  order for the requesting authority to sustain a

15  complaint.  Did I read that accurately?

16  A.  Yes.

17  Q.  All right.  Is that consistent with the

18  language I read to you from the End-User License

19  Agreement, meaning the CVSA is not to be used by

20  itself to make a decision?

21  A.  Yes.

22  Q.  Okay.  Take it through just the narrative, if

23  you will, of what you remember how you got notice

24  of what was going on that day.

25  A.   I got a phone call at home by Captain Kelly

28

1    stating that Ms. Fletcher could not clear the

2    Adani scanner.  I asked the question had she been

3    through twice, and they stated yes, and it still

4    showed the image, so I instructed Captain Kelly

5    to take her to the conference room and that I

6    would be up to the unit.

7    Q.   Okay.  How long did it take you to get there?

8    A.   Maybe five or 10 minutes.

9    Q.   Oh.  So you don't live far from Tucker Max?

10   A.   No.

11   Q.   Okay.  And actually, there's some housing or

12   looks like housing outside the unit.  Did you

13   happen to live in one of those at the time?

14   A.   Yes.

15   Q.   Okay.  So you get into the unit.  What

16   happened next?

17   A.   I go into the unit.  The officer that was

18   running the scanner, which would have been Ms.

19   Barnes.  I looked at the image, and it showed

20   something in the vaginal area.  I proceeded on

21   into the building to the conference room, and

22   when I got to the conference room, Ms. Fletcher

23   was sitting -- Ms. Fletcher was in there, as well

24   as Corporal Releford.  And I asked Corporal

25   Releford why was she in there with Ms. Fletcher,

29

1    and she said she was instructed to sit in there,

2    and so I relieved her and told her she could

3    leave.

4    Q.  Okay.  What happened next?

5    A.  I then asked -- I told Ms. Fletcher what I

6    had seen, which I told her I did see something on

7    the scanner, and I asked her did she have

8    anything, and she stated that she didn't.  At

9    that point I asked her would she submit to a

10   strip search, because based on the image, there

11   was something definitely there, and she told me

12   yes.  I had Captain Kelly, as well a sergeant

13   that was on the shift, that day shift -- Ms.

14   Fletcher works the night shift, so I had the

15   officer on -- sergeant on the day shift, Sergeant

16   Harris.

17   Q.  Is that Cora Harris?

18   A.  Yes.  She came and she assisted Captain Kelly

19   with the search, the strip search.  They strip

20   searched her and advised that they did not find

21   anything.  I told them to take her back out to

22   the entrance building and run her back through

23   the Adani scanner to see if the image was still

24   there.  They ran her through the scanner, and the

25   image was not there.

30

1   Q.   What happened next?

2   A.   I can't remember whether they shook her car

3   down at that point or not, but I do know she come

4   back in the conference room, and I advised her

5   that I would be relieving her of duty, as well as

6   sending her to Internal Affairs, because based on

7   what I seen on the scanner, there was definitely

8   something there.

9   Q.   Let me ask you about that.   So we've talked

10   about at the beginning that the scanner can be

11   wrong, and you obviously have experience looking

12   at images from that scanner.   I take it from the

13   tone of your statement just a moment ago that you

14   believe firmly that the scanner was showing

15   something and not some mis -- known anomaly; is

16   that true?

17   A.   Yes.

18   Q.   And why do you make that statement?

19   A.   Based on the shape and the clarity of the

20   photo, the image that I seen, it was consistent

21   with some other images that I had seen whereas

22   contraband was found.

23   Q.   So you've seen images that were anomalies

24   didn't amount to anything and images with

25   anomalies that did.   And is it your opinion that

1    the image you saw with Ms. Fletcher more

2    better -- or more closely resembled the prior

3    images that you've seen which did show an actual

4    contraband?

5    A.   Yes.

6    Q.   All right.  I want to cover one quick thing

7    with you, and then we'll get back on the

8    narrative.  I'm going to mark a statement from

9    the ADC file which will be Exhibit 4, and I'll

10   represent to you that this is a report from

11   Sergeant Harris.  And from her report it

12   basically documents what you just told me, that

13   she conducted a strip search of Ms. Fletcher at

14   your request, correct?

15                (Deposition Exhibit No. 4 was

16   marked.)

17   A.   Yes.

18   Q.   And I'm going to read about in the middle it

19   says, clothing items were searched by me,

20   Sergeant C. Harris, and Captain Kelly, no

21   contraband was found in the clothing.  Did I read

22   that correctly?

23   A.   Yes.

24   Q.   And have you had a chance to review through

25   that?  There's no mention of any bank card being

32

1    found, is there?

2    A.   No.

3    Q.   All right.   And from your testimony a minute

4    ago, you described that when Captain Kelly and

5    Ms. Harris came back, they said nothing was

6    found.   Did they tell you about a bank card at

7    that time?

8    A.   Not at that time.

9    Q.   All right.   If Ms. Harris had found a bank

10   card in the strip search, would you have expected

11   her to put it in her report?

12   A.   Yes.

13   Q.   And it's not in that report?

14   A.   No.

15   Q.   Did anybody, to your knowledge, follow back

16   with Ms. Harris and verify that there was a bank

17   card actually found as opposed to one being

18   reported later?

19   A.   No.

20   Q.   Okay.  Who told you, to your knowledge, about

21   the bank card?

22   A.   I can't remember whether it was Captain

23   Kelly, or Ms. Fletcher might have said something.

24   Q.   Do you remember where they told you the bank

25   card was found?

33

1   A.   In her back pocket.

2   Q.   Okay.  And again, is a bank card contraband?

3   A.   Yes.

4   Q.   There were two reports completed by Internal

5   Affairs -- I tell you what, we'll use the ones

6   that we used yesterday.  Exhibit No. 1 from Ms.

7   Fletcher's deposition is a report dated May 2nd,

8   2019 from Ms. Donna Best.  I'll give you a second

9   just to thumb through that.  And for the record,

10  have you seen that report before?

11  A.   Parts of it.

12  Q.   And maybe the narrative, the first three

13  pages as opposed to the detail from the CVSA?

14  A.   Yes.

15  Q.   Okay.  And the reason why I phrased my

16  question that way, it's been produced to me in

17  two ways; one is the complete set like what you

18  have, and then it appears elsewhere, like in the

19  SEAGAP hearing I think it only had the three

20  pages attached to it.

21      I want to show you next what was Exhibit No.

22  2 to Ms. Fletcher's deposition, which is a very

23  similar report but dated the next day, May 3rd,

24  2019.  Is that another document that you would

25  have at least seen the narrative of with respect

34

1   to the SEAGAP hearing?

2   A.   Yes.

3   Q.   Okay.  So the first two pages of that report,

4   which is the investigator summary, you've seen

5   but you may not have seen the last part?

6   A.   I haven't seen the last part.  I've seen the

7   questions where they ask the actual questions,

8   and the front page would be more of a narrative,

9   maybe something different than I actually

10   received.  I don't get the actual --

11   Q.   So the part that I'm referring to that was --

12   again, I saw this in two different phases; there

13   was just the narrative, and then the narrative

14   with the actual results of the CVSA that was

15   administered.  If you would, set those just to

16   the side for a moment.

17      So we're going to get back to additional

18   exhibits.  I want to show you what we're marking

19   as Exhibit No. 5, and this is -- and Exhibits 5

20   and 6 are going to be real close to what we just

21   went through, except these are going to be for

22   Captain Nicola Kelly and their investigative

23   report.  So I'll ask you if you recognize Exhibit

24   5, which is the May 2nd, 2019 Internal Affairs

25   report on Captain Kelly?

35

1              (Deposition Exhibit Nos. 5 and 6

2  were marked.)

3  A.  Yes.

4  Q.  All right.  And I'll show you Exhibit 6 which

5  is the May 3rd, 2019 report on Captain Kelly.

6  Have you seen that document before?

7  A.  Yes.

8  Q.  Okay.  And these documents are -- well, first

9  off, they're prepared by a person named Donna

10  Best.  Do you know who Donna Best is?

11  A.  Yes.

12  Q.  And who is she?

13  A.  Ms. Best handles all of the employee

14  grievance hearings.

15  Q.  Did -- do you know if she -- well, Ms. Best

16  works for Mr. Naylor or with Mr. Naylor?

17  A.  No.  Ms. Best works -- I think her immediate

18  supervisor would be -- she works for Ms. Cryer

19  now.

20  Q.  Okay.  If you know.

21         MR. BURNS:  She's getting that

22  confused.  You're thinking of Tammy Baker.

23         THE WITNESS:  Oh, okay.

24  Q.  Yeah.  No big deal.

25  A.  Yeah.

36

1   Q.   But Donna Best --

2   A.   Yeah, she does work for Raymond Naylor.

3   Q.   All right.   Exhibits 5 and 6 to your

4   deposition and Exhibits 1 and 2 on the deposition

5   of Ms. Fletcher appear to represent an

6   investigation that was conducted by Ms. Best with

7   her using the CVSA exam?

8   A.   Yes.

9   Q.   Okay.   And did you rely on information

10  contained in these reports when you were making

11  your termination decisions for Captain Kelly and

12  Corporal Fletcher?

13  A.   Yes.

14  Q.   All right.   I want to ask you just a few

15  things.   The May 2nd report, they have some

16  similarities.   For example, on Captain Kelly,

17  they report finding a bank card, but if you turn

18  to Page 2 of 4 on the narrative which is under

19  ADC 279.   And I'm on Exhibit 5.   And in that last

20  paragraph on that page, it's reported that Ms.

21  Fletcher told Captain Kelly that she stopped and

22  got something to eat and stuffed the bank card in

23  her pocket, correct?

24  A.   Yes.

25  Q.   Okay.   Do you remember Ms. Fletcher telling

37

1    you that she used the card to buy gas, not food?

2    A.   Yes.

3    Q.   Okay.  With respect to Exhibit 5 to your

4    deposition, this is Captain Kelly's report again,

5    Question 4 on the CVSA she was asked if Bianca

6    Fletcher passed contraband to her, and deception

7    was indicated.  And then Question 6, did she hide

8    contraband in the unit, and deception was

9    indicated again, correct?

10   A.   Yes.

11   Q.   All right.  And I believe there was a very

12   similar question asked of Ms. Fletcher in her May

13   3, 2019 in which she was asked if contraband was

14   passed to Captain Kelly, she denied that, but

15   deception was indicated on that as well, correct?

16   A.   Yes.

17   Q.   So both Kelly and Fletcher failed the

18   question when asked if Fletcher passed contraband

19   to Kelly, correct?

20              MR. GILLHAM:  Object to form.

21   A.   Yes.

22   Q.   Okay.  Did you have a chance to review the

23   surveillance video of Releford, Fletcher and

24   Kelly walking from the entrance building down the

25   sidewalk toward the conference room?

38

1   A.   Yes.

2   Q.   And did you make certain observations about

3   that surveillance video?

4   A.   Yes.

5   Q.   What were those observations?

6   A.   That Corporal Fletcher, as her and Captain

7   Kelly -- which Releford was on the outside,

8   Fletcher was on the inside and Kelly was on the

9   outside -- that Fletcher goes toward Kelly, and

10  it appears where something is passed and Kelly

11  puts it in her pocket, and then they kind of

12  drift apart again as they are walking up the

13  walkway.

14  Q.   So they get close together?

15  A.   Yes.

16  Q.   If I remember right, they get close together,

17  they may have bumped.  They separate, they come

18  back close together, and then there's movement,

19  that in your view, would be consistent with a

20  hand-off of some sort?

21  A.   Yes.

22           MR. GILLHAM:  I'm going to object to

23  the form.

24  Q.   And they split back apart?

25           MR. GILLHAM:  Let the record reflect

```
 1    that her answer kind of came over Mr. Robertson's
 2    speech so I didn't have a chance --
 3                MR. ROBERTSON:   That's fine.
 4    Q.   Let me restart my question.   Let's start over
 5    with it.   All right.   When you were watching the
 6    video, did you see where Ms. Fletcher who is in
 7    the middle, and Ms. Kelly, who I think if you're
 8    looking at the video would be on the right side,
 9    correct, Releford, Fletcher, Kelly?
10    A.   Yes.
11    Q.   Okay.   Did you see where they bumped?
12                MR. GILLHAM:   Objection form.
13    Q.   Or came in close contact?
14                MR. GILLHAM:   Same objection.
15    A.   Yes.   They came in close -- you could see
16    where they got close enough.   One hand went
17    behind the other one's back, and then it appeared
18    something went in the pocket.
19    Q.   And by in the pocket, you mean Captain Kelly
20    putting something in her back pocket?
21    A.   Back pocket.
22    Q.   And you made a gesture with your hand as if
23    reaching behind your back to put something in
24    your pocket?
25    A.   Yes.
```

40

1   Q.   And you were mimicking what you saw on the

2   video, or what you think you saw?

3   A.   What I saw.

4   Q.   Okay.  When Captain Kelly and Releford and

5   Fletcher arrived at the conference room, it's my

6   understanding that Releford and Fletcher stayed

7   in the room and Captain Kelly went to the

8   restroom; is that true?

9   A.   No.

10   Q.   It's not true?

11   A.   No.

12   Q.   What happened?

13   A.   Once they came into the main building,

14   Fletcher and Releford went inside the conference

15   room and Captain Kelly went to the bathroom.

16   Q.   Okay.  Did that trigger a red flag in your

17   mind?

18   A.   Yes.

19   Q.   Why is that?

20   A.   Captain Kelly was instructed to escort her to

21   the conference room since she is the captain and

22   she is the chief commander of the shift.

23   Q.   Okay.  And having seen the surveillance

24   video, did you later develop a concern that she

25   may have disposed of contraband when she went

41

1   into the restroom?

2   A.   After seeing the video, yes.

3   Q.   Okay.   I want to point your attention to the

4   report, Exhibit 6 to your deposition.   This will

5   be at the second page of the May 3rd report on

6   Captain Kelly, which is bates labeled ADC 283 at

7   the bottom right.   In the pretest interview,

8   looks likes it's about the third sentence down,

9   and I'll read it, and you tell me if I read it

10  accurately.   Captain Kelly stated she did not

11  pass me any contraband or nothing.   If she did,

12  it was a piece of paper, but I don't even

13  remember her doing that.   Did I read that

14  statement correctly?

15  A.   Yes.

16  Q.   Did she make a statement like that to you?

17  A.   Yes.

18  Q.   What did she say to you, and referring of

19  course to Captain Kelly?

20  A.   Exactly what's stated here.

21  Q.   Now, this is reportedly made to Ms. Best.

22  Were you present when this statement was uttered,

23  or did that happen at a different time?

24  A.   No, I wasn't present, but any meetings that I

25  have they're recorded, and Ms. Best is -- she got

42

1    my recordings of the actual meeting.

2    Q.   Okay.   So were you in a meeting with Ms.

3    Kelly when she made that statement to you, that

4    if she passed anything, it might have just been

5    paper?

6    A.   Yes.

7    Q.   And does that still give you concern, that

8    even if it's just paper, that it may have been

9    contraband?

10   A.   Yes.

11   Q.   Ms. Fletcher actually described a

12   circumstance where people -- their letters don't

13   even go to the inmates anymore because they can

14   be soaked in drugs.   What other concern would you

15   have of paper being passed inside the prison?

16   A.   As you stated, inmates do soak paper.   Now we

17   don't even allow paper products to come in due to

18   that fact.   So when I asked her the question, she

19   stated that, no, she did not pass her anything,

20   but then stated, if she did, it was paper.   So I

21   asked her, how can it be no, she didn't, but now

22   if she did, so I had a question about that.

23   Q.   Okay.   And in your mind's eye, did you begin

24   to think that she was lying to you?

25   A.   Yes.

43

1    Q.   There was testimony two days ago from Ms.

2    Fletcher that her pants were actually unbuttoned

3    when she was in the conference room.   Do you

4    remember seeing that or hearing about that?

5    A.   I remember seeing it.

6    Q.   Okay.   Would this be before the strip search

7    occurred?

8    A.   I don't recall whether it was before or

9    after.

10   Q.   Okay.   Did anybody offer an explanation to

11   you as to why her pants would have been undone?

12   A.   I asked her why her pants were unzipped, and

13   she told me that the button -- it was either a

14   button or something was wrong with the zipper,

15   one or the other.   I can't remember exactly which

16   one, but I asked the question.

17   Q.   Did you have a chance to inspect her clothing

18   to see if it was truly defective or if she was

19   lying to you?

20   A.   No, I didn't inspect it.

21   Q.   Did you -- and I'm looking in particular at

22   the pretest interview information, again, same

23   page, ADC 283.   Did you ask Captain Kelly about

24   her prior relationship with Ms. Fletcher?

25   A.   Yes.

44

1    Q.   And what did she tell you?

2    A.   When I first asked her, she only told me

3    about a baby shower, and then after I questioned

4    her about something else, then I think she told

5    me about an incident where she came to her house

6    and was cutting up some kind of bell peppers or

7    something like that.

8    Q.   Okay.  And it was for a potluck or something?

9    A.   Something they were having on the shift.

10   Then I think asked her -- I can't remember

11   exactly how the questions went.  But then I asked

12   her about something else, and then that's when

13   they told me, well, I'm going to be honest with

14   you, I did give her some answers to some

15   questions for a sergeant interview.

16   Q.   And that was volunteered by Captain Kelly to

17   you?

18   A.   Yes.

19   Q.   Or to her?

20   A.   To me, yes.

21   Q.   All right.  In this same report on Page 283,

22   it's written that she, referring to Captain

23   Kelly, denied ever communicating with Corporal

24   Fletcher via cell phone.  She states that they

25   did not have that type of relationship and did

45

1  not have each other's phone numbers.  Do you see

2  that?

3  A.  Yes.

4  Q.  Did Captain Kelly make those statements to

5  you?

6  A.  Yes.

7  Q.  All right.  And contrast that with your

8  interview of Ms. Fletcher.  Did Ms. Fletcher

9  describe a different relationship between her and

10 Captain Kelly than what Captain Kelly described

11 to you?

12 A.  Yes.

13 Q.  And what did Ms. Fletcher describe with

14 respect to their relationship?

15 A.  That she had only invited her to a baby

16 shower, and as far as the relationship, I think

17 it was actually Ms. Fletcher who told me about

18 her going to Captain Kelly's house to do the

19 potluck.  It wasn't Captain Kelly, it was

20 Corporal Fletcher was the one that actually

21 stated that she went to her house.

22 Q.  And Captain Kelly did not describe any type

23 of interaction like that?

24 A.  No.

25 Q.  Okay.

46

1    A.   She made it seem like she didn't know she was

2    coming, and I asked Ms. Fletcher did Captain

3    Kelly know you were coming, and she says, yes,

4    she knew I was coming.

5    Q.   Okay.  Did you view your interviews of Ms.

6    Fletcher and Ms. Kelly as inconsistent with

7    respect to their description of their

8    relationship with one another?

9    A.   Yes.

10   Q.   Did that cause you to conclude that one of

11   them was being untruthful, or perhaps both of

12   them?

13   A.   Yes.

14   Q.   And you didn't need the CVSA exam to tell you

15   whether or not they were being truthful or

16   untruthful to make that conclusion, did you?

17   A.   No.

18              MR. GILLHAM:  Objection to form.

19   Q.   Now, Ms. Kelly, according to this report,

20   stated that they did not have the type of

21   relationship where they had each other's phone

22   numbers.  I'll represent to you that two days ago

23   Ms. Fletcher had Ms. Kelly's phone number in her

24   phone and even read it to me on the record.  That

25   would be inconsistent with any statement from Ms.

47

1    Fletcher that she did not have the phone number,

2    correct?

3                   MR. GILLHAM:   Objection form.

4    A.  Yes.

5    Q.  Okay.  I'm going to show you what we'll mark

6    as Exhibit No. 7, and it's really just for my

7    information.  This is a handwritten diagram that

8    was used in the SEAGAP hearing.  Have you seen

9    that document before?

10                  (Deposition Exhibit No. 7 was

11   marked.)

12   A.  Yes.

13   Q.  Is any of the handwriting on that document

14   yours?

15   A.  No.

16   Q.  There is -- and I'm holding it up.  So we

17   have -- if you hold the -- in the landscape view

18   of the page, you have the entry building on your

19   right, correct?

20   A.  Yes.

21   Q.  And then it has CR on the far left, which I

22   assume would be conference room, correct?

23   A.  Yes.

24   Q.  There's a -- I guess that's a sidewalk, and

25   then there's an arrow pointing to the middle of

48

1    the sidewalk that says pass underneath it.  Do

2    you know what that's referring to?

3    A.  Based on the video footage, that would be the

4    area where you can actually see where they -- it

5    appears where they come close and something is

6    passed.

7    Q.  All right.  I'm going to show you what we'll

8    mark as Exhibit No. 8 to your deposition, which

9    is an Internal Affairs Final Report.  The

10   requesting authority is you.  The subjects, it

11   lists all three people, Bianca Fletcher, Jasmine

12   Releford and Nicola Kelly.  I'll ask if you

13   recognize Exhibit No. 8?

14                    (Deposition Exhibit No. 8 was

15   marked.)

16   A.  Yes.

17   Q.  All right.  And have you reviewed this

18   document before?

19   A.  Yes.

20   Q.  How long has it been, days, weeks, months?

21   A.  Months.

22   Q.  Okay.  Let's go to Page 8 of the report which

23   is marked as ADC 266.  There's more statements in

24   here that were obtained from Kelly, and I'm

25   reading at the top.  This is the -- I guess it's

49

1    the third sentence down.  It says, Captain Kelly

2    stated she did not pass me any contraband or

3    nothing.  If she did, it was a piece of paper,

4    but I don't even remember her doing that.  That's

5    what we talked about previously, correct?

6    A.  Yes.

7    Q.  And she says, she stated they walked side by

8    side, and she, Captain Kelly, had a cup in her

9    hand.  Do you remember seeing a cup in her hand

10   in any of the surveillance videos?

11   A.  I don't recall, no.

12   Q.  Okay.  This report is dated May 6, 2019,

13   correct?  First page at the bottom I think.

14   A.  May the 6th.

15   Q.  Okay.  And that would be before the

16   termination of Ms. Fletcher and Ms. Kelly,

17   correct?

18   A.  I'm not sure as far as the exact date, but it

19   would be before.

20   Q.  All right.  I want to show you -- first off,

21   I want to get my exhibits back.  So we're looking

22   for Exhibit No. 2 that is the Fletcher May 3rd

23   report.

24       I want to show you what's Exhibit No. 9 from

25   Ms. Fletcher's deposition, and these are two

50

1    still shots from that sidewalk that day, and I'll

2    represent to you there's some typing at the

3    bottom on the first page that says Corporal

4    Bianca Fletcher passing an object to Captain

5    Nicola Kelly.  Do you know who typed that, if you

6    know?

7    A.   I don't remember.

8    Q.   Okay.  Fair enough.  Do those two photographs

9    appear to show to you what we've been talking

10   about as the anticipated hand-off?

11   A.   Yes.

12   Q.   And if you look, we know the time stamp and

13   date is wrong on that screen cap, correct?

14   A.   Yes.

15   Q.   But we know, that if you look at the first

16   page and then turn to the second page, those two

17   pictures were taken one second apart, correct,

18   per the time stamp?

19   A.   Yes.

20   Q.   And in fact, you can see there's a crease in

21   the sidewalk, which in a former life, I would

22   have called that an expansion joint when I poured

23   concrete.  Do you see that?  It's directly behind

24   them?

25   A.   Yes.

51

1   Q.   Okay.   In the second photograph they're not

2   very far, maybe a step or two, beyond that in

3   comparison to the first photograph?

4   A.   Yes.

5   Q.   All right.   And you can see that the person

6   in the middle and the person on the right on the

7   first page of Exhibit 9 to Fletcher's deposition

8   are either touching or near touching, correct?

9                    MR. GILLHAM:   Objection form.

10  A.   Yes.

11  Q.   And describe for me what you're seeing on the

12  second picture on Exhibit 9 to Fletcher's

13  deposition.

14  A.   I'm seeing Captain Kelly with her hand behind

15  her as if something -- what I'm seeing on the

16  second is Captain Kelly with her hand behind her

17  in her pocket area.

18  Q.   As if she's putting something in her pocket?

19  A.   Yes.

20  Q.   Can you tell if Captain Kelly has got a cup

21  in her hand in either of those photographs?

22  A.   No.

23  Q.   And you can also see that in the middle Ms.

24  Fletcher is moving her jacket around; it goes

25  from one hand to the other, correct?

52

1   A.   Yes.

2   Q.   That video itself --

3                MR. GILLHAM:   I'll probably use it

4   when I cross her.

5   Q.   The video itself is not continuous motion,

6   correct, it takes a picture every second or two;

7   is that true?

8   A.   Yes.

9   Q.   I guess we call it old-school surveillance

10  video.  All right.  I'll tell you what I'll do, I

11  want to go ahead and just make a -- these aren't

12  very good.  I'm trying to find the best set of

13  photographs to use.

14               MR. GILLHAM:   Are they of the Adani?

15               MR. ROBERTSON:   It's a packet that

16  came in the ADC file.  They're all black and

17  whites, and they're not -- they've been copied

18  over so many times, I don't know which one is the

19  best one, but we'll just go with this one.

20  Q.   All right.  We'll mark as Exhibit No. 9 a

21  complete copy of the packet of photos that were

22  given to me by the ADC via subpoena.  And I'll

23  show those to you, and if you will, just thumb

24  through those real quick for me.

25               (Deposition Exhibit No. 9 was

53

1   marked.)

2   Q.   Okay.  The first two photographs on Exhibit

3   No. 9 are the same two we were just talking about

4   which are also Exhibit 9 to Fletcher's

5   deposition, correct?

6   A.   Yes.

7   Q.   The remainder appear to be scans.  Are all

8   those from the Adani scanner?

9   A.   Yes.

10  Q.   All right.  You can see that, again, these

11  are bates labeled documents that are numbered as

12  ADC -- well, the scans start at like 177 and go

13  on back.  If you would, look through there and

14  pick out the best photo, two or three, that helps

15  me understand what it is that you would have been

16  seeing on the scanner.

17  A.   182 and 183, 184 are your best ones.

18  Q.   Okay.  I'll tell you what I'll do -- I don't

19  know if blue or red will be better.  I'm going to

20  slide you a pen.  And if you will, on the best

21  ones, 182, 183, 184, I think you said, mark or

22  circle the object that you're talking about.

23  Okay.  Now go to 185, can you see it on that one

24  as well?

25  A.   Yes, you can see it, but not as clear,

54

1    because of the other little piece down at the

2    bottom here.

3    Q.   All right.   Let's go back to the first one

4    then which was 182?

5    A.   Yes.

6    Q.   And just for my information, I saw you circle

7    it, hold it up and show it to me one more time,

8    just so I -- okay.   There is a defined white

9    patch there, correct?

10   A.   Yes.

11   Q.   All right.   The sticker on the bottom of that

12   says Officer Fletcher 4/30/19, and it says

13   before.   Do you know which of the two scans this

14   showed up from where the objects were still

15   showing up?   Is there a way to tell?

16   A.   Yes.   The two -- the ones that say before,

17   that would be the ones when she originally first

18   went through the scanner.

19   Q.   Okay.   And what about these photographs again

20   makes you believe that this was not a false read?

21   A.   Based on the size, based on the position.

22   When I say the position, where it's located and

23   the definite shape.

24   Q.   Okay.   So this would have been in your view

25   in her pubic area?   Here's what I'm getting at;

55

1    everybody has used the word vagina, but this

2    appears to be above the vagina?

3    A.   Uh-huh.

4    Q.   And I'm trying to find out if you can tell me

5    anatomically where you believe that object is

6    located?

7    A.   It could be either inserted in or it could be

8    on the outside, either or.

9    Q.   Really.  Okay.  And that's based on what

10   you've seen in prior cases?

11   A.   Yes.

12   Q.   All right.  Let me get Fletcher's 9 from you,

13   and we'll keep that in the stack over here.  You

14   actually made the initial decision to terminate

15   Ms. Kelly and Ms. Fletcher, correct?

16   A.   Yes.

17   Q.   Was there anybody else in your view that

18   warranted disciplinary action for what happened

19   on April 30, 2019?

20   A.   No.

21   Q.   Do you have any history with the CVSA exam

22   personally?

23   A.   Rephrase that.

24   Q.   Have you ever taken one, been administered

25   one?

56

1   A.   No.

2   Q.   Have you ever had to go through a polygraph

3   exam?

4   A.   Not that I can recall.

5   Q.   Okay.  Do you have any training on either

6   polygraph or CVSA exams?

7   A.   No.

8   Q.   Have you ever reviewed any of the literature

9   or publications from my client, NITV Federal

10  Services, LLC?

11  A.   No.

12  Q.   Has anybody, to your knowledge, made a claim

13  against the manufacturer of the Adani scanner for

14  being defective?

15  A.   No.

16  Q.   Are you satisfied with the performance of the

17  Adani scanner?

18              MR. GILLHAM:  Objection form.

19  A.   Yes.

20  Q.   Have we covered all of the events surrounding

21  the termination of Ms. Fletcher and Ms. Kelly to

22  your knowledge?

23              MR. GILLHAM:  Objection form.

24  A.   Yes.

25  Q.   Is there anything else that stands out in

57

1   your mind that you considered or relied upon in

2   making the termination decisions for those two

3   individuals?

4           MR. GILLHAM:  Object to the form.

5   A.  No.  Based on what's in the report.

6   Q.  All right.  When Captain Kelly volunteered

7   that she had given answers to the sergeant's exam

8   to Ms. Fletcher, is that something that she could

9   have been disciplined for?

10  A.  Yes.

11  Q.  Is that something that's common or expected

12  with respect to people who are taking the

13  sergeant's exams?

14  A.  No.

15  Q.  Okay.  They are not supposed to be given

16  those answers in advance?

17  A.  No.

18  Q.  Are they not even supposed to be given the

19  questions in advance?

20  A.  When you say questions, each interviewer or

21  promotion panel have a different set of

22  questions, so you do have staff that may actually

23  jot down some of the questions, but when you talk

24  about a captain giving it to a corporal, then no.

25  Q.  That should not have happened?

58

1   A.   No.

2   Q.   Did that demonstrate an element of bias to

3   you that Ms. Kelly is biased in favor of Ms.

4   Fletcher?

5   A.   Yes.

6   Q.   And is that a problem for someone who is in

7   leadership like Ms. Kelly?

8   A.   It could be.

9   Q.   All right.  We have a situation where you're

10  investigating potential contraband being brought

11  into a prison, correct?

12  A.   Yes.

13  Q.   You have interviewed the person who had two

14  positive scans showing at least a potential that

15  something is there, correct?

16  A.   Yes.

17  Q.   You have surveillance video that makes it

18  sure look like something was handed off, correct?

19  A.   Yes.

20  Q.   You have Captain Kelly immediately going to

21  the restroom, which was an opportunity for her to

22  discard what it made it look like on the video

23  that she had been handed, correct?

24            MR. GILLHAM:   Object to form.

25  A.   Yes.

59

1   Q.   You interviewed Ms. Fletcher and Ms. Kelly,

2   and they provided inconsistent statements to you

3   concerning their knowledge of one another,

4   correct?

5               MR. GILLHAM:  Objection form.

6   A.   Yes.

7   Q.   Do you form the belief that one or both of

8   them were lying to you at the time, correct?

9               MR. GILLHAM:  Objection form.

10  A.   Yes.

11  Q.   You did not need the CVSA exam to tell you

12  that they were lying to you, did you?

13              MR. GILLHAM:  Object to form.

14  A.   No.

15  Q.   Given the circumstances of this termination

16  and the fact that you had inconsistent

17  statements, surveillance video, Adani scanner

18  showing the presence of an object, and especially

19  with the fact that one or both had lied to you,

20  was there any way that you could allow them to

21  remain employed with Arkansas Department of

22  Corrections?

23              MR. GILLHAM:  Objection form.

24  A.   No.

25  Q.   And you didn't need the CVSA exam to tell you

61

1    why don't we take a break and let her look at it.

2    If she says it's accurate, then that's --

3                    MR. GILLHAM:  Well, I don't have a

4    printed out copy.

5                    MR. ROBERTSON:  I do.

6                    MR. GILLHAM:  You do, oh, okay.

7                    MR. ROBERTSON:  I have hers.  I

8    don't have anybody else's.

9                    MR. GILLHAM:  That'll work.

10                      (A break was taken.)

11                      (Back on the record.)

12                        EXAMINATION

13    BY MR. GILLHAM:

14    Q.  So, ma'am, we took a break.  You have had the

15    opportunity to review the transcript that the ADC

16    had provided of your testimony at the SEAGAP

17    hearing for Ms. Fletcher.  Did that accurately

18    reflect what your testimony was in that hearing?

19    A.  Yes.

20    Q.  And did you tell the truth in that hearing?

21    A.  Yes.

22    Q.  And -- thanks.  That makes everything a

23    little bit quicker, because I'm not going to

24    necessarily ask as many things.  One thing I

25    wanted -- I've got here your -- your Exhibit 9

60

1   that, did you?

2               MR. GILLHAM:  Objection form.

3   A.  No.

4   Q.  Based on what you know today, would you have

5   terminated both of those individuals even if the

6   CVSA exam had not been performed?

7               MR. GILLHAM:  Object to form.

8   A.  Yes.

9               MR. ROBERTSON:  I pass the witness.

10              MR. GILLHAM:  Jim, can we stipulate

11  to -- you know, they gave a transcript of the

12  hearing to us, and my cross-examination is going

13  to be shorter if we can stipulate that that's an

14  accurate transcript, but if you can't, then I'm

15  going to have to go on.

16              MR. ROBERTSON:  I'm assuming it's

17  accurate.  I mean, was it a court reporter that

18  did it?

19              MR. BURNS:  The SEAGAP panel?

20              MR. GILLHAM:  It was recorded.  You

21  did not have a court reporter?

22              MR. BURNS:  Right, it's recorded.

23  We don't have a court reporter there, but the

24  SEAGAP administrator is the one who --

25              MR. ROBERTSON:  Well, let's do this;

62

1   there, and then Mr. Robertson had two pages that

2   had somewhat better copies -- or maybe these are

3   direct printouts of photos rather than copies --

4   than is in your packet.  Would you agree with me

5   that what I'm showing you there is kind of a

6   better copy than those pictures?

7   A.   Yes.

8   Q.   And one is color in fact.  So anyway, I think

9   you were saying that the video camera doesn't

10  really -- it's not really a true video camera,

11  it's more like it's taking a frame every second

12  or something like that, or it's taking -- it's

13  not just like a continuous video.  Apparently it

14  takes a shot every second or half-second or

15  something; is that what's going on?

16  A.   Yes.

17  Q.   And looking at the document there on your

18  left, Mr. Robertson's two pages, is that about

19  the resolution if you were just looking at the

20  actual -- I don't know what to call it, because

21  it's not truly video.  If you're looking at the

22  actual screen, the actual like if you're playing

23  the recording on a computer or something like

24  that, is that about the resolution that you would

25  see on the screen?

63

1    A.   No.

2    Q.   Is it better, is it worse?

3    A.   It's better.   It's better.

4              MR. GILLHAM:   Did you get that

5    video?

6              MR. ROBERTSON:   I don't have it.   He

7    found a lady to show it to me when I got here.

8              MR. GILLHAM:   I want to -- at some

9    point I'm going to issue a subpoena to get the

10   actual video, because I've seen it too, years

11   ago, you know.

12             MR. BURNS:   Yeah.

13             MR. GILLHAM:   But we're going to

14   need better -- we probably want better than this

15   if there's better than this available.

16   Q.   So anyway, one thing, is that video is

17   straight on, goes straight down -- looks like

18   it's probably on the building that the sidewalk

19   leads into; is that correct, is that where the

20   camera is?

21   A.   I'm not sure whether it's on that building as

22   far as the direction of the camera, but it would

23   catch the area.

24   Q.   It's coming from the direction of the

25   building that the conference room is in, correct?

64

1    A.   Yes.

2    Q.   And it kind of -- can the camera see the

3    entire sidewalk?

4    A.   Yes.

5    Q.   Are there any other video cameras that cover

6    that sidewalk other than that one?

7    A.   I'm not sure.

8    Q.   And, you know, in your life you've seen

9    people walk, right?

10   A.   Yes.

11   Q.   I know it's a stupid question.  But in your

12   life, you've seen two people walking, right?

13   A.   Yes.

14   Q.   And one thing that happens when they walk is

15   -- and I'm just going to stand here -- is they

16   sometimes swing their hands front to back like

17   this as they're walking?

18   A.   Yes.

19   Q.   And so if you have two individuals and their

20   hands are swinging kind of front to back, one

21   person's hand could be behind another's, but they

22   wouldn't actually be touching, but you wouldn't

23   necessarily be able to tell that from a video; is

24   that fair?

25   A.   No, it's not fair.

65

1  Q.  Why?

2  A.  Based on the video you can see that.

3  Q.  Did you watch the video?

4  A.  Yes.  Yes, I watched the video.

5  Q.  And you're saying that you can see it on the

6  video?

7  A.  Yes.

8  Q.  Can you see an item in their hands in the

9  video?

10  A.  You can't see the item.

11  Q.  Okay.  In the video, is the resolution good

12  enough that you can see their eyes?

13  A.  Yes.

14  Q.  Okay.  Now, in terms of -- in terms of the

15  room that she was initially in where the Adani

16  scanner is, is that just -- does that building

17  contain the whole -- is it just one room; does it

18  have any other rooms in it?

19  A.  Yes.  It has a bathroom, and then it has a

20  utility closet.

21  Q.  And does that building have video cameras in

22  it?

23  A.  Yes.

24  Q.  And when Ms. Fletcher was in there, before

25  she walked down this sidewalk, did she go

1   anywhere else before she went down the sidewalk

2   with Releford and Captain Kelly?

3   A.   I don't recall seeing her go anywhere else.

4   Q.   And you didn't see her go into the bathroom

5   or the utility closet, did you?

6   A.   No.

7   Q.   And that's the sort of thing you would --

8   like if you have this situation, and Ms. Fletcher

9   had gone into the bathroom where things could be

10  flushed, for instance, that would raise some real

11  questions and flags, wouldn't it, right?

12  A.   Yes.

13  Q.   So if that had happened, you would have

14  noticed it, correct?

15  A.   Yes.

16  Q.   And then not only was there cameras in that

17  room that she was in, but there were always

18  people in that room she was in as well, correct?

19  A.   Yes.

20  Q.   And nobody ever saw her reach into her pants

21  or pull contraband out or anything like that

22  while she was in that room, did they?

23  A.   No one stated they did.

24  Q.   And that doesn't appear anywhere on the video

25  that y'all would have watched while she was in

67

1    the room; is that correct?

2    A.   I would have to go back and look at that

3    video again.

4    Q.   Did you look at the video at the time when

5    you were doing this investigation?

6    A.   Yes, I looked at it.

7    Q.   And if you had noted that it appeared that

8    she was reaching into her pants or something like

9    that while she was in that room, that's the sort

10   of thing you would have noted, write down and put

11   in the investigation, right?

12   A.   Yes.

13   Q.   And we would have photos like we have of

14   Exhibit 9 here, correct?

15   A.   Correct.

16   Q.   And so then -- while she's in that room, if

17   you or the investigators had seen anything that

18   appeared to be a pass while she was in the Adani

19   scanner room, y'all would have noted that and

20   kept photos, video, that sort of thing, of that,

21   correct?

22   A.   Correct.

23   Q.   But y'all didn't see anything like that,

24   right?

25   A.   No.

68

1    Q.   Okay.  On the walk -- once she goes out that

2    room, does she -- out the Adani scanner room,

3    does she go directly onto this sidewalk that's in

4    Exhibit 9?

5    A.   No.  She walks out the entrance building

6    area, and there's a gate when she walks outside

7    the door that has to be opened, and then there's

8    another gate she has to walk through, and then

9    she walks onto the sidewalk.

10   Q.   Okay.  And does the video that's got the

11   pictures in Exhibit 9, can it see them at that

12   gate area that you were talking about before they

13   hit the sidewalk?

14   A.   Yes.

15   Q.   And so the video camera that's coming from

16   the direction of the conference room building

17   that some of the stills are in Exhibit 9 there,

18   that would see -- be able to see everything that

19   she does from the moment she walks out the Adani

20   scanner building; is that correct?

21   A.   I'm not sure how many cameras we actually had

22   on the -- in that area.  I know we had that one

23   on the building, but I don't know how many

24   cameras was actually positioned there at the

25   entrance building that would actually catch --

69

1   Q.   I thought you were saying that the camera

2   coming from the conference room building --

3   A.   Uh-huh.

4   Q.   -- could see people coming out of the

5   entrance building?

6   A.   Yes.

7   Q.   Okay.  And is there any point where -- is

8   there anything that would obscure the view

9   between the camera and the entrance building

10  where at some point Ms. Fletcher would have been

11  out of sight or anything like that?

12  A.   No.

13  Q.   And did y'all -- if y'all had seen a point

14  where Ms. Fletcher had walked -- if there was a

15  point where Ms. Fletcher had walked -- where

16  Ms. -- from the point that Ms. Fletcher had

17  walked out of the building, went through the kind

18  of gate area and then got on the sidewalk, if at

19  any point during that y'all had seen Ms.

20  Fletcher appear to reach down into her pants and

21  pull an item out, if she was rooting around in

22  her pants or something like that, y'all would

23  have put that video -- that portion of the video

24  into this investigation as well, correct?

25  A.   Correct.

70

1  Q.  But you didn't do that, because y'all didn't

2  see anything like that, did you?  Y'all didn't

3  see that at any point, did you?

4  A.  Coming out the building?

5  Q.  Yes.

6  A.  Is that what you're saying?

7  Q.  Yeah.  From the moment she went out the door

8  of the entrance building into that gate area you

9  were talking about, throughout the time that

10  she -- to the point where, you know, we have the

11  photos that are in Exhibit 9, anytime during that

12  time y'all didn't see her appear to be rooting

13  around in her pants or anything like that, did

14  you?

15  A.  No.

16  Q.  And so if you'll flip over to the Adani

17  scanner images that -- one of the better ones

18  maybe where it's kind of a little triangle light.

19  You circled something.  I think you circled it on

20  one of those pages?

21  A.  Yes.

22  Q.  And just to make sure I understand, is that

23  what you're talking about right there?

24  A.  Yes.

25         MR. GILLHAM:  John -- or Jim, do you

71

1    mind if I circle just right around --

2                   MR. ROBERTSON:   Why don't you let

3    her do it.   That way we can --

4    Q.   Will you circle around that for me, and

5    then -- Page 0182 is the bates number down at the

6    bottom.   All right.   Now, that is a triangular

7    object, correct; is that what it looks like?

8    Well, I mean, the way it looks kind of flat looks

9    kind of triangular?

10   A.   It looks round to me.

11   Q.   Round?

12   A.   Yes.

13   Q.   But in any event, it doesn't look like a bank

14   card, does it?

15   A.   No.

16   Q.   And one thing that's of interest to me, is

17   that on those Adani scanner images, there is no

18   point where we see something that does look like

19   a bank card; is that correct?

20   A.   I would have to look at the color ones to

21   determine that.

22   Q.   And in fairness, on the day that Ms. Fletcher

23   came through, there was -- I can't remember which

24   sergeant was on duty -- but there was somebody on

25   duty at the Adani scanner?

72

1    A.   Yes.

2    Q.   And they did not see anything that looked

3    like a credit card, did they?

4                   MR. ROBERTSON:   Object to form,

5    speculation.

6    A.   Never questioned that person about a credit

7    card.

8    Q.   Well, I mean, if they saw something that

9    looked like a credit card, they're supposed to

10   tell you about it, right?

11   A.   Yes.

12   Q.   Because that would be something that's not

13   supposed to come in, right?

14   A.   Yes.

15   Q.   And so if they had seen something like that,

16   you would expect them to tell you, tell Captain

17   Kelly about it, correct?

18   A.   Yes.

19   Q.   And given that they're already identifying

20   some potential contraband there on Page 182,

21   there wouldn't really be any reason for them to

22   not tell you guys if they saw a credit card or a

23   bank card, right?

24   A.   Correct.

25   Q.   Now, when you came in, you had not been on

73

1    the facility at the point that you received the

2    call from Captain Kelly, correct?

3    A.   Correct.

4    Q.   So you had to come in through that entrance

5    building; is that right?

6    A.   Correct.

7    Q.   And when you came in through that entrance

8    building, I think you did look at the Adani

9    scanner images; is that right?

10   A.   Yes.

11   Q.   And you did not see anything that looked like

12   a credit card on there, did you?

13   A.   At that point I wasn't looking for a credit

14   card.

15   Q.   Okay.  But the images you were looking at

16   would have been those images, but maybe color and

17   better, a little more sharper, or something like

18   that?

19   A.   Correct.  When I got the call, they normally

20   tell you exactly what area it's in and what it

21   looks like.

22   Q.   Okay.  And so now, a credit -- a bank card or

23   a credit card, something like that, would that be

24   something that would be picked up by the Adani

25   scanner?

1    A.   It should pick it up.

2    Q.   If it's in somebody's pant's pocket, either

3    their kind of hip pockets in back or their front

4    pockets, those -- the pictures of her body here

5    that we're seeing cover, looks like from maybe

6    right next to her shoulders down to right above

7    her knees, correct?

8    A.   Yes.

9    Q.   And so if we had hip pockets or pants pockets

10   with a bank card in it, that would be about

11   midway in that picture, right?

12   A.   No, not midway.  When you say midway, are you

13   talking about up in the -- this would be the

14   pocket area here.

15   Q.   Okay.  So the pocket area here would be --

16   there's -- and I was going to ask you about this.

17   There's a little square area with dots.  What is

18   that?

19   A.   Well, it's more just pinpointing some things

20   to draw your attention.

21   Q.   Okay.  And so what you're saying, is that the

22   pants pockets -- and I've never seen one of these

23   before, so I wouldn't -- but the pants pockets,

24   the top of them would be about where that square

25   dotted area is?

75

1    A.   Yes.

2    Q.   And so if there were a credit card, it should

3    be picked up somewhere in that same vicinity

4    that -- you know, about the same level of her

5    body is as where the white rounded thing that

6    you're saying is there, it's about that same

7    area, right?

8              MR. ROBERTSON:   Object to form.   I

9    didn't follow you.

10   A.   Ask that question again.

11   Q.   If there was something in her -- I mean, is

12   this what you would have -- is this the image

13   that you would have been looking at on the Adani

14   screen?

15   A.   Yes.   This is a zipper here.

16   Q.   Okay.   And so -- and when you say the zipper,

17   there's a line --

18   A.   Yes.

19   Q.     -- that goes about from her navel straight

20   down to right next to the rounded white object

21   you circled?

22   A.   Yes.

23   Q.   Okay.   And it's a dark line.   Okay.   So

24   anyway, when you were looking at the Adani screen

25   to look at this white object that you circled,

76

 1   would you have been seeing practically the same

 2   size of her body as this?

 3   A.   Yes.   It shows her head all the way down to

 4   her feet.

 5   Q.   And so when you were looking at the objects,

 6   if you saw a rectangular object the size of her

 7   credit card, and if it was -- I mean, if it was

 8   in her pockets, it should appear somewhere in

 9   here, right, if it was to be seen on the screen?

10   A.   Yes.   If I had been actually looking for

11   that.

12   Q.   Do the -- and I don't -- well, you don't see

13   it now, do you?

14   A.   No, I don't see -- no, I don't see it on this

15   black and white.

16   Q.   Okay.   One thing is I'm not familiar with

17   your uniforms, as you know, by correcting me

18   about where the pockets are.   Do the uniforms

19   have a shirt pocket or anything like that?

20   A.   Yes.

21   Q.   Okay.   And so if she had a bank card in her

22   shirt pocket, where is the shirt pocket; where

23   would that be?   Is that about right --

24   A.   It's going to be up a little higher.

25   Q.   Like here you think?

77

1  A.  Well, yeah, probably up in that area.

2  Q.  Can you draw where the shirt pocket would be,

3  if you don't mind?  I tell you what, it might

4  also be good for you to draw where the pants

5  pockets would be if you could.

6  A.  The black and white is a little harder to

7  tell.  This would be the breast area up here.

8  I'm just going to say it's probably going to be a

9  little bit higher here, because this is the

10  breast area here, so I would say up in here

11  somewhere.

12  Q.  Okay.  And you drew a little box toward the

13  top of Page 182 there, just for future reference.

14  You don't have to draw the pants.  I think I

15  located them when I said that the top was near

16  that little dotted box, so we're good there.

17      All right.  Now, and the Adani scanner -- I

18  mean, that credit card should have shown up on

19  the Adani scanner if it was anywhere on her body;

20  is that right?

21  A.  It should have.

22  Q.  And so if she was carrying a credit card, and

23  we don't see a credit card anywhere on these

24  Adani body scan images, then it looks like the

25  Adani scanner may have missed it?

78

1    A.  I wouldn't say that, because --

2    Q.  What would you say?  How else would it get

3    through there?

4    A.  I would say based on that's what she said

5    what it was.  I don't know whether that's where

6    it was or not, because if she brought something

7    in, it might not have been in her pocket, but

8    that's what she said.  She said that's where the

9    card was in her pocket.  I don't know whether it

10   was or not.

11   Q.  So where else would it be?

12   A.  They bring in food items, they bring in other

13   things.  I don't know whether she had it in her

14   bag.  She had some other things with her when she

15   came to work.  I don't know whether it was food

16   items, but I do remember something sitting on

17   the -- in the conference room sitting on the

18   table, so it wasn't -- I don't know whether it

19   was actually in her back pocket or where.  That's

20   what she told me.

21   Q.  What do they get to bring in in terms of like

22   a bag?

23   A.  They can bring in a little food container

24   that they can have sandwiches in.  They can bring

25   in plastic bags.  So they can bring in other --

79

1    Q.   Okay.   And that, does that just go through

2    without being inspected?   Surely not.   Surely it

3    gets --

4    A.   Yes.   It's supposed to be inspected, yes,

5    sir.

6    Q.   How do they inspect it?   Is it like a visual

7    and they go through it; does it run through an

8    x-ray machine?   What happens there?

9    A.   It goes through an x-ray machine, and then

10   they inspect also, so you have staff there going

11   through the things that they bring in, sandwiches

12   as well.

13   Q.   So if it came through in some sort of box or

14   container or bag, or whatever it was that she was

15   carrying that day, an inspection should have been

16   done by the guard?

17   A.   Yes.

18   Q.   But no credit card was found in that material

19   or we would know about it, right?

20   A.   Not that I'm aware of.

21   Q.   Well, I mean, if a credit card or a bank card

22   was found in that material, then it would be

23   reported and put into this investigation,

24   correct?

25   A.   Yes.   It's supposed to be reported.

80

1    Q.   And if it was seen on some sort of x-ray

2    machine, same thing, right, should have been

3    reported?

4    A.   Yes.

5    Q.   But it was not?

6    A.   No.

7    Q.   Okay.  So anyway, have there been instances

8    where -- Ms. Fletcher was telling me about

9    apparently there was a day where everybody came

10   through was shown to have something in their

11   right left breast kind of pocket area, and it was

12   just an error that was occurring with everybody

13   that came through on that day.  Do you recall

14   that happening?

15   A.   No.

16   Q.   When you were questioned by Mr. Robertson

17   about how often it makes incorrect kind of

18   findings, you know, has a false image that shows

19   something and there's not something there, and

20   you said it wasn't once a day, and then he got to

21   once a week and you kind of hesitated.  Is it

22   close enough to once a week that you kind of had

23   to think about your answer there?

24   A.   No.  When he asked me the question when

25   you're talking about a false, it all depends on

81

1   the operator.  The operator might see something

2   that is questionable to her or him, so it's not

3   really a false positive.  It's more of something

4   that's questionable.

5   Q.  And so that you want to look?

6   A.  Correct.

7   Q.  And how often do you have situations where

8   the operator sees something, makes them like want

9   to look and make sure that there's not some

10  contraband there, and it turns out that there's

11  nothing where they believe that image -- you

12  know, that it was a little bit suspect, how often

13  does that happen?  Is that once a week?

14  A.  I would say once a week.

15  Q.  Do you think it happens as much as once a

16  day?

17  A.  It might happen once a day.

18  Q.  Thank you.

19  A.  It's based on the operator.

20  Q.  That's fair enough.  So anyway, I want to go

21  to the issue of -- I assume you have a cell

22  phone, right?

23  A.  Yes.

24  Q.  And do you have a lot of people's phone

25  numbers and contact information in that cell

82

1   phone, like a contacts list?

2   A.   My State cell phone, the people that I -- I

3   bring in my State cell phone, and that's for

4   State employees.

5   Q.   Right.   So you have like a list of employees

6   and things like that in your State cell phone?

7   A.   Not my employees.   My supervisors.

8   Q.   Oh, your supervisors?

9   A.   Yes.

10  Q.   What about your personal cell phone?   And I

11  don't want to know what's in it specifically, but

12  in your personal cell phone, do you have like a

13  lot of contacts of people and things like that?

14  A.   Yes.

15  Q.   And can you tell me with certainty the

16  identity of every single person that is in your

17  contacts in your cell phone?

18  A.   If I went through there, yeah, I could tell

19  you who they are.

20  Q.   Without looking at it, though, you wouldn't

21  remember every single one, correct?

22  A.   No.

23  Q.   I mean, you would know some.   Like you'd know

24  for sure that you got your sister or, you know,

25  people like that, close relatives, your best

83

1   friend, but then there would be other people that

2   might or might not be in there that you wouldn't

3   know, right?

4   A.   Relatives, too, yes.

5   Q.   And of course if -- you're familiar with if

6   somebody calls you, you'll have like -- if you

7   call them or somebody calls you, their number

8   will come up in like a list of calls you've made,

9   right?

10  A.   Yes.

11  Q.   And if you choose to, you can then put that

12  into your contacts; like you can hit the little

13  thing that puts it into your contacts, and you

14  can type in that person's name, right?

15  A.   Yes.

16  Q.   So there could be situations where, if for

17  some reason my client had occasion to call

18  Captain Kelly, that she could store that

19  information in her phone as a contact, right?

20  A.   Yes.

21  Q.   And Captain Kelly, if she chose to, would

22  also be able to put it into her phone, but she

23  doesn't have to, right?

24  A.   No.

25  Q.   And so just because Ms. Fletcher has Captain

84

1   Kelly's contact information in her phone and has

2   called her before, doesn't mean that Captain

3   Kelly would have put it into her contacts and

4   kept that information; is that fair?

5   A.   Yes.

6   Q.   In addition, are you familiar with being able

7   to -- like you can take your cell phone and share

8   a contact with a person?

9   A.   No.  I don't know how to do that.

10   Q.   Okay.  Do you know that it can be done?

11   A.   Yeah, I know you can do it.

12   Q.   And so if somebody shared Kelly's contact

13   information with Corporal Fletcher, Captain Kelly

14   might not even know about it, right?

15   A.   Correct.

16   Q.   I want you to think back to 2019.  Can you

17   tell me every time that you had like a family

18   meeting or you may have met up with your family,

19   your friends, your relatives, went to Christmas

20   parties, things like that?

21   A.   No.

22   Q.   And you wouldn't expect that most people

23   could do that, right?

24   A.   Well, some can.

25   Q.   Well, in 2020 it would be easier, because you

85

1    hardly get to see anybody.  But in 2019, before

2    COVID, it would be -- a lot of people wouldn't be

3    able to tell you every single time they went to a

4    little potluck or a little gathering or that sort

5    of thing, right?

6    A.   Correct.

7    Q.   And so Captain Kelly has been with ADC for

8    several years -- or had been with ADC for several

9    years, correct?

10   A.   Yes.

11   Q.   Corporal Fletcher had been with ADC for

12   several years, correct?

13   A.   Yes.

14   Q.   And so at some point they crossed over and

15   went to the same potluck or party or Tupperware

16   party or something like that, it wouldn't be too

17   shocking if one remembered that and the other

18   didn't, would it?

19              MR. ROBERTSON:   Object to form,

20   speculation.

21   A.   Repeat the question.

22   Q.   Well, I mean, if you've got a situation

23   where --

24              MR. ROBERTSON:   My apologies.   Can

25   we take a break?

1          MR. GILLHAM:  Yeah.

2               (A break was taken.)

3               (Back on the record.)

4    Q.  (By Mr. Gillham)  Back on the record.  So

5    anyway, you know what we were talking about is

6    kind of, you know, little potlucks, gatherings,

7    parties, things like that.  If you -- it wouldn't

8    be too surprising to you if a person is asked to

9    think back about a year or two about all the

10   potlucks and gatherings and things like that that

11   they've been to, but they might not remember all

12   of them, correct?

13   A.  Correct.

14   Q.  Wouldn't be too surprising if they did not

15   remember those gatherings and how they came about

16   in perfect detail; is that correct?

17   A.  Correct.

18   Q.  It wouldn't be surprising if they did not

19   recall everybody that was there at that

20   gathering; is that fair?

21   A.  Yes.

22   Q.  It wouldn't be surprising if they could not

23   recall correctly everything that happened at

24   those gatherings; is that fair?

25   A.  Yes.

87

1    Q.   And so one thing about it, is that if we're

2    looking back at this gathering, the testimony --

3    there was some statements about a gathering or a

4    potluck and chopping vegetables, things like

5    that.  First of all, Ms. Fletcher is the one who

6    told you about that, right?

7    A.   I think so.

8    Q.   And you didn't find that she was being

9    deceptive about that, correct?

10   A.   Rephrase that.

11   Q.   You didn't find that she was being -- I mean,

12   she's the one who told you about it, right?

13   A.   Yeah.  She's the one that told me about it

14   after I asked about it.

15   Q.   Right.  But that's what happens in

16   interviews --

17   A.   Uh-huh.

18   Q.   -- is the interviewers ask questions, and

19   the people that are being asked questions answer

20   them, right?

21   A.   Correct.

22   Q.   And I mean, it's not too shocking if Fletcher

23   and Kelly have different memories about how

24   exactly a potluck went, is it?

25   A.   No.

1   Q.   And there could be an innocent explanation

2   for why Fletcher says that she and Captain Kelly

3   have their numbers, and Captain Kelly says, no, I

4   don't have that number; it's just that one kept

5   the information and one didn't; is that possible?

6   A.   Yes.

7   Q.   And you can read and sign your deposition.

8   We don't -- I don't care if you do.   Jim probably

9   doesn't either --

10          MR. ROBERTSON:   I do not.

11   Q.   -- but you have the right to do it if you

12   want.   It's basically where you go through and

13   make sure that it's typed up correctly, you know,

14   and that your answers are reflected as --

15          MR. ROBERTSON:   I've got a couple

16   more questions if you --

17          MR. GILLHAM:   Oh, yeah.

18   Q.   And basically I'm done, but he's going to

19   have a few follow-up.

20              FURTHER EXAMINATION

21   BY MR. ROBERTSON:

22   Q.   I forgot to ask you this, and I meant to

23   earlier.   Did Captain Kelly appeal her

24   termination decision?

25   A.   Captains don't have any appeal rights.

89

1  Q.  So she could not?

2  A.  She could not, but she did file an EEOC.

3  Q.  Oh, she did?

4  A.  Yes.

5  Q.  And what was the result of that?

6  A.  I don't know what the result of that was.

7  All I know is that she did file one.

8  Q.  Okay.  Part of Ms. Fletcher's testimony the

9  other day, she described how she basically had

10  some sergeant responsibilities, and that she had

11  taken the sergeant's exam sometime relatively

12  close.  In fact, she was waiting on results I

13  guess as to whether she was going to be promoted

14  or not, so the exam had to have occurred sometime

15  relatively close to the events that happened on

16  April 30, 2019.  Do you remember any of that?

17  A.  I do remember her applying.  I don't remember

18  the exact dates, though, but I do remember she

19  did apply.

20  Q.  And I'll represent to you, that when we were

21  discussing that two days ago, I asked Ms.

22  Fletcher how Captain Kelly gave her the

23  information about the sergeant's exam, and she

24  testified under oath that it was texted to her.

25  Assume for me that that's true testimony, if that

90

1   is the case, that Kelly texted the sergeant's

2   exam information to Ms. Fletcher, would that

3   indicate to you that Ms. Kelly was lying when she

4   told you that she did not have communication via

5   text with Ms. Fletcher?

6                   MR. GILLHAM:  Object to form.

7   A.  Yes.

8   Q.  I have nothing further.  Thank you for your

9   time.

10                  FURTHER EXAMINATION

11  BY MR. GILLHAM:

12  Q.  Do you know when that sergeant's exam would

13  have been, what year, anything like that?

14  A.  Would have been the same year that this

15  incident happened.

16  Q.  All right.  Just because you have a phone

17  call or text with somebody doesn't mean that you

18  keep their information, does it?

19  A.  Ask that question again.

20  Q.  Well, just because you -- you know, I have

21  phone calls with people all the time that aren't

22  in my contacts list and don't make it into my

23  contacts list, but just because I have a phone

24  call with them or a text with them doesn't mean

25  that I kept that information in my phone?

91

1  A.  Correct.

2  Q.  All right.  I don't have any other questions.

3              MR. ROBERTSON:  Nothing further.

4  Hand me that handwritten Exhibit 9 picture back.

5  It's a copy of that one, but it's mine.

6              MADAM COURT REPORTER:  Is this just

7  extra?

8              MR. BURNS:  We didn't mark the

9  SEAGAP --

10              MR. GILLHAM:  Do you want to make

11  that an exhibit?

12              MR. ROBERTSON:  If you want to.

13              MR. GILLHAM:  Let's go ahead and

14  make that an exhibit.

15              MADAM COURT REPORTER:  Then that's

16  Exhibit 10.

17              (Deposition Exhibit No. 10 was

18  marked.)

19              (Deposition proceedings

20              concluded at 3:09 p.m.)

21

22

23

24

25

92

1                         CERTIFICATE

2    STATE OF ARKANSAS   )
                         )    ss:
3    COUNTY OF PULASKI   )

4         I, KELLY HILL, Certified Court Reporter, a
     notary public in and for the aforesaid county and
5    state, do hereby certify that the witness,
     AUNDREA CULCLAGER, was duly sworn by me prior to
6    the taking of testimony as to the truth of the
     matters attested to and contained therein; that
7    the testimony of said witness was taken by me
     stenographically, and was thereafter reduced to
8    typewritten form by me or under my direction and
     supervision; that the foregoing transcript is a
9    true and accurate record of the testimony given
     to the best of my understanding and ability.
10        I FURTHER CERTIFY that I am neither counsel
     for, related to, nor employed by any of the
11   parties to the action in which this proceeding
     was taken; and, further, that I am not a relative
12   or employee of any attorney or counsel employed
     by the parties hereto, nor financially
13   interested, or otherwise, in the outcome of this
     action; and that I have no contract with the
14   parties, attorneys, or persons with an interest
     in the action that affects or has a substantial
15   tendency to affect impartiality, that requires me
     to relinquish control of an original deposition
16   transcript or copies of the transcript before it
     is certified and delivered to the custodial
17   attorney, or that requires me to provide any
     service not made available to all parties to the
18   action.

19

20

21                        Kelly D. Hill
                          Certified Court Reporter
22                        State of Arkansas
                          Certification #515
23

24

25

                         KELLY D. HILL
                   CERTIFIED COURT REPORTER
                        (501) 416-9329